IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

AMY CARPENTER,

      Plaintiff,

v.

REGIS CORP., INC.,

      Defendant.

Civil Action No.:
3:07-CV-00501-WKW-CSC

## DEFENDANT'S BRIEF IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

Timothy A. Palmer
Brian R. Bostick
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART
One Federal Place, Suite 1000
1819 5th Avenue North
Birmingham, Alabama 35203
(205) 328-1900 Telephone
(205) 328-6000 Facsimile

Attorneys for Defendant
Regis Corporation

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   STATEMENT OF UNDISPUTED FACTS ........................................................2

      A.    Plaintiff's Employment With Regis.........................................................2

      B.    Plaintiff Is Passed Over for Promotion ..................................................3

      C.    Plaintiff's Promotion to the Position of Salon Manager ........................4

      D.    Plaintiff Is Demoted to A Stylist Position ..............................................5

      E.    Plaintiff Begins Work at The Tiger Town Store And Has Two Customer

            Complaints on Her First Day ..................................................................7

            1.    A Customer Complains that Carpenter And Others Are Engaged In A

                  Sexual Conversation ....................................................................7

            2.    A Customer Complains that Carpenter Refuses to Perform Hair Services

                  for Her............................................................................................8

      F.    Plaintiff Makes Accusations Against Her Supervisor Delise Burdette ....................9

      G.    Toni Alvarez Conducts an Investigation Into Plaintiff's Allegations.........................10

      H.    Alzarez's Investigation Reveals Several Instances of Misconduct By Plaintiff........12

      I.    Plaintiff Is Discharged from Employment With Regis...........................16

III.  ARGUMENT....................................................................................................17

      A.   The Evidentiary Framework for Plaintiff's Claims ........................................18

      B.   Plaintiff's Claim that She Was Denied a Promotion on the Basis of her Race Must

           Fail ..............................................................................................................19

      C.   Plaintiff's Claim of Disparate Training Must Fail.........................................21

      D.   Plaintiff's Demotion Claim Must Fail ............................................................22

E.  Plaintiff's Racial Discharge Claim Must Fail ................................................................23

    1.  Plaintiff Cannot Prove a Prima Facie Case for Her Racial Discharge Claim ................................................................................................................23

    2.  Plaintiff Cannot Dispute the Legitimate Non-Discriminatory Reasons for Her Discharge ................................................................................................25

F.  Plaintiff's Retaliatory Discharge Claim Must Fail .........................................................27

    1.  Plaintiff Cannot Prove a Prima Facie Case for Her Retaliation Claim ..........27

        a.  Plaintiff Did Not Engage In Protected Activity .......................................27

        b.  Plaintiff Cannot Prove a Causal Connection Between Her Termination and Her Supposed Protected Expression ..................................................30

    2.  Plaintiff Cannot Dispute the Legitimate, Non-Retaliatory Reasons for Her Discharge ................................................................................................31

IV.  CONCLUSION ........................................................................................................................31

# I.    INTRODUCTION

Plaintiff, Amy Carpenter, is a former employee of the Defendant, Regis Corporation ("Regis"). Plaintiff contends that she was denied a promotion and training, demoted and later terminated because of her race (African-American) in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. She also asserts that her termination was retaliatory in violation of Title VII. Carpenter cannot prevail on any of her claims.

Carpenter cannot dispute that she did not receive the promotion to Salon Manager in early July of 2006 because her Area Supervisor, Delise Burdette, determined that the other candidate (Kathryn Kilgore) had better customer service skills as reflected by the fact that Carpenter had received customer complaints that the successful candidate had not. Only one week after being passed over for supposedly discriminatory reasons, Burdette then awarded Carpenter the Salon Manager position. Carpenter complains that she did not receive the same one-on-one training received by Kilgore in her initial week. This is not a cognizable claim under Title VII because plaintiff has not shown that any supposed disparate training affected a term or condition of her employment. Nonetheless, plaintiff admitted that she was fully apprised as to what the expectations were for her in the Salon Manager position. Unfortunately, Carpenter performed poorly in the position and was thus demoted in early August of 2006.

When Carpenter was demoted, she was transferred to another store to work as a stylist, which is consistent with company policy. Carpenter received two customer complaints on her first day in the store. The next day, she complained to corporate headquarters that Burdette was treating her unfairly and that she felt the customer complaints were unwarranted. Regional Manager Toni Alvarez investigated the situation. She met with Carpenter, Burdette and several of Carpenter's co-workers. Alvarez received reports from Carpenter's co-workers that caused Alvarez to conclude in good faith that Carpenter had lied during the investigation and made false

1

allegations against Burdette, had attempted to get a co-worker to lie for her, had manipulated and falsely represented the nature of a reference letter written by a co-worker, and had overcharged her customers in violation of company policy. Based on these findings, Alvarez discharged Carpenter.

Carpenter asserts that her termination was both discriminatory and retaliatory. She cannot establish a prima facie case of discrimination however, because she cannot identify any person outside her protected class who committed similar offenses but was not discharged. She likewise cannot prove a prima facie case of retaliation because her vague mention of making a telephone call to the EEOC does not constitute protected expression, and the intervening discoveries that Alvarez made during her investigation cut off any causal connection between this initial conversation and Carpenter's termination. Even if Plaintiff could prove prima facie cases for her termination claims, she cannot dispute the reasons that Regis has offered for her termination. Therefore, Regis is entitled to summary judgment on all claims.

## II.     STATEMENT OF UNDISPUTED FACTS

### A.     Plaintiff's Employment With Regis

Plaintiff, Amy Carpenter, is an African-American former stylist and Salon Manager for Regis. (Carpenter Depo., at 27:18-28:15, 46:12-21). In November of 2005, Carpenter was hired as a stylist at the Regis salon in the Bruno's shopping mall in Auburn, Alabama under Salon Manager Amy Grace (Caucasian). (Carpenter Depo., at 26:18-28:20, 35:15-20, 67:5-6, Ex. 2). Carpenter was trained on the company's anti-discrimination and anti-harassment policies when hired and acknowledged receiving a handbook which contained both policies. (Carpenter Depo., at 31:1-32:12, Ex. 3-4).

Salon Manager Amy Grace reported to Area Supervisor Delise Burdette (Caucasian), who assumed responsibility for the stores at issue in this lawsuit on June 1, 2006. (Burdette Decl.

¶¶ 2-3). Burdette reported to Regional Manager Toni Alvarez (Caucasian). (Alvarez Decl., ¶2). In this lawsuit, Carpenter directs her contentions of discriminatory treatment at Delise Burdette. Carpenter is not aware of any racist comments being made at Regis, and does not contend that she has any direct evidence of discrimination. (Carpenter Depo., at 86:3-12).

**B.    Plaintiff Is Passed Over for Promotion**

In late June/early July of 2006, the Salon Manager at the Bruno's salon, Amy Grace, was moved to the Salon Manager position at the store in the Tiger Town mall in Opelika, Alabama, which created an opening in the Salon Manager position at the Bruno's store. (Carpenter Depo., at 27:18-28:8) (Burdette Decl., ¶ 3). Carpenter expressed interest in being promoted to Amy Grace, but not to Delise Burdette. (Carpenter Depo., at 36:18-37:14).

On July 7, 2006, Delise Burdette awarded the Salon Manager position to a Caucasian employee named Katherine "Katie" Kilgore, who worked as a stylist in the College Street store in Auburn, Alabama. (Carpenter Depo., at 37:14-22, 43:8-14, 155:20-156:2, Ex. 4)(Burdette Decl., ¶ 3). Burdette concluded that Kilgore was the best qualified candidate because she had approximately 15 months of experience with the company, working as a stylist, and had demonstrated successful customer service skills during that time. (Burdette Decl., ¶ 5). Kilgore had previously worked for Regis from approximately October of 2004 until August of 2005 and was subsequently rehired in February of 2006. (Burdette Decl., ¶ 5).

Burdette had previously worked as the Salon Manager in the College Street store and observed that Kilgore had good relationships with her customers. (Burdette Decl., ¶ 5). At the time Burdette made this promotion decision, Carpenter had only been with Regis Corporation for approximately seven months. (Burdette Decl., ¶ 5). During the time that Carpenter worked with the company, she had failed to demonstrate customer service skills that would match those of

3

Kilgore. (Burdette Decl., ¶ 5. Indeed, in the short time that Burdette had held responsibility over the relevant stores, she had received customer complaints about services provided by Carpenter, but had not had any such complaints against Kilgore. (Burdette Decl. ¶ 5).

**C.    Plaintiff's Promotion to the Position of Salon Manager**

Kilgore stepped down from the Salon Manager position and returned to her stylist job in Auburn after only one week because she did not like working with Carpenter. (Carpenter Depo., at 43:8-44:8, 103:6-13). Burdette offered Carpenter the Salon Manager position after Kilgore stepped down. (Carpenter Depo., at 46:12-21). Carpenter was promoted to the salon manager position on or about July 11, 2006. (Carpenter Depo., at 48:8-16, Ex. 7). Burdette expressed her concern that Carpenter would need to improve her performance and Carpenter expressed a willingness to do so. (Burdette Decl., ¶ 7). Burdette told Carpenter that she would have a 90-day probationary period and that if she did not prove herself in the position then she would be returned to a stylist position. (Burdette Decl., ¶ 7)(Carpenter Depo., at 46:22-47:13, Ex. 14).

Carpenter says that Burdette was in the store approximately 3 or 4 days during the one week that Kilgore worked as the Salon Manager. (Carpenter Depo., at 203:23-204:7). Carpenter complains that Burdette did not likewise provide her with three to four consecutive days of training. (Carpenter Depo., at 204:4-7). Carpenter admits that Burdette provided her with initial training, however. (Carpenter Depo., at 33:8-35:14, Ex. 6). When Carpenter was promoted to Salon Manager, Burdette provided her with several reading materials to help with the training process. (Carpenter Depo., at 34:1-20). The paperwork provided guidelines on the proper way to manage the store and a manager's duties. (Carpenter Depo., at 34:9-13). The materials gave examples of how to properly clean and handle the store, how to prepare the store for opening, how to keep the store organized, how to properly make deposits, as well as the expectations of a

4

manager. (Carpenter Depo., at 34:21-35:14). Burdette also provided Carpenter with a list of her expectations of a manager. (Carpenter Depo., at 33:8-20, Ex. 6). Carpenter admits that the materials provided a good explanation of what was expected of her as a manager. (Carpenter Depo., at 35:12-14). Burdette was also in the salon at least two times a week throughout the time that Carpenter worked as a Salon Manager. (Burdette Decl., ¶ 8).

**D.    Plaintiff Is Demoted to A Stylist Position**

After the promotion, Carpenter demonstrated significant difficulty in meeting the company's expectations. (Burdette Decl., ¶ 9). For example, she frequently called Salon Manager Amy Grace instead of Burdette to ask questions regarding how to perform her job. (Burdette Decl., ¶ 9). In addition, Burdette discovered that Carpenter had violated the company's time clock and scheduling policies by bringing her children to work; leaving the salon during her shifts (while remaining on the clock) to go home to care for her children; scheduling stylists for fewer evenings or weekends than required; and frequenting the salon without authorization when the business was closed. (Burdette Decl., ¶ 9).

There were several times that Burdette visited the store when Carpenter was not there and she had not clocked out. (Burdette Decl., ¶ 9). Some of the stylists were complaining that they were not being assigned an adequate number of night shifts. (Burdette Decl., ¶ 9).

Finally, during the short period Carpenter managed the salon, she received an excessive number of customer complaints which she was unable to appropriately resolve at the salon level. (Burdette Decl., ¶ 9). Burdette received several customer complaints and there were additional complaints made against Carpenter to the corporate office during the time that she was a Salon Manager. (Burdette Decl., ¶ 9, Ex. 2). On August 9, 2006, a complaint was lodged through the corporate office by a customer named Sylvie Ledbetter, who was dissatisfied with a coloring job

that Carpenter did on her daughter's hair. (Carpenter Depo., at 80:16-81:14, Ex. 8a). Carpenter acknowledges that it would be troublesome for an employee to have multiple customer complaints within such a short period of time. (Carpenter Depo., at 78:15-23).

Based on these facts, Burdette demoted Carpenter from Salon Manager to stylist on August 10, 2006. (Carpenter Depo., at 59:19-61:15, Ex. 8). Burdette told Carpenter that there had been a customer complaint about a coloring that had been performed, and that Burdette had concluded that she was not management material. (Carpenter Depo., at 61:16-20). Carpenter claims that Burdette told her that "I wasn't management material and that I was low class and I had a low class clientele and that's not what they wanted there." (Carpenter Depo., at 62:19-63:14).

When a Salon Manager is involuntarily demoted, it is Regis' practice to send the demoted employee to a new store to prevent friction between the old manager and the new one. (Burdette Decl., ¶ 10). This was explained to Carpenter by both Burdette and Regional Manager Toni Alvarez. (Carpenter Depo., at 64:2-19) (Burdette Decl., ¶ 12) (Alvarez Decl., ¶ 8). This was a legitimate concern in Carpenter's case, given that she had previously had difficulties getting along with Kilgore when she was the Salon Manager. (Carpenter Depo., at 43:8-44:8)(Burdette Decl., 10). Carpenter says she requested to remain as a stylist at the Bruno's store, but she was instead reassigned to the Tiger Town store in Opelika, Alabama. (Carpenter Depo., at 27:3-6, 61:5-15, 64:2-9). The two stores are located only two miles from each other. (Carpenter Depo., at 112:1-11).

6

Carpenter is not aware of any stylists who were involuntarily demoted and were allowed to remain a stylist in the same salon. (Carpenter Depo., at 109:10-19).[1]  Burdette demoted six Salon Managers during her time as an Area Supervisor, and all were white except for Carpenter. (Burdette Decl., ¶ 12).

**E.    Plaintiff Begins Work at The Tiger Town Store And Has Two Customer Complaints on Her First Day**

Ms. Carpenter started working at the Tiger Town salon on Tuesday, August 15, 2006. (Carpenter Depo., at 97:15-22) (Burdette Decl., ¶ 13).  Carpenter received two separate customer complaints on that day.  (Alvarez Decl. ¶ 10) (Burdette Decl., ¶¶ 13-14).

**1.    A Customer Complains that Carpenter and Others Are Engaged In A Sexual Conversation**

On August 15, 2006, a customer complained to Salon Manager Amy Grace that he had heard Carpenter and two other women (a customer named Latoya and Shannon Martin – an employee from the Bruno's store) in the store engaged in conversation of a sexual nature. (Carpenter Depo., at 120:14-123:9, 125:18-127:5).  Shannon Martin was in the store but was not working. (Carpenter Depo., at 121:12-16).  Neither LaToya nor Martin were receiving services at the time, but they were sitting in the service area with Carpenter, which is a violation of company policy. (Carpenter Depo., at 121:17-122:10)(Alvarez Decl., ¶ 7). Carpenter understood that persons who are not employed in the salon should not be in the service area unless they were receiving service. (Carpenter Depo., at 104:16-22).  Burdette had told Carpenter that Latoya should not come to the store anymore unless she was getting a service because they did not want

---

[1] Plaintiff points to Tina Cottel, a Caucasian employee, who was allowed to stay in the same salon as a stylist where she had previously worked as a Salon Manager, but she had voluntarily stepped down from her position  and there was no concern of friction between her and the new Salon Manager.  (Carpenter Depo., at 109:1-22, 214:11-14).

that type of atmosphere in the store and it was unprofessional.  (Carpenter Depo., at 104:23-105:8, Ex. 14) (Burdette Decl., ¶ 13).

Two of Carpenter's co-workers (Cindy Carlton and Carolyn Perry) reported that the three ladies were discussing "whipping wax," and that Carpenter made the statement "LaToya needed to tattoo Shannon's name on the back of her neck."  (Carpenter Depo., at 123:13-125:23, 129:8-130:5, Exs. 10, 11).  The co-workers reported that Latoya also said "You know I'm your Boo," or words to that effect.  (Burdette Decl., ¶ 7).  Carpenter says that Latoya and Martin have dated. (Carpenter Depo., at 119:2-6).  Store Manager Grace issued Carpenter a written reprimand as a result of the customer complaint, and Burdette also issued Shannon Martin a reprimand for her involvement.  (Carpenter Depo., at 137:9-139:13, Exs. 12, 13)(Burette Decl. ¶ 13).

## 2.    A Customer Complains that Carpenter Refuses to Perform Hair Services for Her

In a separate incident on August 15, 2006, a customer named Nicole Callaway called and made a complaint to the corporate office that she was scheduled for an appointment with Carpenter and received a telephone call one hour before she was to receive her service in which Carpenter stated that the salon did not have products for highly textured hair and she would not be able to perform the service.  (Carpenter Depo., at 69:16-23).  Carpenter also says that the customer wanted a relaxer and a rinse on the same day which cannot be done because it will break the hair.  (Carpenter Depo., at 72:1-14).

Carpenter says that the relaxer product that she needed to perform the service was not in stock that day.  (Carpenter Depo., at 71:16-23).  She claims that there were different products needed to perform services on African-American hair such as conditioners, moisturizers, Marcel irons, and certain relaxers. (Carpenter Depo., at 51:12-52:9).  Carpenter acknowledges that Regis

does not produce any products that are designated for use only with customers of a particular race. (Carpenter Depo., at 52:17-53:23).

Carpenter also says that she did not have her Marcel irons in the store to perform the service. (Carpenter Depo., at 72:1-21). Carpenter owned her own Marcel irons for use in the salon, but had left them at home. (Carpenter Depo., at 56:16-57:14, 74:3-75:3). Carpenter claims that Burdette told her that they did not have room for her Marcel irons at the new store. (Carpenter Depo., at 57:15-23).

Amy Grace had told Carpenter that they would obtain some of the needed products from the Bruno's store when they realized they did not have any relaxer. (Carpenter Depo., at 75:11-22). Burdette and Grace say that Burdette was at the Bruno's store, only two miles away, at the time and volunteered to bring over Marcel Irons to perform the service, but Carpenter denies this. (Burdette Decl., ¶ 16)(Alvarez Decl., ¶ 11)(Carpenter Depo., at 75:11-76:16). Carpenter says that Burdette refused to bring Marcel Irons to the store. (Carpenter Depo., at 117:1-20).

**F.    Plaintiff Makes Accusations Against Her Supervisor Delise Burdette**

On August 16, 2006, Carpenter called Amy Edwards in the Regis Corporate office to make a complaint. (Carpenter Depo., at 141:13-22). She was aware of the two customer complaints from the previous day at the time she made her call. (Carpenter Depo., at 142:23-143:23). Carpenter complained that she was not being treated fairly by Delise Burdette, and said she felt that the customer complaints were also unfair. (Carpenter Depo., at 143:19-145:3)(Alvarez Decl., ¶ 3). She says she also likely complained that the employees at the Tiger Town location did not want her there. (Carpenter Depo., at 145:4-9). Carpenter did not complain of race discrimination in her call to Amy Edwards. (Carpenter Depo., at 148:4-150:23).

After speaking to Amy Edwards, Carpenter also sent via facsimile a recommendation letter that she represented as being a reference letter written by Amy Grace on June 30, 2006. (Carpenter Depo., at 169:5-14, 187:2-188:20, Ex. 17). She sent the letter as support for her assertion that she was a good employee. (Carpenter Depo., at 191:15-192:5). Carpenter says the letter was written in case she wanted to seek other employment. (Carpenter Depo., at 187:23-188:7). Carpenter did not speak to Amy Grace or seek her permission before sending the letter to Amy Edwards. (Carpenter Depo., at 196:11-21).

**G.     Toni Alvarez Conducts an Investigation Into Plaintiff's Allegations**

In response to Carpenter's complaint, Regional Manager Toni Alvarez conducted an investigation at the salon where Carpenter worked on August 17 and 18, 2006. (Carpenter Depo., at 153:1-23)(Alvarez Decl., ¶ 4, Ex. 1). Alvarez met with Carpenter on August 17, 2006. (Carpenter Depo., at 154:3-10, Ex. 14) (Alvarez Decl., ¶ 5). At that meeting, Carpenter made various complaints that she felt Delise Burdette was treating her unfairly. (Alvarez Decl., ¶ 5). She claimed that she had not been able to perform a service for a customer because she did not have the necessary relaxer product or her necessary tools. (Alvarez Decl., ¶ 5). She claimed that Burdette had said that she could not do ethnic hair or have ethnic products in the store because there was no room. (Alvarez Decl., ¶ 5).

Carpenter then claimed that Burdette told two of her co-workers, Christy Boatright and Shannon Martin, that she demoted Carpenter because she was "low class and not management material." (Carpenter Depo., at 159:23-160:15) (Alvarez Decl., ¶ 6). She also contended that Burdette had said to Martin and Boatwright that Carpenter was demoted because she "fucked up a lady's color."  (Carpenter Depo., at 110:22-111:10, 160:16-23) (Alvarez Decl., ¶ 6). Carpenter

10

claimed that Burdette had specifically used the phrase "fucked up a lady's color." (Carpenter Depo., at 111).

Carpenter also said that she felt that there had been unfair customer complaints made against her. (Alvarez Decl., ¶ 7). Carpenter mentioned the situation that occurred two days earlier in which she was issued the written reprimand by Grace for the conversation on the service floor with Shannon Martin and Latoya. (Alvarez Decl., ¶ 7). During her investigation, Alvarez learned from Carpenter's co-workers that Latoya, a non-employee, was spending a large amount of time in the salon, behind the desk and on the service floor, which is a violation of company policy. (Alvarez Decl., ¶ 7). Carpenter said one of her co-workers had reported that they were having a conversation of a sexual nature, but that the conversation only referenced Latoya getting a tattoo on her neck that said "Child Boo." (Alvarez Decl., ¶ 7) (Carpenter Depo., at 161:10-23). She then accused her co-worker, Cindy Carlton, of lying about this incident, and she said that she did not believe that the customer had actually complained. (Alvarez Decl., ¶ 7).

Carpenter says she told Alvarez during their August 17, 2006, conversation that she had made a telephone call to the EEOC (Carpenter Depo., at 150:6-23, 175:6-179:11). She does not recall if she told Carpenter the substance of her call to the EEOC or merely reported that she had made the call. (Carpenter Depo., at 178:4-12). Carpenter says that she may have told Alvarez that she called the EEOC because she had not been allowed to bring her tools or her ethnic products to the new salon. (Carpenter Depo., at 176:21-177:7). Carpenter undisputedly did not tell Alvarez that she felt her demotion or her write-up from the day before or any other action was based on her race. (Carpenter Depo., at 177:8-22).

**H.     Alzarez's Investigation Reveals Several Instances of Misconduct By Plaintiff**

Alvarez next spoke to Amy Grace, the Salon Manager at the Tiger Town Store. (Alvarez Decl., ¶ 10). Grace complained that, during the time Carpenter was a Salon Manager, she would constantly call Grace with problems at the store on issues that she should have been dealing with Burdette. (Alvarez Decl., ¶ 10). Grace said Carpenter would constantly state that she did not like instructions that Burdette had given her and that she did not want to follow them. (Alvarez Decl., ¶ 10). Grace said that, during the time she worked as the Salon Manager at the Bruno's store, Carpenter had been a constant disruption at work and had told lies to and about various employees in the store. (Alvarez Decl., ¶ 10). Grace said that she felt that Burdette was justified in demoting Carpenter, given what she had observed about her performance as a manager. (Alvarez Decl., ¶ 10).

Grace told Alvarez about her involvement in the customer complaint on August 15, 2006, regarding an African-American customer's request for services. (Alvarez Decl., ¶ 11). Grace said that there were relaxer products available in the store. (Alvarez Decl., ¶ 11). As part of the relaxer service, Carpenter typically used her own personal Marcel Irons, but she told Grace that she could not perform the service because she did not have her irons and that they were at home in her closet. (Alvarez Decl, ¶ 11). Nevertheless, Grace told the customer that they could perform the relaxer service. (Alvarez Decl., ¶ 11).

Grace said that she then called Burdette, who volunteered to bring the irons from the Bruno's store. (Alvarez Decl., ¶ 11). Grace said that Carpenter lied when she asserts that Burdette refused to bring the Marcel irons to the store. (Alvarez Decl., ¶ 11). Carpenter also claimed that Christy Boatright and Shannon Martin had told her that Burdette had told them that she was not letting Carpenter transfer any ethnic products to the Tiger Town store because she

12

did not want that kind of people at Tiger Town. (Alvarez Decl., ¶ 11). Both persons denied ever hearing this statement from Burdette when Alvarez spoke to them as part of her investigation. (Alvarez Decl., ¶ 11). Grace also said this was not true. (Alvarez Decl., ¶ 11).

Grace said that she had to redo several coloring services that Carpenter had initially performed incorrectly. (Alvarez Decl., ¶ 12). On approximately August 11, 2006, Amy Grace said that a customer, Heather Collins, was sent to the Tiger Town location to have her hair redone because she was not pleased with Carpenter's performance of a shampoo, cut, and conditioning treatment. (Carpenter Depo., at 69:16-70:10) (Alvarez Decl., ¶ 12). Collins told Grace that she paid $48.00 for the service that should have been no more than $34.95 under Regis' prices. (Alvarez Decl., ¶ 12). It is a violation of company policy to charge a customer more than the listed price. (Alvarez Decl., ¶ 12).

In support of her complaint against Burdette, Carpenter provided a letter to Amy Edwards supposedly written by Amy Grace with regard to her recent job performance. (Alvarez Decl., ¶ 16, Ex. 2). Amy Grace said she had written the letter in either April or May of 2006 for a school application, however. (Alvarez Decl., ¶ 16). She denied that she had written the letter in June of 2006 as Carpenter claimed. (Alvarez Decl., ¶ 16).The letter was written at a time when Carpenter was working for Grace as a stylist and Grace did not know that she would later be transferred to the Tiger Town store. (Alvarez Decl., ¶ 16).

Furthermore, Grace said the letter was altered in several ways from the letter that she had originally provided Carpenter. (Alvarez Decl., ¶ 16). Grace said she did not include the following sentence in her letter: "Amy is someone who is understanding, empathetic to others." (Alvarez Decl., ¶ 16). Grace said that she hand signed and dated the letter that she provided to Grace. Grace said that she had not put the telephone number for the Tiger Town store on the

13

original letter, because she had not worked at the Tiger Town store at the time the original letter was sent. (Alvarez Decl., ¶ 16). Grace said that she provided the letter in hopes that Carpenter might get another job so that she would not have to deal with all of the problems that she caused by her lying and poor job performance. (Alvarez Decl., ¶ 16). Moreover, Carpenter did not tell Grace that she was sending this letter to Edwards. (Alvarez Decl., ¶ 16).

Alvarez next spoke to Shannon Martin. (Alvarez Decl., ¶ 13). Martin told Alvarez that Carpenter had called her while Alvarez was meeting with Grace and tried to get Martin to say that she had witnessed Burdette treating Carpenter badly in the store. (Alvarez Decl., ¶ 13). Martin said that Carpenter wanted her to say that Burdette had said that she was low class, which Martin said was not true. (Alvarez Decl., ¶ 13). Martin was concerned that Carpenter was asking her to lie. (Alvarez Decl., ¶ 13). Martin said that she had never heard Burdette refer to Carpenter as low class. (Alvarez Decl., ¶ 13). She said merely that Burdette stated that she was sorry that there had been so much turnover with the past managers and that they were hoping to achieve a higher standard in the store and to hopefully get a good manager for the store. (Alvarez Decl., ¶ 13). Martin denied ever hearing Burdette or any other employee say that Carpenter was demoted because she kept "fucking up people's color." (Alvarez Decl., ¶ 13). Martin said that Carpenter was the only person who had said this. (Id.). She said that she had never heard Burdette curse. (Alvarez Decl., ¶ 13).

Alvarez also spoke to Christy Boatright, a stylist in the Bruno's store. (Alvarez Decl., ¶ 14). She also denied ever hearing Delise Burdette say that Carpenter was "low class" or ever hearing Burdette say that Carpenter was demoted because she kept "fucking up people's color." (Alvarez Decl., ¶ 14). Boatright said that she had never heard Burdette use profanity. (Alvarez Decl., ¶ 14). Boatright expressed concern that Carpenter was always creating a negative

14

environment. (Alvarez Decl., ¶ 14). Boatright also mentioned that Carpenter did not follow proper scheduling and would leave the store while she was still on the clock. (Alvarez Decl., ¶ 14).

Boatright said that she did not want to have any more interaction with Carpenter. (Alvarez Decl., ¶ 14). She told Alvarez that she would turn in her notice if Carpenter returned to work at the Bruno's location. (Alvarez Decl., ¶ 14). Boatright voiced her concern that Carpenter or her friend Latoya might retaliate against her for speaking to Alvarez during the investigation. (Alvarez Decl., ¶ 14). Martin and Boatright also said that Carpenter had told them that she had called several of her customers at home and asked them to call Alvarez to complain about Burdette and the company. (Alvarez Decl., ¶ 14).

Alvarez also spoke to Burdette as part of her investigation. (Alvarez Decl., ¶ 15). Burdette denied ever cursing at or about Carpenter. (Alvarez Decl., ¶ 15). Burdette told Alavarez her version of the customer complaint regarding the Marcel irons situation, and it was consistent with Grace's version of the story. (Id.). Burdette denied having ever treated Carpenter unfairly. (Alvarez Decl., ¶ 15).

Additionally, Alvarez looked into a customer complaint in which a customer named Electra made a complaint to Amy Grace that she had been overcharged by Carpenter, and that she felt that Carpenter had acted unprofessionally. (Alvarez Decl., ¶ 17). The customer claimed that she had been charged $40.00 to have tracks removed from her hair and for a conditioning treatment. (Alvarez Decl., ¶ 17). A conditioning treatment has its own entry on the computer and should be no more than $10.00. (Alvarez Decl., ¶ 17). The woman only had four tracks removed and the charge should only be somewhere between $2.50 and $5.00 per track. (Alvarez Decl., ¶ 17).

After following up on the charges, Alvarez concluded that Carpenter had, in fact, overcharged the customer. (Alvarez Decl., ¶ 17). The computer reflects charges made by each stylist and Alvarez reviewed Carpenter's charges for this transaction. (Alvarez Decl., ¶ 17). No conditioning treatment was charged on the computer. (Alvarez Decl., ¶ 17). However, a $40.00 miscellaneous charge was. (Alvarez Decl., ¶ 17). Other employees in the salon also told Alvarez that they felt the customer was overcharged for the service. (Alvarez Decl., ¶ 17).

I.    **Plaintiff Is Discharged from Employment With Regis**

At the completion of Alvarez's investigation, Alvarez made the decision to discharge Carpenter. (Alvarez Decl., ¶ 18).    After speaking with stylists, managers, and at least one customer involved, Alvarez concluded that Carpenter had falsely accused Burdette and another stylist (accusing Cindy Carlton of lying) of misconduct. (Alvarez Decl., ¶ 18). Alvarez concluded that Carpenter had lied, attempted to manipulate coworkers and clients to cover up information or to lie for her; and altered and misrepresented a letter of reference that Salon Manager Amy Grace had provided to her months earlier. (Alvarez Decl., ¶ 18).  In addition, a review of the customer complaints that Carpenter asked to be investigated all appeared to have been based on well-founded complaints of misconduct by Carpenter.  (Alvarez Decl., ¶ 18). Further, Alvarez's investigation revealed that Carpenter had charged customers more than the stated price for services in violation of company policy.  (Alvarez Decl., ¶ 18). Based on these discoveries, Alvarez informed Carpenter that she was being discharged on August 18, 2006. (Alvarez Decl., ¶ 18). (Carpenter Depo., at 164:15-23, 171:8-172:8).

Alvarez told Carpenter that the investigation had been completed and that no one had corroborated her story. (Carpenter Depo., at 172:208) (Alvarez Decl., ¶ 19).  Carpenter merely

16

responded "thank you for your investigation" to Alvarez and shook her hand. (Carpenter Depo., at 179:12-180:3).

Alvarez completed a termination form for Carpenter's termination, and stated on the form that Carpenter was being discharged for her violation of Regis Security Regulations 1, 12, 15 and 21. (Alvarez Decl., ¶ 19, Ex. 2). Carpenter violated Security Regulation 1 by allowing Latoya to constantly stay in the salon and to loiter on the service floor. (Alvarez Decl., ¶ 19, Ex. 4). Carpenter violated Security Regulation 12 by charging her customers more than the Regis charge. (Alvarez Decl., ¶ 19, Ex. 4). Carpenter violated Security Regulation 15 because she was not using approved back bar products. (Alvarez Decl., ¶ 19, Ex. 4). Finally, Carpenter had violated Security Regulation 21 by lying during the investigation, misrepresenting what her co-workers had allegedly said, altering and misrepresenting the nature of Grace's reference letter, attempting to pressure her co-workers to lie, and creating an unpleasant working environment for her co-workers. (Alvarez Decl., ¶ 19, Ex. 4).

Carpenter wrote a letter dated August 29, 2006, to the Regis corporate office complaining about her termination. (Carpenter Depo., at 169:15-170:16, Ex. 15). In her letter, she claimed that she had told Alvarez that she had called the EEOC during the termination meeting on August 18, 2006, not their initial meeting on August 17. (Carpenter Depo., at 171:8-172:22, Ex. 15). Carpenter claimed in her deposition that this was a mistake in the wording of the letter. (Carpenter Depo., at 174:3-175:15). Carpenter filed her EEOC charge on September 18, 2006. (Carpenter Depo., Ex. 18).

### III.    ARGUMENT

Carpenter asserts that she was subjected to four adverse employment actions because of her race in violation of Title VII and 42 U.S.C. § 1981: (1) a denied promotion; (2) disparate

training in the Salon Manager position; (3) her demotion from the Salon Manager position; and (4) her termination. She also claims that her termination was retaliatory in violation of Title VII. Carpenter has failed to present sufficient evidence to support her claims. She cannot dispute that Burdette awarded the promotion to the person she believed to be the better qualified candidate. Her disparate training contention does not constitute an adverse employment action, and nonetheless she has failed to show that Burdette treated her in a discriminatory manner. Further, she cannot dispute that she was demoted for performance issues. Finally, Carpenter cannot prove a prima facie case for her race discrimination or retaliation termination claims, and she cannot dispute that she was discharged based on the good faith belief of Toni Alvarez that Carpenter had engaged in several incidents of misconduct. For each of these reasons, all of her claims must be dismissed.

## A.    The Evidentiary Framework for Plaintiff's Claims[2]

Carpenter does not have any direct evidence of discrimination or retaliation. Therefore, she must prove her claims through the circumstantial evidentiary model created in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, the Plaintiff must prove a prima facie case of race discrimination or retaliation. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Chapman v. AI Transport, 229 F.3d 1012, 1024-25 (11th Cir. 2000); Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308, 1314 (11th Cir. 1994); Weaver v. Casa Gallardo, 922 F.2d 1515, 1524 (11th Cir. 1991).

After the Plaintiff proves a prima facie case of discrimination or retaliation, the Defendant need only to produce evidence that there is a legitimate, non-discriminatory (or non-retaliatory) reason for the challenged employment action. See McDonnell Douglas Corp., 411

---

[2] The evidentiary standards for race discrimination claims under Title VII and 42 U.S.C. § 1981 are the same. See Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1060 (11th Cir. 1994).

U.S. at 802; Chapman, 229 F.3d at 1024-25; Armstrong, 33 F.3d at 1313-14. The presumption of discrimination/retaliation is then rebutted and the employer is entitled to summary judgment unless the Plaintiff proffers evidence sufficient to create a genuine issue of material fact that discrimination/retaliation was actually the reason for the challenged action. See Chapman, 229 F.3d at 1024-25. If the employer offers more than one reason for the stated employment action, then the Plaintiff must dispute each stated reason to survive summary judgment. See Chapman, 229 F.3d at 1025 (noting that plaintiff must rebut each of the employer's proffered reasons for its challenged action) (emphasis added) (citing Combs v. Plantation Patterns, 106 F.3d 1519, 1529 (11th Cir. 1997), cert. denied, 522 U.S. 1045 (1998)).

**B.    Plaintiff's Claim that She Was Denied a Promotion on the Basis of her Race Must Fail**

Carpenter challenges the promotion of Katherine Kilgore in July of 2006.   In order to establish a prima facie case on the basis of a failure to promote, Plaintiff must demonstrate that: (1) she belonged to a protected class; (2) she was qualified for and applied for a position; (3) despite her qualifications, she was rejected; and (4) the position was filled with an individual outside the protected class. McDonnell Douglas Corp., 411 U.S. at 802; Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768 (11th Cir. 2005).    Assuming for purposes of this motion that Carpenter can establish a prima facie case, she cannot dispute Regis' proffered reason for its promotion decision – that Kilgore was better qualified because of her superior customer service skills.

Kilgore was offered the position because she had demonstrated superior customer service skills over a 15-month period, whereas Plaintiff had not made the same showing in her seven months with the company.  (Burdette Decl., ¶ 5).  Burdette had previously worked as the Salon Manager in the College Street store and personally observed that Kilgore worked well with her

customers. (Burdette Decl., ¶ 5). Significantly, in the short time that Burdette had held responsibility over the relevant stores, she had received some customer complaints about services provided by Carpenter, but had not had any such complaints against Kilgore. (Burdette Decl., ¶ 5).

The Eleventh Circuit has upheld an employer's right to make promotion decisions based on "personal qualities," such as one's ability to get along with customers, particularly in supervisory jobs, such as a Salon Manager position. "Personal qualities . . . factor heavily into employment decisions concerning supervisory or professional positions. Traits such as common sense, good judgment, originality, ambition, loyalty, and tact often must be assessed primarily in a subjective fashion, yet they are essential to an individual's success in a supervisory or professional position." Denney v. City of Albany, 247 F.3d 1172, 1186 (11th Cir. 2001) (citation and internal quotations omitted) (quoting Chapman v. A.I. Transport, 229 F.3d 1012, 1033-34 (11th Cir. 2000) (en banc)). "A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." Id. at 1186. Regis has clearly met its burden, and the evidence of customer complaints further supports Burdette's belief that Kilgore was better qualified because of her customer service skills.

In the context of a promotion, "a plaintiff cannot prove pretext by simply arguing or even by showing that [she] was better qualified than the [person] who received the position [she] coveted. A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race." Brooks v. County Comm'n of Jefferson County, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting Alexander v. Fulton County, 207 F.3d 1303, 1339 (11th Cir. 2000)). Furthermore, Carpenter must show that the disparities between

20

Kilgore's and her own qualifications were "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." Cooper v. So. Company, 390 F.3d 695, 732 (11th Cir. 2004) (citation omitted); see also Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006) (approving of this language from Cooper). Carpenter cannot make such a showing in this case, and her promotion claim must be dismissed.

**C.    Plaintiff's Claim of Disparate Training Must Fail**

Carpenter next claims that she was treated differently than Kilgore as a Salon Manager because Burdette did not stay in the store with her for three or four consecutive days during the week of her initial promotion to Salon Manager, as Burdette had allegedly done with Kilgore. Carpenter has not produced evidence that this alleged deficient training altered the terms or conditions of her employment or that it adversely affected her status as an employee in any way. See Mack v. ST Mobile Aero. Eng'g, Inc., 195 Fed. Appx. 829, 845-46, (11th Cir. 2006). Thus, she has not shown that this disparate training constituted an adverse employment action and has not established a prima facie case of disparate treatment. See Merriweather v. Alabama Department of Public Safety, 17 F. Supp. 2d 1260, 1271 (M.D. Ala. 1998)(plaintiff failed to establish a prima facie case of disparate treatment arising from non-selection for training courses where she did not show that the training "affected or could affect her salary, chances of promotion, ability to perform her job, or any other aspect of her employment."); Fitzhugh v. Topetzes, No. 1:04-cv-3258-RWS, 2006 U.S. Dist. LEXIS 62630, at *24 2006 WL 2557921. *7 (N.D. Ga. Sep. 1, 2006)("Other than identifying the fact that she was denied such training, Plaintiff fails to state how, or even if, that denial affected her salary, title position, or job duties. The denial of training, without more, does not constitute an adverse employment action."). Carpenter's claim is even weaker than those in Fitzhugh and Merriweather because she does not

allege a denial of training; she merely alleges that the training that she was provided was not as initially extensive as that provided to Kilgore.

It is further undisputed that Carpenter admits that Burdette provided her with initial training and provided her with several materials that explained Carpenter's management duties, Burdette's expectations of a manager, and guidelines as to how to clean the store, how to open the store, how to keep the store organized, how to properly make deposits and what are the expectations of a manager. (Carpenter Depo., at 33:6-35:14, Ex. 6). Burdette was also in the salon at least two times a week throughout the time that Carpenter worked as a Salon Manager. (Burdette Decl., ¶ 8). Carpenter admits that the materials provided a good explanation of what was expected of her as a manager. (Carpenter Depo., at 35:9-14). Given that Carpenter admits that she was clearly informed of what was expected of her as a Salon Manager, her disparate training claim must fail.

**D.    Plaintiff's Demotion Claim Must Fail**

Carpenter next contends that she was unlawfully demoted because of her race. First, it should be noted that the same person who demoted her had promoted her only a month earlier. No reasonable person could conclude that Burdette would promote Carpenter to the Salon Manager position if her true intention was to later discriminate against her on the basis of race. See Williams v. Vitro Services Corp., 144 F.3d 1438, 1442-43 (11th Cir. 1998) (holding that it is permissible for Courts to draw an inference of non-discrimination when the alleged discriminator was the same person who previously hired the plaintiff).

Carpenter cannot dispute the reasons for her demotion. Burdette demoted Carpenter because she had learned that Carpenter had violated the company's time clock and scheduling policies by bringing her children to work; leaving the salon during her shifts (while remaining on

22

the clock) to go home to care for her children; scheduling stylists for fewer evenings or weekends than required; and frequenting the salon without authorization when the business was closed. (Burdette Decl., ¶ 9). Burdette testified that she visited the store several times when Carpenter was not there and she had not clocked out. (Burdette Decl., ¶ 9). The stylists were also complaining to Burdette that they were not being assigned an adequate number of night shifts. (Burdette Decl., ¶ 9). Finally, during the short period that Carpenter managed the salon, she received an excessive number of customer complaints which she was unable to appropriately resolve at the salon level. (Burdette Decl., ¶ 9). Burdette legitimately concluded that Carpenter should be demoted based on these performance issues.

**E.    Plaintiff's Racial Discharge Claim Must Fail**

Carpenter claims that she was discharged because of her race and in retaliation for her supposed complaints of discrimination. (Carpenter Depo., at 7:15-19, 200:1-22, 205:7-20). She cannot establish a prima facie case for either claim, however, and she cannot dispute Regis' reasons for its actions.

**1.    Plaintiff Cannot Prove a Prima Facie Case for Her Racial Discharge Claim**

To establish a prima facie case of discriminatory discharge, involving an employer's alleged racial animus in disciplining employees for violations of work rules, an employee must show the following: (1) that she is a member of a protected class; (2) that she was qualified for the job; (3) that she suffered an adverse employment action; (4) that she "has engaged -- either (a) disputedly or (b) admittedly -- in misconduct similar to persons outside the protected class; and (5) that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment." Jones v. Bessemer Carraway Med. Ctr., 137 F.3d

1306, 1311 n.6 (11th Cir. 1998), modified on other grounds on denial of reh'rg, 151 F.3d 1321

(11th Cir. 1998).

To establish a prima facie case of discrimination for her discharge claim, Plaintiff must

come forward with evidence that she was treated differently than others outside the protected

class.  See Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999)(affirming grant of

summary judgment for employer and noting that employee could not establish a prima facie case

because he failed to point to any persons outside the protected class who were treated more

favorably than her).  Carpenter has failed in this regard.  The Eleventh Circuit has stated the

following about comparator evidence:

> In determining whether employees are similarly situated for
> purposes of establishing a prima facie case, it is necessary to
> consider whether the employees are involved in or accused of the
> same or similar conduct and are disciplined in different ways. The
> most important factors in the disciplinary context are the nature of
> the offenses committed and the nature of the punishments
> imposed. We require that the quantity and quality of the
> comparator's misconduct be **nearly identical** to prevent courts
> from second-guessing employers' reasonable decisions and
> confusing apples with oranges. Exact correlation is neither likely
> nor necessary, but the cases must be fair congeners. In other words,
> apples should be compared to apples.

Mannica v. Brown, 171 F.3d at 1368-69 (citations and quotations omitted)(emphasis added).

Carpenter has failed to point to any Caucasian employees who were accused by her co-workers

of lying, making false accusations against co-workers, charging customers more than Regis'

listed price, attempting to manipulate her co-workers to lie during an investigation, and

fraudulently misrepresenting a reference letter from a co-worker.  Absent evidence that she was

treated differently than persons who were accused of committing the same or similar misconduct,

her claim should fail.

24

2. **Plaintiff Cannot Dispute the Legitimate Non-Discriminatory Reasons for Her Discharge**

Plaintiff was discharged based upon the discovery of misconduct made during an investigation of her claims of unfair treatment. The Eleventh Circuit has discussed an employer's right to conduct an investigation and to conclude that false statements have been made:

> When an employer is told of improper conduct at its workplace, the employer can lawfully ask: is the accusation true? When the resulting employer's investigation (not tied to the government) produces contradictory accounts of significant historical events, the employer can lawfully make a choice between the conflicting versions--that is, to accept one as true and to reject one as fictitious--at least, as long as the choice is an honest choice. And, at least when the circumstances give the employer good reason to believe that the fictitious version was the result of a knowingly false statement by one of its employees, the law will not protect the employee's job.

EEOC v. Total Systems, 221 F.3d 1171, 1176 (11th Cir. 2000).  Thus, "whether to fire an employee for lying to the employer in the course of the business's conduct of an important internal investigation is basically a business decision; this decision, as with most business decisions, is not for the courts to second-guess as a kind of super-personnel department." Id.

It should be noted that the relevant inquiry is whether Toni Alvarez had a good faith belief that Carpenter engaged in misconduct, not whether Carpenter actually did.  See Total Sys., 221 F.3d at 1176 ("an employer, in these situations, is entitled to rely on its good faith belief about falsity, concealment and so forth."); Jones v. Gerwins, 874 F.2d 1534, 1540 (11th Cir. 1989) ("The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation.").

25

Alvarez had a wealth of evidence to support her conclusion that Carpenter engaged in misconduct.  First, Salon Manager Amy Grace told Alvarez that Carpenter had lied about Burdette's involvement in the African-American customer incident on August 15, 2006, when she claimed Burdette refused to bring Marcel irons to perform the service.  (Alvarez Decl., ¶ 11). Grace also reported that she had observed an incident of overcharging customers by Carpenter. (Alvarez Decl., ¶ 12).  Grace also told Alvarez that Carpenter had altered and misrepresented the nature of her reference letter. (Alvarez Decl. ¶ 16, Ex. 2).

Shannon Martin told Alvarez that Carpenter was trying to get her to lie to Alvarez during the investigation.  (Alvarez Decl., ¶ 13).  Both Martin and Christy Boatright expressly denied hearing comments allegedly made by Burdette (that Carpenter was "low class" and was demoted because she "kept fucking up people's color") that Carpenter claimed they could corroborate. (Alvarez Decl., ¶ 13-14).  Boatright confirmed that Carpenter was not following proper scheduling practices and was leaving while she was still on the clock. (Alvarez Decl., ¶ 14). Both employees said that Carpenter had said she was calling her customers to encourage them to complain about Burdette and the company.  (Alvarez Decl., ¶ 14).  Both denied ever hearing Burdette say that Carpenter could not take her ethnic products to the Tiger Town store as Carpenter had claimed.  (Alvarez Decl., ¶¶ 13, 14).

There was abundantly sufficient information provided to Alvarez during her investigation to allow her to conclude that Carpenter should be discharged.  Her co-workers had accused her of lying, misrepresenting the reference letter, overcharging customers, and trying to manipulate her co-workers to lie for her.  Carpenter cannot dispute these reports of misconduct or that Alvarez relied upon them in good faith.

26

**F.**    **Plaintiff's Retaliatory Discharge Claim Must Fail**

To establish a prima facie case of retaliation, Carpenter must show: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. See, e.g., Weaver v. Casa Gallardo, 922 F.2d 1515, 1524. Carpenter cannot establish the first or third required elements of her prima facie case. Further, as with her race discrimination claim, she cannot dispute Regis' proffered reasons for its actions.

**1.**    **Plaintiff Cannot Prove a Prima Facie Case for Her Retaliation Claim[3]**

**a.**    **Plaintiff Did Not Engage In Protected Activity**

Title VII contains two different types of protected activity, known as the "opposition clause" and the "participation clause." See 42 U.S.C. § 2000e-3(a). Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this (subchapter)." Id. Likewise, "under the participation clause," an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this (subchapter)." Id.

The participation clause covers participation in "an investigation … under this subchapter," that is, an investigation under subchapter VI of Chapter 21 of Title 42 (42 U.S.C. §§ 2000e-2000e-17). 42 U.S.C. § 2000e-3(a). This clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC. "[A]t a

---

[3] Plaintiff is pursuing her retaliation claim only under Title VII, not 42 U.S.C. §1981. (Plaintiff's Complaint, ¶¶ 23-25). The U.S. Supreme Court heard argument on February 20, 2008, as to whether a plaintiff can even pursue a retaliation claim under 42 U.S.C. § 1981. See Humphries v. CBOCS, 474 F.3d 387 (7th Cir. 2007), cert. granted, 128 S. Ct. 30, 168 L. Ed. 2d 807, 2007 U.S. LEXIS 9079, 76 U.S.L.W. 3154 (U.S. 2007).

minimum, some employee must file a charge with the EEOC (or its designated representative) or otherwise instigate proceedings under the statute for the conduct to come under the participation clause." EEOC v. Total Sys. Servs., 221 F.3d at 1174 n.2. Carpenter did not file her EEOC Charge until September 18, 2006, and the holding of EEOC v. Total Sys. Servs. makes clear that merely making a telephone call to the EEOC should not be deemed sufficient to constitute participation under the statute.

To engage in protected activity under the "opposition clause," the employee must actually oppose the conduct made unlawful under Title VII. The Eleventh Circuit's holding in Coutu v. Martin County Bd. of County Commissioners, 47 F.3d 1068 (11th Cir. 1995), confirms this point. The Eleventh Circuit held that a filed grievance did not amount to statutorily protected activity where the written grievance contained a conclusory allegation of racial discrimination, but during the hearing, the plaintiff made no allegation and offered no proof of discrimination. Couto, 47 F.3d at 1074. The Court concluded that unfair treatment alone does not qualify as an unlawful employment practice under Title VII, absent evidence of discrimination based on some unlawful category. Id. at 1074-75. Thus, the mere fact that an employee makes a conclusory allegation of discrimination, without any opposition, is not protected activity. To hold otherwise would require the removal of the word "opposed" from the retaliation provision of Title VII. See 42 U.S.C. § 2000e-3(a).

The mere fact that Carpenter may have mentioned contacting the EEOC does not constitute opposition to conduct made unlawful under Title VII as a matter of law. See EEOC v. Bojangles Rests., Inc., 284 F. Supp. 2d 320, 326 (M.D.N.C. 2003) ("the plain language of [Title VII] clearly covers only those who 'actually oppose' discrimination or those who 'participate,

assist, etc.,' in an investigation or proceeding. In other words, the person must have some connection to the protected activity").

Carpenter's statement that she called the EEOC is likewise too vague to constitute protected expression under the "opposition" clause. She does not recall whether she told Alvarez the substance of her call to the EEOC, or merely reported that she had made the call. (Carpenter Depo., at 174:3-176:20). Carpenter says only that she may have told Alvarez that she called the EEOC because she had not been allowed to bring her tools or her ethnic products to the new salon. (Carpenter Depo., at 176:21-177:7). Carpenter did not tell Alvarez that she felt her demotion or her write-up from the day before, or any other employment action, was based on her race. (Carpenter Depo., at 177:8-17).

The law requires more than a general statement that she has called the EEOC to constitute protected activity. See Galdieri-Ambrosini v. Nat'l Realty & Development Corp., 136 F.3d 276, 292 (2nd Cir. 1998)("[Plaintiff's] complaints to Simon and Chiaro did not state that [she] viewed Simon's actions as based on her gender, and there was nothing in her protests that could reasonably have led National Realty to understand that that was the nature of her objections."); Jurado v. Eleven-Fifty Corporation, 813 F.2d 1406, 1411-12 (9th Cir. 1987) (Hispanic employee who opposed format change at radio station to English-only broadcasts did not engage in protected activity where he expressed his concern that change would impact his "numbers" because he had a large number of Hispanic listeners); Webb v. R & B Holding Company, Inc., 992 F. Supp. 1382, 1389 (S.D. Fla. 1998)("[T]he employee must, at the very least, communicate her belief that discrimination is occurring to the employer. It is not enough for the employee merely to complain about a certain policy or certain behavior of coworkers and rely on the employer to infer that discrimination has occurred.")(citing Jurado, supra); EEOC v.

Shoney's, Inc., 536 F. Supp. 875, 877 (N.D. Ala. 1982)("His very generalized complaints were that he was not being treated fairly in that other managers could date waitresses who worked at the restaurant. There is nothing in his own testimony of what he said that would put Shoney's on notice that he was protesting an illegal employment practice.").

> **b.    Plaintiff Cannot Prove a Causal Connection Between Her Termination and Her Supposed Protected Expression**

Carpenter will undoubtedly argue that the two-day span between her supposed statement about the EEOC and her termination shows a causal connection between the two events. Nonetheless, "close temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity." Hankins v. Airtran Airways, Inc., 237 Fed. Appx. 513, 520 (11th Cir. 2007). In Hankins, the plaintiff was terminated 20 days after he had made a complaint of discrimination. The Court noted the following had occurred in between those two dates:

> Here, it is undisputed (indeed, Hankins herself acknowledges), that on 14 September -- five days after Hankins allegedly reported Durham's suspected racial bias to Head -- Hankins yelled at a co-worker for cutting her off in line and stated that she would "kick his ass if he ever tried to cut in front of [her] again in line." R2-34 at 124. This intervening act of misconduct ... severed the causal connection (if any) between Hankins' initial complaint of discrimination and AirTran 's decision to terminate her employment.

Hankins, 237 Fed. Appx. at 520 (emphasis added).[4]    Where, as here, there is a significant intervening event, such as Alvarez's discovery of reported misconduct by Carpenter during her investigation, no causal connection can be inferred.

---

[4]    Although the Hankins opinion is unpublished, it relied on another Eleventh Circuit case Fleming v. Boeing Company, 120 F.3d 242, 248 (11th Cir. 1997) -- and a former Fifth Circuit case -- Whatley v. Metropolitan Atlanta Rapid Transit Authority, 632 F.2d 1325, 1329 (5th Cir. 1980), as support for its holding.

2.   **Plaintiff Cannot Dispute the Legitimate, Non-Retaliatory Reasons for Her Discharge**

Even if plaintiff's actions are construed as constituting engaging in protected activity, this does not insulate Carpenter from being discharged for misconduct during the company's investigation. See Total Sys., 221 F.3d at 1176 ("Warren could properly be discharged based on Defendant's good faith belief that she lied in an internal investigation."); Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999)("Although contesting an unlawful employment practice is protected conduct, the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace."), cert. denied, 528 U.S. 818 (1999). Regis has offered legitimate, non-retaliatory reasons for Plaintiff's discharge. She was discharged based upon the discovery of several incidents of dishonest behavior and other misconduct that violated company policy during an internal investigation. As discussed supra at pages 25 - 26, Plaintiff has failed to offer any evidence to suggest that Regis' stated reasons for its actions are a pretext for discrimination or retaliation. For all of these reasons, Plaintiff's retaliation claims must be dismissed.

### IV.   CONCLUSION

For all the foregoing reasons, Regis is entitled to summary judgment on all of the Plaintiff's claims. Regis respectfully requests that this Court grant its Motion for Summary Judgment, dismiss this case with prejudice, and award Regis its costs in defending against this case.

Respectfully submitted,

*s/ Brian R. Bostick*
Timothy A. Palmer
Brian R. Bostick
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Federal Place, Suite 1900

1819 Fifth Avenue North
Birmingham, Alabama 35203-2118
(205) 328-1900 Telephone
(205) 328-6000 Facsimile
brian.bostick@odnss.com

Attorneys for Defendant Regis Corporation

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of March, 2008, I electronically filed the foregoing Defendant's Brief in Support of Its Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Benjamin H. Parr.

*s/ Brian R. Bostick*
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Federal Place, Suite 1900
1819 Fifth Avenue North
Birmingham, Alabama 35203-2118
(205) 328-1900 Telephone
(205) 328-6000 Facsimile
brian.bostick@odnss.com