## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **AMY CARPENTER,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.:**<br>**3:07-CV-00501-WKW-CSC** |
| **REGIS CORP., INC.,** | |
| **Defendant.** | |

## DEFENDANT'S EVIDENTIARY SUBMISSION IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant, Regis Corporation (hereinafter "Regis"), submits this Evidentiary Submission in Support of Its Motion for Summary Judgment. Regis relies upon the following evidence:

Exhibit A:    Deposition of Amy Carpenter and Exhibits Thereto

Exhibit B:    Declaration of Delise Burdette and Exhibits Thereto

Exhibit C:    Declaration of Toni Alvarez and Exhibits Thereto

Respectfully submitted,

*s/ Brian R. Bostick*
Timothy A. Palmer
Brian R. Bostick
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Federal Place, Suite 1900
1819 Fifth Avenue North
Birmingham, Alabama 35203-2118
(205) 328-1900 Telephone
(205) 328-6000 Facsimile
brian.bostick@odnss.com

Attorneys for Defendant Regis Corporation

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of March, 2008, I electronically filed the foregoing Defendant's Evidentiary Submission in Support of Its Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Benjamin H. Parr.

s/ Brian R. Bostick
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Federal Place, Suite 1900
1819 Fifth Avenue North
Birmingham, Alabama 35203-2118
(205) 328-1900 Telephone
(205) 328-6000 Facsimile
brian.bostick@odnss.com

# EXHIBIT A

In The Matter Of:

**AMY CARPENTER**
v.
**REGIS CORP, INC.,**

---

**AMY CARPENTER**
**January 30, 2008**

---



TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

THE HIGHEST QUALITY IN COURT REPORTING

AMY CARPENTER
REGIS CORP, INC.,

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CIVIL ACTION NO. 3:07-CV-00501-WKW-CSC

AMY CARPENTER,
      Plaintiff,
vs.
REGIS CORP, INC.,
      Defendants.


DEPOSITION
OF
AMY CARPENTER
January 30, 2008


REPORTED BY:  Stacy L. Lovin
      Court Reporter
      and Notary Public

Page 3

1      A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4      Mr. Benjamin H. Parr
5      Attorney at Law
6      Ingrum, Rice & Parr
7      410 Second Avenue
8      Opelika, Alabama 36801
9
10  FOR THE DEFENDANT:
11     Mr. Brian R. Bostick
12     Attorney at Law
13     Ogletree, Deakins, Nash,
14        Smoak & Stewart, P.C.
15     One Federal Place, Suite 1000
16     1819 Fifth Avenue North
17     Birmingham, Alabama  35203
18
19  OTHERS PRESENT:
20     Ms. Delise Burdette
21
22
23

Page 2

1       S T I P U L A T I O N
2       IT IS STIPULATED AND AGREED,
3   by and between the parties, through their
4   respective counsel, that the deposition of
5   AMY CARPENTER may be taken before Stacy L.
6   Lovin, Court Reporter and Notary Public;
7       That the signature to and
8   reading of the deposition by the witness
9   is waived, the deposition to have the same
10  force and effect as if full compliance had
11  been had with all laws and rules of Court
12  relating to the taking of depositions;
13      That it shall not be necessary
14  for any objections to be made by counsel
15  to any questions, except as to form or
16  leading questions, and that counsel for
17  the parties may make objections and assign
18  grounds at the time of trial, or at the
19  time said deposition is offered in
20  evidence, or prior thereto.
21
22
23

Page 4

1       I N D E X
2           PAGE:
3   EXAMINATION BY MR. BOSTICK        7
4
5
6       E X H I B I T S
7           PAGE:
8   Defendant's Exhibit 1       23
9   Defendant's Exhibit 2       28
10  Defendant's Exhibit 3       30
11  Defendant's Exhibit 4       32
12  Defendant's Exhibit 5       32
13  Defendant's Exhibit 6       33
14  Defendant's Exhibit 7       48
15  Defendant's Exhibit 8       59
16  Defendant's Exhibits 7A and 8A    80
17  Defendant's Exhibit 9       101
18  Defendant's Exhibit 10      123
19  Defendant's Exhibit 11      129
20  Defendant's Exhibit 12      130
21  Defendant's Exhibit 13      138
22  Defendant's Exhibit 14      154
23  Defendant's Exhibit 15      169

AMY CARPENTER
REGIS CORP, INC.,

AMY CARPENTER
January 30, 2008

(Pages 5 to 8)

Page 5

| 1 | Defendant's Exhibit 16 | 183 |
| 2 | Defendant's Exhibit 17 | 186 |
| 3 | Defendant's Exhibit 18 | 199 |
| 4 | Defendant's Exhibit 19 | 212 |
| 5 | Defendant's Exhibit 20 | 215 |
| 6 | Defendant's Exhibit 21 | 216 |

Page 6

1  I, Stacy L. Lovin, a court
2  reporter of Birmingham, Alabama, and a
3  Notary Public for the State of Alabama at
4  Large, acting as Commissioner, certify
5  that on this date, as provided by the
6  Federal Rules of Civil Procedure of the
7  United States District Court, and the
8  foregoing stipulation of counsel, there
9  came before me at Ingrum, Rice & Parr, 410
10  Second Avenue, Opelika, Alabama, on
11  January 30, 2008, commencing at 10:48
12  a.m., AMY CARPENTER, witness in the above
13  cause, for oral examination, whereupon the
14  following proceedings were had:
15
16  AMY CARPENTER,
17  being first duly sworn, was examined and
18  testified as follows:
19
20  COURT REPORTER:  Do we have
21  usual stipulations?
22  MR. PARR:  Yes.
23  MR. BOSTICK:  That's fine.

Page 7

1  EXAMINATION BY MR. BOSTICK:
2  Q.   Can you state your full name
3  for me, please.
4  A.   Amy Natasha Slaughter
5  Carpenter.
6  Q.   And have you given a
7  deposition before?
8  A.   No, I haven't.
9  Q.   Okay.  Let me tell you a
10  little bit about how -- how we'll progress
11  today just so we're kind of clear on some
12  of the rules of the game.  My name is
13  Brian Bostick, and I'm a lawyer.  I
14  represent Regis Corporation.  And I'm here
15  to ask you questions today about your
16  lawsuit that you have and your claims
17  against Regis for discrimination and
18  retaliation.
19  A.   Yes.
20  Q.   My purpose in coming here
21  today is to understand what you base your
22  claims on for.  And I'll do the best to
23  ask my questions.  If you don't understand

Page 8

1  a question that I ask or it's unclear,
2  confusing, you feel free to ask me to
3  rephrase my question.  If you answer the
4  question, though, we'll work under the
5  assumption that you understood it and felt
6  you could answer it fairly.
7  If you need a break, feel free
8  to let me know.  You have to answer yes or
9  no to questions.  I don't want to know
10  anything about any conversations that you
11  had between your attorney.  So keep in
12  mind if the answer to the question might
13  implicate that, feel free to tell your
14  attorney --
15  A.   Okay.
16  Q.   -- that.  But I am entitled to
17  know, one, you know, what you yourself
18  will testify at trial; two, what you think
19  people that you've spoken to might say at
20  trial; and, three, what kind of documents
21  you've got that you say support your
22  claims.  So those are the areas I'm going
23  to be asking you about.  Is that fair?

Page 9

1    A.    Yes, sir.
2    Q.    Okay.  And the one thing I
3 would say, we can take a break whenever,
4 but if I have a question on the table, I'd
5 ask you to answer the question before we
6 take a break and to do so.  I'm asking you
7 not to -- unless you need to consult with
8 your lawyer about a specific issue, I'd
9 like to get your best answer, and then if
10 you need to take a break, let's do it
11 after we get through a particular subject
12 matter.  Is that fair?
13    A.    Yes, sir, I understand.
14    Q.    Tell me what your current
15 address is.
16    A.    ~~1000 Lee Road 208, Apartment~~
17 ~~1001,~~ Phenix City, Alabama, 36870.
18    Q.    And how long have you lived at
19 that address?
20    A.    60 days.
21    Q.    Where had you lived prior to
22 that time?
23    A.    ~~1700 Lee Road 208, Apartment~~

Page 10

1 ~~100B,~~ as in boy, Smith Station, Alabama,
2 36877.
3    Q.    Okay.  Who currently resides
4 with you at your current apartment?
5    A.    Myself and my three children.
6    Q.    Okay.  Are any of your
7 children over the age of 18?
8    A.    No, sir.
9    Q.    Okay.  Who resided with you at
10 the prior apartment?
11    A.    The same.
12    Q.    Okay.  How long did you live
13 at the Smith Station apartment?
14    A.    16 to 18 months.
15    Q.    Where were you living back
16 during the time that you worked at Regis?
17    A.    I was living in Chester
18 Avenue.
19    Q.    Is that in Opelika?
20    A.    Yes, sir.
21    Q.    Okay.  Was that --
22    A.    It was 242B Chester Avenue,
23 Opelika, Alabama, 36804.

Page 11

1    Q.    Okay.  Are you married?
2    A.    I'm divorced.
3    Q.    Okay.  When was your divorce
4 finalized?
5    A.    October of 2006.
6    Q.    Okay.  And what was your ex --
7 what is your ex-husband's name?
8    A.    Wendell Walter Carpenter, Jr.
9    Q.    Does he live in Opelika still?
10    A.    No, sir.
11    Q.    Do you have any -- one of the
12 questions we ask is who would be relatives
13 or friends that live in the Middle
14 District of Alabama in case we have our
15 jury selection in this case.  You know,
16 don't want your mother sitting on the jury
17 deciding the case.
18    A.    Right.
19    Q.    Tell me who your immediate
20 relatives are in -- you know, being
21 Montgomery, Opelika, that general range
22 that would be over 18.  I don't need to
23 know under 18.

Page 12

1    A.    My immediate family?
2    Q.    Yes.
3    A.    My mother only had one child,
4 and that's me.  My mother is deceased.  My
5 father resides in Albany, New York.
6    Q.    What's your father's name?
7    A.    Raymond Wilcox.
8    Q.    Okay.  What was your maiden
9 name?
10    A.    Slaughter.
11    Q.    Do you have any -- I guess if
12 you were going to look through your cell
13 phone and the people that you have, who
14 are some of the people that would be in
15 your cell phone in Montgomery, Opelika
16 area?
17    A.    I don't have any.
18    Q.    Do you have a cell phone?
19    A.    Yes.
20    Q.    Okay.  There is not anybody in
21 your contacts list that would reside in
22 Opelika?
23    A.    Not in my immediate family,

Page 13

1  no.
2      Q.    I'm talking about friends as
3  well here too.
4      A.    Yes.
5      Q.    Okay.  Who would be -- give me
6  some of those names.
7      A.    Monica Nelan, Gena Johnson,
8  Diane Jones.  I don't have many.
9      Q.    Do you attend any churches
10  here in town?
11      A.    Yes.
12      Q.    What church do you go to?
13      A.    Antioch Baptist Church.
14      Q.    Any other social groups or any
15  type of organizations you're a member of.
16      A.    No, sir.
17      Q.    Okay.  Tell me about your
18  educational background.
19      A.    I have 12 years of high
20  school.
21      Q.    Where did you graduate high
22  school from?
23      A.    Opelika High.

Page 14

1      Q.    Okay.  What year were you
2  born?
3      A.    1973.
4      Q.    And after high school, did you
5  have any -- any college, any junior
6  college training?
7      A.    I went to Southern Union.  I
8  received my cosmetology degree.
9      Q.    Where is that located?
10      A.    In Opelika.
11      Q.    Okay.  And how long did that
12  take for you to get that?
13      A.    If I'm sure, it was two years.
14      Q.    And have you been working as a
15  hair stylist pretty much since that time?
16      A.    Yes.
17      Q.    You know, not going too in
18  depth, kind of give me a little bit of
19  your job history from the time you
20  graduated and got your cosmetology degree
21  going forward.
22      A.    I worked at Sheer Magic Hair
23  Salon for a while.  After that I worked in

Page 15

1  Beauregard Salon.  After that I went home
2  and had my own salon for a while.
3      Q.    Okay.
4      A.    And after that I went to Regis
5  Hair Masters.
6      Q.    Okay.
7      A.    And I also worked at Master of
8  Elegance before I was finished with
9  school.
10      Q.    Okay.  Did you take time off
11  when you were having your children more so
12  than just to have the child?
13      A.    Between my cosmetology career,
14  my husband's oldest son was drowned in our
15  swimming pool, so I did take a couple
16  years off to stay at home with my
17  children.
18      Q.    I'm sorry to hear that.  What
19  time frame was that?
20      A.    That was in '98.
21      Q.    So give me -- give me the best
22  you can estimate '98 until when that you
23  were not in the work force.

Page 16

1      A.    Maybe 2003.  I'm not sure.
2      Q.    Were you doing hair at home
3  during that time?
4      A.    Yes.
5      Q.    Okay.  Where did you -- where
6  was the next place you started to work in
7  2003 or the first time you went back into
8  the job --
9      A.    I went to Care Center of
10  Opelika.
11      Q.    And what job did you have
12  there?
13      A.    CNA.
14      Q.    Is that a certified nursing
15  assistant?
16      A.    Yes, sir.
17      Q.    Did you have to get
18  certification for that job?
19      A.    Yes, sir.
20      Q.    Tell me about that process.
21  When did you get that certification?
22      A.    You attended the classes.  I
23  think it was like a two-week course.  Then

AMY CARPENTER
REGIS CORP, INC.,

Page 17

1  you went out for training, and you waited
2  till you went to state.  You took your
3  test and you began work.
4      Q.    Did you have this
5  certification -- did you receive this
6  certification in 2003 or was this some
7  point --
8      A.    It was 2003.
9      Q.    Okay.  I'm not pinning you
10 down.  But you got it before you had
11 gotten out of the job market for a while?
12     A.    Right.
13     Q.    You got it after.  Do you
14 recall what your pay was there?
15     A.    No, sir, I don't.
16     Q.    Was it an hourly rate?
17     A.    Yes.
18     Q.    And did you work 40 hours a
19 week?
20     A.    Yes.
21     Q.    And then why did you leave the
22 Care Center of Opelika?
23     A.    I was going through a divorce

Page 18

1  in a domestic violence situation and had
2  to relocate.
3      Q.    Okay.  Where did you relocate
4  to?
5      A.    We went to a battered women
6  shelter for a while.  Then we moved to
7  Chester in Opelika.
8      Q.    It looked like -- had you had
9  some criminal charges filed against you
10 relating to that divorce?
11     A.    Yes.
12     Q.    Tell me about what was the
13 charge against you.
14     A.    Domestic violence.
15     Q.    Okay.  I mean, what
16 specifically were you alleged to have
17 done?
18     A.    To scratch Wendell in the
19 face.
20     Q.    Did you file criminal charges
21 against him as well?
22     A.    What happened -- excuse me.
23 What happened, when I went to court, I was

Page 19

1  found not guilty.
2      Q.    But did you -- were there
3  criminal charges lodged against him as
4  well?
5      A.    At some point.
6      Q.    Okay.  Did you have a
7  restraining order against him?
8      A.    No, I didn't.
9      Q.    Okay.  Other than whatever
10 charges were brought relating to the
11 domestic violence issue, have you ever
12 been charged with any other crimes?
13     A.    Yes.
14     Q.    Tell me what other charges you
15 faced.
16     A.    Harassment.
17     Q.    Who made that charge against
18 you?
19     A.    Tony Bedell.
20     Q.    Tony --
21     A.    Bedell.
22     Q.    B-A-D-E-L?
23     A.    B-E-D-E-L-L.

Page 20

1      Q.    What did he claim that you had
2  done?
3      A.    Harassing him.
4      Q.    Was this a boyfriend or --
5      A.    Yes.  Well, it was
6  ex-boyfriend.
7      Q.    What time frame was this?
8      A.    If I'm correct, it was around
9  1992.
10     Q.    Okay.  And what were the
11 results of that charge?
12     A.    Both of us was found guilty
13 for harassing each other.
14     Q.    Okay.  You had made charges
15 against him as well?
16     A.    Yes, sir.
17     Q.    Any other charges?
18     A.    No, sir.
19     Q.    You ever been arrested for bad
20 checks?
21     A.    No, sir.
22     Q.    Ever had to go in court for
23 bad checks?

AMY CARPENTER
REGIS CORP, INC.,

Page 21

1    A.    Yes, sir.
2    Q.    Okay.  Do you recall if you
3  were ever charged with any crime as a
4  result of bad checks?
5    A.    No, sir.
6    Q.    Okay.  Have you ever filed an
7  EEOC charge against any other employer
8  other than Regis?
9    A.    No, sir.
10    Q.    Have you ever called the EEOC
11  about any other employer?
12    A.    No, sir.
13    Q.    Have you ever made a complaint
14  of discrimination in writing, maybe not
15  necessarily to the EEOC, about some
16  employer?
17    A.    No, sir.
18    Q.    Okay.  Ever made an internal
19  complaint of discrimination at any of the
20  employers you've worked for?
21    A.    No, sir.
22    Q.    So you said you had to move or
23  quit the job with the Care Center of

Page 22

1  Opelika with this domestic issue going on
2  and you had to move.  What was the next
3  job that you got after that?
4    A.    Hair Masters.
5    Q.    Was there -- was there any
6  reason why you got back in the job market
7  in 2003 but didn't look for a job styling
8  hair?
9    A.    At that time, I was trying to
10  get a job to take care of me and my
11  children, and I was going for something
12  that I knew would pay me and help feed my
13  children.
14    Q.    Okay.  I mean, you'd had more
15  than a decade of experience styling hair.
16  Why did you feel that would not satisfy
17  that goal?
18    A.    Because I know it takes time
19  to build a clientele and I didn't have
20  that kind of time.
21    Q.    So you didn't have clientele
22  big enough from just doing hair in your
23  home that you could take over to a salon

Page 23

1  with you?
2    A.    Not that would pay rent,
3  light, water, and gas, no, sir.
4    Q.    Okay.  And when you say -- you
5  understand Hair Masters is related to
6  Regis?
7    A.    Yes, sir.
8    Q.    Do you know how those fit
9  together?
10    A.    Regis is the corporate office.
11  (Whereupon, Defendant's Exhibit 1 was
12            marked for identification.)
13    Q.    Okay.  Show you what I've
14  marked as Exhibit 1.  Some of these
15  documents I'll just ask you if you can
16  tell me what it is.
17    A.    Okay.
18    Q.    Does this look like the
19  application you filled out when you tried
20  to apply for work at Regis?
21    A.    Yes, sir.
22    Q.    And we'll just refer to Hair
23  Master -- all this together as Regis if

Page 24

1  that's all right, just for simplicity.
2  Did you fill this out all in your own
3  handwriting?
4    A.    Yes, sir.
5    Q.    As you look over this, is
6  there anything that you put on here back
7  on the application when you filled it out
8  that you now, having to testify under
9  oath, say is incorrect?
10    A.    Could you repeat that
11  question.
12    Q.    Yeah.  Is there anything that
13  you put on this application when you
14  filled it out in November of 2005 that was
15  not true at that time?  Did you lie on
16  this application anywhere?
17    A.    No, sir, not that I recognize.
18    Q.    Okay.  I notice on page two it
19  says did the bridal shows for Jim Massey's
20  Cleaners for two years, hair shows,
21  Platform, wedding bridal parties.  Tell me
22  what that type of work involves.  I know
23  there is a reference later where you were

AMY CARPENTER
REGIS CORP, INC.,

Page 25

1  meeting with some ladies in the store
2  about their bridal showers or their
3  weddings, what not.
4      A.   Auburn holds a show every year
5  for brides that are getting married, and
6  they have a lot of different vendors that
7  come out.  And for two years I did the
8  girls' hair.
9      Q.   Okay.  And so you would do it
10 actually for the show?
11     A.   Yes, sir.
12     Q.   Okay.  Do you remember who you
13 interviewed with when you submitted your
14 application on Regis's behalf?
15     A.   Amy Grace.
16     Q.   Where did y'all meet?
17     A.   Hair Masters in Auburn.
18     Q.   Okay.  And help me get
19 clarification on what stores we're dealing
20 with here.  Okay?
21     A.   Yes, sir.
22     Q.   Now, I've seen a reference to
23 a store called Tiger Town.

Page 26

1      A.   Uh-huh.
2      Q.   And then I've seen reference
3  to a Bruno's.
4      A.   Yes, sir.
5      Q.   Explain to me where exactly is
6  the Tiger Town store, not maybe an
7  address, and like why does it have that
8  name that's it been referred to as.
9      A.   It's in Opelika.
10     Q.   Okay.  Do you know why it's
11 called Tiger Town?
12     A.   Because it's in Tiger Town.
13 That's what the complex is called.
14     Q.   Okay.  Like is it a little
15 shopping complex and that's one of many
16 stores in there?
17     A.   Yes, sir.
18     Q.   Okay.  And then how about the
19 Bruno's location?
20     A.   It's next to Bruno's grocery
21 store.
22     Q.   Okay.
23     A.   In Auburn.

Page 27

1      Q.   In Auburn?
2      A.   Yes, sir.
3      Q.   Now, are those the only two
4  stores that you worked at during the time
5  you were with Regis?
6      A.   Yes, sir.
7      Q.   Okay.  Do you know what the
8  store number is for the Opelika store?
9      A.   I can't remember.
10     Q.   Okay.  How about the Auburn
11 store?
12     A.   I can't remember.  I'm sorry.
13     Q.   Okay.  That's all right.  But
14 they do each have a separate number within
15 Regis's system to designate one store from
16 the other?
17     A.   Yes, sir.
18     Q.   Okay.  What position were you
19 interviewing for when you met with
20 Ms. Grace with Regis?
21     A.   Cosmetologist.
22     Q.   Okay.  Is that the equivalent
23 to a stylist?

Page 28

1      A.   Yes, sir.
2      Q.   Did she offer you a job?
3      A.   Yes, sir.
4      Q.   What was her position at that
5  time?
6      A.   Store manager.
7      Q.   For which of the two stores?
8      A.   Bruno's.
9      Q.   Okay.  Do you remember what --
10 did you want to work full-time, or what
11 were you looking for?
12     A.   Yes, sir.
13     Q.   She offered you a full-time
14 job?
15     A.   Yes, sir.
16 (Whereupon, Defendant's Exhibit 2 was
17         marked for identification.)
18     Q.   Is that your signature in the
19 bottom left-hand corner of Exhibit 2?
20     A.   Yes, sir.
21     Q.   Can you see who's the
22 signature of the manager?
23     A.   I can't read it.

AMY CARPENTER
REGIS CORP, INC.,

Page 29

1    Q.    You don't know if that's Amy
2  Grace's signature or not?
3    A.    I don't know.
4    Q.    Is that consistent with your
5  recollection, that you would get an hourly
6  wage of $6 per hour?
7    A.    Yes, sir.
8    Q.    And then it says -- explain to
9  me -- it says service commission and then
10  retail commission.  How does that work?
11    A.    They have a scale of what you
12  perform, and when you perform between the
13  certain amount of dollar, you would get 40
14  percent.  And when you sold products, you
15  would get 10 percent of whatever you would
16  sell.
17    Q.    Okay.  So you would have to --
18  you have to reach a certain amount per
19  week to get the 40 percent?
20    A.    Yes, sir.
21    Q.    Okay.  I know some stores have
22  a situation where they'll say you're
23  guaranteed that you'll make at least $6 an

Page 30

1  hour, but if you do better in commission,
2  you'll get above that.  Is that how this
3  pay structure was working?
4    A.    Yes, sir.
5    Q.    Okay.  So if you only cut one
6  head of hair in a week, you would still
7  get the $6 an hour at least?
8    A.    Yes, sir.
9    Q.    Okay.  And it references the
10  important information for the new
11  employee.  Did you get a copy of the
12  handbook and the other documentation
13  that's kind of a new employee orientation
14  packet?
15    A.    I'm sure I did.
16    Q.    Okay.  Did you go to Minnesota
17  ever to any of the training sessions?
18    A.    No, sir.
19    Q.    Okay.  The -- did you ever do
20  any out-of-town trips for Regis?
21    A.    No, sir.
22  (Whereupon, Defendant's Exhibit 3 was
23        marked for identification.)

Page 31

1    Q.    Okay.  Can you identify
2  Exhibit 3 for me.
3    A.    It says Salon Policy
4  Acknowledgment.
5    Q.    Is that your signature there?
6    A.    Yes, sir.
7    Q.    Okay.  Did you -- do you
8  recall viewing this educational video
9  titled "Antiharassment Policy" when you
10  were hired?
11    A.    Yes.
12    Q.    And they gave you a
13  copy of the policy itself?
14    A.    Yes.
15    Q.    Okay.  Did anybody other than
16  Amy Grace do training with you in the
17  beginning?
18    A.    No.
19    Q.    Is Amy Grace the person who
20  was reviewing the handbook with you and
21  showing you the video and those things?
22    A.    Yes, sir.
23    Q.    Did you have any interaction

Page 32

1  with Toni Alvarez during any of the
2  interview process?
3    A.    No, sir.
4    Q.    How about Delise Burdette?
5    A.    No, sir.
6  (Whereupon, Defendant's Exhibit 4 was
7        marked for identification.)
8    Q.    Does Exhibit 4 look like a
9  copy of the harassment policy that would
10  have been provided to you when you were
11  hired?
12    A.    Yes, sir.
13    Q.    Okay.  Did you have any
14  training on discrimination or harassment
15  policies during the time you were at Regis
16  other than this kind of initial
17  orientation process?
18    A.    No, sir.
19  (Whereupon, Defendant's Exhibit 5 was
20        marked for identification.)
21    Q.    Okay.  Have you seen the
22  company's security regulations I've marked
23  as Exhibit 5 before?

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Page 33

1    A.   Yes, sir.
2    Q.   And was it your understanding
3  that these were general rules to go by in
4  running the store?
5    A.   Yes, sir.
6  (Whereupon, Defendant's Exhibit 6 was
7          marked for identification.)
8    Q.   Okay.  What is Exhibit 6?
9    A.   "What I expect of a manager."
10    Q.   My question was what is this,
11  do you know?
12    A.   I answered.  "What I expect of
13  a manager."
14    Q.   That's the title on it.  Do
15  you remember who gave this to you?
16    A.   Delise Burdette.
17    Q.   Okay.  Was this something that
18  Delise had prepared for the managers
19  underneath her?
20    A.   Yes, sir.
21    Q.   Okay.  Tell me what kind of
22  discussions you recall you and Delise
23  having when she gave you this.

Page 34

1    A.   She gave me this along with a
2  lot of other supplies for me to read
3  through and said that she would end up
4  going through the things and training me
5  on anything that I needed help with.
6    Q.   Is this at the point in time
7  where she promotes you to manager?
8    A.   Yes, sir.
9    Q.   What were the other materials
10  that she provided you other than this as
11  best you can recall?
12    A.   Basically on things what the
13  manager's duties were.
14    Q.   Were there some guidelines, or
15  were these Regis prepared documents?
16    A.   It was things that Delise had
17  prepared with Regis headings them.
18    Q.   Okay.  Do you remember the
19  title of any of those documents?
20    A.   No, sir, I don't.
21    Q.   Did they have -- what subjects
22  were covered in those documents?
23    A.   How to clean and handle your

Page 35

1  store, how to prepare your store, how to
2  keep it organized, referring to deposits,
3  and what she expects from you as a
4  manager.
5    Q.   Would it be basically more
6  detailed discussion of each of these
7  points in here?
8    A.   Yes, sir.
9    Q.   Okay.  Did you actually read
10  the material she gave you?
11    A.   I did.
12    Q.   Did it give you a pretty good
13  understanding about what she expected?
14    A.   Yes.
15    Q.   Who was your manager while you
16  were in the Bruno's store as a stylist?
17    A.   Amy Grace.
18    Q.   Okay.  Was it throughout the
19  entire time?
20    A.   Yes.
21    Q.   Okay.  Did there come a point
22  in time where a salon manager position
23  became available?

Page 36

1    A.   Yes, sir.
2    Q.   Okay.  Did Amy Grace move
3  somewhere else?
4    A.   Yes, sir.
5    Q.   Where did she move?
6    A.   To the Tiger Town store.
7    Q.   Why did she move there?
8    A.   I'm not sure.  That was
9  between her and the head manager.
10    Q.   Okay.  Who is the head
11  manager?
12    A.   At that time Delise was over
13  her.
14    Q.   Okay.  But Amy Grace didn't
15  say anything about why she was
16  transferring?
17    A.   No.
18    Q.   And then the -- when the
19  position became available, did you express
20  interest in it?
21    A.   Yes, sir.
22    Q.   Who did you express interest
23  to?

AMY CARPENTER
REGIS CORP, INC.,

Page 37

1     A.   Amy Grace.
2     Q.   Okay. What did you say to Amy
3 Grace?
4     A.   What did I say to her?
5     Q.   Yes.
6     A.   I expressed interest in the
7 position. And for a long time she and I
8 had been at the Bruno's store together and
9 had worked long and hard hours. And I
10 felt like I would be a good candidate.
11     Q.   What did Amy Grace say to you?
12     A.   She felt the same.
13     Q.   Did you talk to Delise any?
14     A.   Not -- not at that time.
15     Q.   And then a lady named Kay
16 received the promotion initially?
17     A.   I think her name was Katie.
18     Q.   What was her last name; do you
19 remember?
20     A.   No, sir.
21     Q.   What was her race?
22     A.   She was Caucasian.
23     Q.   And just for the record,

Page 38

1 what's your race?
2     A.   I'm African-American.
3     Q.   And did you have any
4 conversations with Delise about why Katie
5 was promoted into the position?
6     A.   When I talked -- when I did
7 talk to Delise about it, we both were
8 given a test to see who would score the
9 highest. After that, I was informed that
10 she had chose Katie and it had nothing to
11 do with the scores. I asked her why. She
12 said she didn't have to give me a reason,
13 that it was her decision.
14     Q.   So how did Delise know you
15 were interested in the job if you hadn't
16 communicated that to her?
17     A.   Through Amy Grace.
18     Q.   Okay. Who administered the
19 test to you?
20     A.   Amy Grace gave it to me.
21     Q.   Do you know what the name of
22 the test was?
23     A.   No, sir.

Page 39

1     Q.   What were the type questions
2 on the test?
3     A.   I can't remember.
4     Q.   Was it dealing with Regis
5 policies, or was it more of a technical
6 how do you do hair or what type things?
7     A.   I can't remember. I'm sorry.
8     Q.   You don't know what the name
9 of the test was?
10     A.   No, sir.
11     Q.   Do you know what your score
12 was on the test?
13     A.   No, sir.
14     Q.   Do you know what Katie's score
15 on the test was?
16     A.   No, sir.
17     Q.   Okay. So did Delise -- so had
18 -- the first time you spoke to Delise
19 about that position, Katie had already
20 been placed in the position, right?
21     A.   No, sir.
22     Q.   Okay. When was the first time
23 that you had a conversation with Delise

Page 40

1 about the position?
2     A.   After I had taken the test.
3     Q.   Okay. And Delise tells you at
4 that point that Katie is getting the
5 position?
6     A.   No. I'm not sure about the
7 time line or the time frame, but I know
8 the thing was at that time we had to wait
9 till the scores were revealed on the test.
10     Q.   Okay. So tell me what was
11 said during that conversation with you and
12 Delise the first time y'all discussed the
13 position.
14     A.   Well, really, at that time,
15 Amy Grace was still my manager. She did
16 not leave for like a month, so I was
17 communicating through her.
18     Q.   Okay. And I want to be clear
19 about when I ask questions I'm very
20 specific.
21     A.   Yes, sir.
22     Q.   And so when I ask about a
23 conversation you had with Delise --

AMY CARPENTER
REGIS CORP, INC.,

AMY CARPENTER
January 30, 2008

(Pages 41 to 44)

Page 41

1    A.   Yes, sir.
2    Q.   -- and you're telling me, I
3  assume this is a conversation you're
4  having with Delise.  If you're having this
5  through Amy, I need to know that as well.
6    A.   Okay.
7    Q.   Okay.  So did you have a
8  face-to-face conversation with Delise
9  about this position prior to Katie being
10 awarded the position?
11   A.   I'm not sure when Katie was
12 awarded the position.
13   Q.   Well, obviously if she says in
14 the first conversation you had with her
15 Katie got the job --
16   MR. PARR:  Object to the form.
17   Q.   -- then that conversation
18 would have taken place afterwards.  I
19 mean, do you recall a conversation with
20 Delise where she says I'm considering both
21 of y'all?
22   A.   No.
23   Q.   Okay.  So did Delise at some

Page 42

1  point tell you that Katie got the position
2  because she felt she was a better
3  qualified candidate?
4    A.   No.
5    Q.   Was that communicated through
6  Amy Grace to you, that that's what the
7  decision was?
8    A.   Yes.
9    Q.   Okay.  What specifically did
10 Amy Grace tell you?
11   A.   That she had chose Katie, a
12 girl from the Auburn store.
13   Q.   Okay.  Did she say that Delise
14 felt she had shown better customer service
15 skills during the time she had been there
16 at the store?
17   A.   No, sir.
18   Q.   Did she say specifically about
19 why she made the decision?
20   A.   No, sir.
21   Q.   So --
22   MR. PARR:  I hate to interrupt
23 you, but I think something was unclear.

Page 43

1  If I may, when you say the Auburn store,
2  are you referring to the Bruno's store or
3  is there a third store?
4    THE WITNESS:  It's the College
5  Street store.
6    MR. PARR:  I was afraid that
7  might not be clear.
8    Q.   So Katie was working at a
9  third store, College Street store?
10   A.   Yes, sir.
11   Q.   Okay.  So she comes into the
12 store as a manager and works for only
13 about a week, right, the Bruno's store?
14   A.   Yes, sir.
15   Q.   And did Katie tell you that
16 she was leaving because she didn't get
17 along with you?
18   A.   She didn't like me.
19   Q.   Okay.  What did -- how did you
20 come to learn that?
21   A.   She said it.
22   Q.   What did Katie tell you?
23   A.   She left because she didn't

Page 44

1  like me.
2    Q.   I mean, anything more detailed
3  than that?
4    A.   No, sir.
5    Q.   Did she go to another Regis
6  store, or did she just quit altogether?
7    A.   She went back to the store
8  where she had her clientele.
9    Q.   She never told you anything
10 specifically about what you had said or
11 done to make her not like you?
12   A.   No, sir.
13   Q.   Had anyone else told you that
14 they had heard from Katie why she said she
15 didn't like you?
16   A.   Yes.
17   Q.   Who had told you that?
18   A.   Christy Boatwright.
19   Q.   What did Christy Boatwright
20 tell you?
21   A.   That she did not like me
22 because I hog the customers.
23   Q.   Anything else?

AMY CARPENTER
REGIS CORP, INC.,

Page 45

1      A.    And that she just didn't like
2  me.
3      Q.    Had you been rude to her since
4  the time she came in the store?
5      A.    No, sir.
6      Q.    Were you upset that she had
7  gotten the manager position that you were
8  trying to obtain?
9      A.    Disappointed.
10      Q.    Did you show your
11  disappointment to her during the time she
12  was there at the store?
13      A.    No, sir.
14      Q.    Did you do anything
15  unprofessional to her during the time she
16  was at the store?
17      A.    No, sir.
18      Q.    How did you learn that Katie
19  was leaving the store?
20      A.    I'm not sure.
21      Q.    Okay. Did you go to --
22  obviously you ended up being placed in the
23  position after she leaves.

Page 46

1      A.    Yes, sir.
2      Q.    Tell me how we get from you
3  hearing that she's leaving the store to
4  where you're placed in the position.
5      A.    I don't remember hearing that
6  she was leaving. I don't remember hearing
7  that at all, but I know that she did
8  leave.
9      Q.    Okay.
10      A.    Rephrase your question if I'm
11  not answering what you wanted.
12      Q.    At some point you learned
13  she's leaving and you get put in the job.
14      A.    Yes, sir.
15      Q.    Tell me how we get from point
16  A to point B.
17      A.    I don't remember the
18  conversation of why she left or how she
19  left or when she left, but I remember
20  Delise coming in making me manager and
21  saying here's your opportunity.
22      Q.    Okay. Now, did she talk to
23  you about a 90-day period to prove

Page 47

1  yourself?
2      A.    We did talk about if it did
3  not work out that I would be demoted and
4  that I -- and I asked her if that happened
5  could I remain in the store where I had my
6  clientele. And she said if it didn't work
7  out for me or for her that that would be
8  fine.
9      Q.    Do you remember any 90-day
10  period being discussed?
11      A.    I'm sure that it was a
12  probation period, but I don't remember how
13  many days.
14      Q.    Okay. What would you estimate
15  that your book of business was -- what
16  were you -- what was your income on a
17  weekly basis roughly? I know it would
18  vary from commissions. But what kind of
19  range were you receiving on a weekly
20  basis?
21      A.    Before I became manager?
22      Q.    Yes.
23      A.    We would -- excuse me. I

Page 48

1  would try to have 50 percent commissions.
2  And I remember several times being between
3  2000, 22.
4      Q.    2200?
5      A.    Yes.
6  (Whereupon, Defendant's Exhibit 7 was
7              marked for identification.)
8      Q.    This is dated July 11th. I
9  just wonder on the first page, at least,
10  is that consistent -- the second date says
11  July 10th. Is that consistent with your
12  recollection about when you were promoted
13  to the salon manager position?
14      A.    I think it was a couple of
15  days before. I think this was when she
16  got around to doing the paperwork.
17      Q.    Okay. What was your
18  understanding of what your pay would be in
19  the new -- in the salon manager position?
20      A.    It says here payroll rate,
21  salary guarantee of $6 per hour,
22  commission rate 50 percent of service.
23      Q.    Is that 50 percent of the hair

AMY CARPENTER
REGIS CORP, INC.,

AMY CARPENTER
January 30, 2008

(Pages 49 to 52)

Page 49

1  that you do?
2      A.   Yes, sir.
3      Q.   Okay.  So you were going to
4  continue doing hair during the time you
5  were manager as well?
6      A.   Yes, sir.
7      Q.   Okay.  And then it looks like
8  on the first page there is some discussion
9  of an annual sales bonus.
10     A.   Yes.
11     Q.   In the Regis salon, does Regis
12  have their own product lines that they
13  sell to the customers?
14     A.   Yes.
15     Q.   What's the name of the product
16  line?
17     A.   They have a lot of different
18  lines.
19     Q.   I mean, but do they -- if you
20  were going into a Regis salon, could you
21  buy a product in the salon from a
22  competitor on their shelves?
23     A.   I'm not sure now.

Page 50

1      Q.   Back then?
2      A.   No.
3      Q.   Okay.  So if you were buying a
4  product in a Regis store, it was made by
5  Regis?
6      A.   If it was a Regis product.
7      Q.   I mean, but would there be any
8  non-Regis products for sale to the
9  customer in the salon?
10     A.   Yes.
11     Q.   What were some of those
12  products?
13     A.   They had Biosilk.
14     Q.   Did they have any Aveda
15  products?
16     A.   I can't remember did they have
17  Aveda.
18     Q.   What about -- you don't recall
19  what the Regis line was referred to as?
20     A.   No, sir.
21     Q.   Was there a Regis product that
22  was used for doing colorings?
23     A.   I can't remember the color

Page 51

1  line that they used.
2      Q.   What about conditioning
3  treatments?
4      A.   Depending on the person's type
5  of hair.
6      Q.   But there would be a
7  conditioner for conditioning treatments?
8      A.   Yes.
9      Q.   That was a Regis prepared
10  product?
11     A.   I'm not sure.
12     Q.   I notice there is this
13  allegation in your complaint about ethnic
14  hair.  I mean, is it your contention
15  that -- and I'll refer to it as highly
16  textured hair as opposed to ethnic hair.
17  I think some people can be offended by
18  that phrase.
19          If you're looking at hair,
20  typical African-American hair or possibly
21  a Jewish -- what I refer to as highly
22  textured hair, is it your contention that
23  there are certain conditioners that would

Page 52

1  work differently on that type of hair as
2  opposed to the typical hair of a
3  Caucasian?
4      A.   Conditioners, yes, as well as
5  other products.
6      Q.   What other products do you
7  claim?
8      A.   Moisturizers, Marcel irons,
9  certain relaxers.
10     Q.   What percentage of your
11  clientele in your book of business was
12  African-American and what percentage was
13  Caucasian?
14     A.   I would estimate 60/40.
15     Q.   60 white or 60 black?
16     A.   60 African-American.
17     Q.   And do you know whether or not
18  that's an accepted principle in the salon
19  business, that products are different for
20  Caucasian hair versus African-American
21  hair?
22     A.   Is that an accepted --
23     Q.   I mean, there are certain

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

AMY CARPENTER
REGIS CORP, INC.,

Page 53

1  people that say no, all hair can be
2  treated with the same products, aren't
3  there?
4      A.   They can't.
5      Q.   There are certain people that
6  say that within the business, aren't
7  there?
8      A.   I don't know what people say.
9      Q.   Well, does Regis produce a
10 conditioner that says for use only with
11 ethnic hair?
12     A.   Not that I know of.
13     Q.   Okay. Or do they produce a
14 conditioner that says only for use with
15 highly textured hair?
16     A.   Not that I know of.
17     Q.   Okay. So Regis has
18 conditioners, and your preference is to
19 use other conditioners other than what
20 they have for your African-American
21 customers; is that what I understand?
22         MR. PARR:  Object to the form.
23     A.   No.

Page 54

1          MR. PARR:  Go ahead and
2  answer.
3      A.   No, sir. There were certain
4  products that would be more suitable for
5  African-American hair and there would be
6  more products suitable for Caucasian. You
7  put moisture and oil into African-American
8  hair, not into Caucasian.
9      Q.   Okay. And so -- and let's be
10 clear on the difference between -- are we
11 talking about a normal conditioning
12 treatment, or are we talking about a deep
13 conditioning treatment here?
14     A.   Depending on the person's
15 hair.
16     Q.   Explain to me what your
17 understanding of the difference between
18 those two is.
19     A.   Between the deep conditioning
20 and the regular conditioning?
21     Q.   Yes.
22     A.   If my hair is dry and brittle
23 and, as I would say, maybe feel like a

Page 55

1  Brillo pad, it would need a more deep
2  condition. If I would put that in
3  Caucasian hair, it would weigh it down,
4  you wouldn't be able to style it maybe for
5  a week or two.
6      Q.   Well, with the deep
7  conditioning, though, are there additional
8  steps that you take like putting someone's
9  hair under a steamer or heating, anything
10 to that extent?
11     A.   Yes, sir.
12     Q.   I mean, there is a deep
13 conditioning that's an additional charge
14 above just a conditioning treatment,
15 right?
16     A.   Yes, sir.
17     Q.   Explain to me what a deep
18 conditioning treatment involves that's
19 different from just getting your hair
20 conditioned.
21     A.   You would use conditioning
22 moisture, maybe add a couple of oil drops,
23 and put a plastic cap over their head and

Page 56

1  put them under the dryer.
2      Q.   Is there a Regis provided
3  product that you could use on
4  African-American customers to do that deep
5  conditioning treatment?
6      A.   I can't think right off the
7  top of my head right now, but if you could
8  bring all the products in here, I'm sure I
9  could choose one.
10     Q.   I mean, I just want to make
11 clear there is some contention you had
12 that there weren't products available for
13 African-American customers of yours when
14 you moved to the Tiger Town store.
15     A.   Right.
16     Q.   You know, is your contention
17 that Regis store just didn't have
18 products that are needed to do a
19 particular service, or is it your
20 contention that there was a product you
21 would have preferred to use that they
22 didn't have?
23     A.   They didn't have products for

AMY CARPENTER
REGIS CORP, INC.,

Page 57

1 African-Americans such as relaxers. I was
2 not able to bring my Marcel irons, which
3 you could not use in Caucasian hair. It
4 would burn it off.
5 Q. You owned those Marcel irons,
6 correct?
7 A. I did.
8 Q. They are not supplied by
9 Regis.
10 A. Some were supplied by Regis at
11 the Bruno's store.
12 Q. But the Marcel irons you used
13 are your own personal irons?
14 A. I used mine and theirs.
15 Q. But the irons you're talking
16 about they didn't have in the salon are
17 your own personal irons, right?
18 A. They didn't have any.
19 Q. Did someone prevent you from
20 bringing your own Marcel irons over to
21 that store?
22 A. Delise told me they did not
23 have room for them there.

Page 58

1 Q. Delise told you that?
2 A. Yes.
3 Q. When?
4 A. When I was told to pack my
5 stuff and take it there.
6 Q. How big are these Marcel
7 irons?
8 A. The iron itself is like a
9 regular curling iron.
10 Q. Okay. So tell me about your
11 job duties during the time that you served
12 as the salon manager.
13 A. I was to make the schedules
14 for the other employees. I was to keep
15 everything stocked and fronted. They
16 would send out a billboard of how
17 everything is supposed to be for that
18 month, where the promotions would be.
19 Q. Did you have to balance the
20 cash registers at the end of the day?
21 A. Whatever person was closing.
22 Q. What were your normal work
23 hours during that time?

Page 59

1 A. I can't remember. From open
2 maybe to close.
3 Q. Was the salon open seven days
4 a week?
5 A. Six.
6 Q. What days was it closed?
7 A. Sundays.
8 Q. And did you have a particular
9 day off that you would take each week?
10 A. I don't remember.
11 Q. Did you get a day off --
12 A. Yes, sir.
13 Q. -- during the time you were
14 manager? And then Delise came back to you
15 at a later point and said that she was
16 going to move you back down to a stylist
17 position?
18 A. Yes, sir.
19 (Whereupon, Defendant's Exhibit 8 was
20 marked for identification.)
21 Q. This is a change form that's
22 dated August 2nd. Is that consistent with
23 your recollection as to when she came and

Page 60

1 told you about that?
2 A. My signature is not on here,
3 so I'm not sure.
4 Q. Okay. When is your
5 recollection as to when you were asked to
6 step down?
7 A. This is dated 8, the 2nd,
8 2006, but it was entered on 8/17.
9 MR. PARR: He's asking you
10 what your memory is.
11 Q. Your recollection. I'm not
12 asking you to interpret the document. I
13 think I've seen something that may have
14 said around August 10th. Do you remember
15 what day of the week it was that you had a
16 conversation or that you learned you were
17 going to be moved back to the stylist
18 position?
19 A. No, sir. But I refer back to
20 my notes, I could remember.
21 Q. Who told you that you were
22 going to be moved back to a stylist
23 position?

15

AMY CARPENTER
REGIS CORP, INC.,

Page 61

1    A.    Delise.
2    Q.    Was anybody else involved in
3    that conversation?
4    A.    Just she and I.
5    Q.    Okay.  What specifically did
6    Delise tell you?
7    A.    That I had to have my stuff
8    packed by five o'clock and out of there.
9    Q.    Did she tell you where you
10   were going to be going?
11   A.    She said I had to go to the
12   Tiger Town store.
13   Q.    Did she say why you had to go
14   to Tiger Town?
15   A.    That I was being demoted.
16   Q.    Did she say why you were being
17   demoted?
18   A.    She said that I had had a
19   complaint about a color.  She also had
20   told me that I wasn't management material.
21   Q.    What specifically do you
22   recall her saying about the complaint
23   about a color?

Page 62

1    A.    I didn't do what the customer
2    wanted.
3    Q.    Do you know who that customer
4    was, what that person's name was?
5    A.    No.
6    Q.    What do you recall about that
7    particular customer?
8    A.    That it was a child.
9    Q.    Child.  White or black?
10   A.    Caucasian.
11   Q.    Okay.  Did she give you any
12   specifics about what the customer's
13   complaint had been?
14   A.    That I didn't do what they
15   wanted, it wasn't bright enough.
16   Q.    Did she say how they had tried
17   to resolve the customer complaint?
18   A.    No.
19   Q.    Then did she give you any
20   specifics about what she meant that you
21   weren't management material?
22   A.    That I was low class.
23   Q.    Are you saying these are words

Page 63

1    that she said to you directly?
2    A.    Yes.
3    Q.    She told you the words that
4    you were low class?
5    A.    Yes.
6    Q.    Did she say that about you or
7    about your clientele?
8    A.    Both.
9    Q.    Tell me as specifically as you
10   can what you recall her saying to you.
11   A.    That I wasn't management
12   material and that I was low class and I
13   had a low-class clientele and that's not
14   what they wanted there.
15   Q.    Do you recall -- did you ask
16   her what she meant by low class?
17   A.    I did.
18   Q.    Did she give you any
19   explanation?
20   A.    No.
21   Q.    What else do you recall being
22   said in that conversation?
23   A.    To just pack my stuff and be

Page 64

1    out of there by five o'clock.
2    Q.    Okay.  Did you have any
3    conversation with her at that time about,
4    you know, can I stay here in this Bruno's
5    store as a stylist?
6    A.    Yes.
7    Q.    What was said in regards to
8    that conversation?
9    A.    She said no.
10   Q.    Did she tell you that it's
11   standard practice that if a manager is
12   demoted to move to another salon?
13   A.    Not at that time she didn't.
14   Q.    Did she tell you that at some
15   point later?
16   A.    She didn't.
17   Q.    Did Toni Alvarez tell you
18   that?
19   A.    Yes.
20   Q.    And Toni Alvarez said that
21   she's the one that had advised to move
22   to -- move you to another salon, correct?
23       MR. PARR:  Object to the form.

AMY CARPENTER
REGIS CORP, INC.,

Page 65

1    A.    Not to me.
2    Q.    To your knowledge, do you know
3  who made the decision to move you to that
4  other salon?
5    A.    To my knowledge, Toni Alvarez
6  didn't know.  I was told that it was
7  Delise -- Delise decision.
8    Q.    Who told you Toni Alva -- what
9  were you saying Toni Alvarez didn't know?
10    A.    That I had been transferred to
11  the other store.
12    Q.    Who else worked with you in
13  the Bruno's store during the time you were
14  the manager?
15    A.    Christy Boatwright and
16  Shannon.  I can't think of Shannon's last
17  name.  And Norah and, let me see.  Norah
18  was hired.  She wasn't working.  But there
19  was an older African-American lady.  I
20  can't remember her name.
21    Q.    Was there anybody that would
22  work just as a receptionist?
23    A.    Yes.

Page 66

1    Q.    Who was that?
2    A.    Shannon.
3    Q.    Okay.  And then at the Tiger
4  Town store, who all worked there?
5    A.    I can't remember all of their
6  names, but I know Amy Grace, Carolyn.
7    Q.    Carolyn?
8    A.    Carolyn.
9    Q.    Okay.
10    A.    Tina Cottle.
11    Q.    C-O-T-T-L-E?
12    A.    I think so, yes.
13    Q.    Anybody else that you can
14  recall there?
15    A.    There were plenty more there.
16  I just don't remember their names.
17    Q.    Okay.  What was Christy
18  Boatwright's race?
19    A.    Caucasian.
20    Q.    How about Shannon?
21    A.    Caucasian.
22    Q.    Norah?
23    A.    Caucasian.

Page 67

1    Q.    And then there was an older
2  African-American lady.  You don't recall
3  her name?
4    A.    I can't recall.
5    Q.    And then Amy Grace?
6    A.    She's Caucasian.
7    Q.    Carolyn?
8    A.    She's African-American.
9    Q.    Tina Cottle?
10    A.    Caucasian.
11    Q.    Okay.  Do you want to take a
12  few minutes to look through that?  We can
13  take a break.  It's several pages.  And we
14  can go off the record.
15        (Off-the-record discussion.)
16    Q.    (BY MR. BOSTICK:)  We were
17  talking about Exhibit 7.  Do you recall
18  seeing any of these documents back at the
19  time you worked for Regis?
20    A.    No, sir.
21    Q.    Okay.  Do you recall there
22  being a complaint made by a customer on
23  August 15th, 2006 against you as referred

Page 68

1  to on page one?
2    A.    No, sir.
3    Q.    How about the three complaints
4  that are listed on the second page?
5    A.    Which page?  I'm sorry.  Maybe
6  I'm not --
7    Q.    It's Bates numbered.  If you
8  look at the page number on the side, it's
9  D-00180.
10    A.    The one over here?
11        MR. PARR:  He's talking
12  about --
13    A.    Okay.  I'm sorry.
14    Q.    Do you recall whether or not
15  you knew back at the time about these
16  complaints being made about you between
17  March 12, August 1, and August 11?
18    A.    No, sir.  The only complaint
19  that I was aware of, like I said earlier,
20  was a child that had wanted highlights and
21  the mother wanted them a lot brighter than
22  what I had done.
23    Q.    Look on the next page for me.

AMY CARPENTER
REGIS CORP, INC.,

Page 69

1    This is a printout.  It says that there
2    was a customer named Andy who made a
3    complaint on July 18th of 2006.  And on
4    the next page it says -- looks like his
5    complaint was that his ear had gotten cut
6    during the service.  Do you remember
7    anything about that?
8        A.   I don't remember.
9        Q.   I mean, do you remember if
10   there was a customer named Andy whose ear
11   that you cut?
12       A.   I don't remember specifically.
13   I've cut my hand several times.  I'm sure
14   I probably nicked a customer or two.  Not
15   intentionally.
16       Q.   Okay.  The next one is dated
17   August 15th of 2006.  Customer named
18   Heather Collins.  Do you know who that is?
19       A.   No, sir.
20       Q.   Looks like the service was
21   provided on August 11.  The complaint was
22   -- it says the customer was not happy with
23   her cut.  She stated one side of her head

Page 70

1    has layers and the other is longer with no
2    layers.  Apologized and contacted the
3    manager.  She is willing to do a redo.  Do
4    you know anything about that complaint?
5        A.   I don't know anything about
6    that complaint, but I know I wouldn't put
7    layers on one side and not the other.
8        Q.   And you don't know who Heather
9    Collins is?
10       A.   No.
11       Q.   How about Nicole Calloway?
12       A.   Yes.
13       Q.   Do you know her?
14       A.   Yes.
15       Q.   Who is she?
16       A.   She was a customer.
17       Q.   It says customer called and
18   scheduled an appointment for shampoo, cut,
19   blow dry with stylist.  Is that correct?
20       A.   That is not correct.
21       Q.   What did she schedule?
22       A.   That particular day she was
23   supposed to get a relaxer, a rinse, and a

Page 71

1    haircut and Marcel iron curls.  And this
2    is incorrect.  That complaint was in the
3    store against the salon, not me.  So this
4    is incorrect.
5        Q.   Then it says stylist called
6    her one hour before service and stated
7    salon does not have products for highly
8    textured hair, so she wouldn't be able to
9    do her hair.  Is that true?
10       A.   This is incorrect.
11       Q.   I'm asking about that specific
12   question.  Okay?
13           MR. BOSTICK:  Read my question
14   back because it wasn't answered.
15           (Record read.)
16       A.   No.  I told her upon arrival,
17   because I was trying to offer her a
18   different service of whatever I could do,
19   because I did not have relaxer there.  She
20   also talked with the manager that day,
21   which was Amy Grace, and Amy told her and
22   Tina Cottle told her that we did not have
23   anything there for her hair.

Page 72

1        Q.   What was the specific product
2    that you say was not available?
3        A.   She wanted relaxer and a rinse
4    that you could put on top of a relaxer.
5    You can't put a permanent color on top of
6    a relaxer.  It would break the hair off.
7    And they did not have that there.
8        Q.   She wanted to get a relaxing
9    and a coloring done on the same day?
10       A.   A rinse.
11       Q.   A rinse.  What is a rinse?
12       A.   It's a color.
13       Q.   Okay.
14       A.   But it's not permanent.
15       Q.   Okay.  So what product was not
16   available that would have allowed y'all to
17   do that?
18       A.   The relaxer wasn't there.  The
19   rinses weren't there.  I was told there
20   wasn't any room for my Marcel irons, so I
21   didn't have those there either.
22       Q.   What is the name of the
23   relaxer that was not there?

AMY CARPENTER
REGIS CORP., INC.,

Page 73

1    A.   I can't remember the name of
2  the relaxer we was using at that time.
3    Q.   Were there any other stylists
4  in the Tiger Town store who had
5  African-American customers?
6    A.   I had just been transferred
7  there. I don't know what everybody's
8  clientele was.
9    Q.   You didn't see any other
10  African-American customers in the store
11  other than that you were working on?
12    A.   No, I didn't. Not the few
13  days I was there.
14    Q.   Do you know if anybody else
15  had Marcel irons in the store?
16    A.   No.
17    Q.   You don't know or nobody did?
18    A.   I don't know what they had.
19    Q.   This entry says that the
20  stylist was aware of the appointment and
21  knew that she needed her own specialized
22  tools -- I'm paraphrasing -- and neglected
23  to bring them and blamed it on the salon.

Page 74

1  Do you agree or disagree with that?
2    A.   That statement is not true.
3    Q.   Would you have needed Marcel
4  irons to perform the service that she
5  needed?
6    A.   Yes, sir.
7    Q.   Okay. And where did you take
8  your Marcel irons when you left the
9  Bruno's store?
10    A.   I attempted to bring all of my
11  items to the Tiger Town store.
12    Q.   Again, attempted. Where did
13  you put them? Where did they end up?
14  Were they at your house?
15    A.   Yes.
16    Q.   What tools did you bring with
17  you to the Auburn store?
18    A.   To the Auburn store?
19    Q.   Or to the Tiger Town store.
20    A.   My combs, my brushes.
21    Q.   Any clippers?
22    A.   Yes.
23    Q.   Tell me everything you brought

Page 75

1  with you.
2    A.   Pins, accessories, whatever I
3  had that was mine that I had bought.
4    Q.   Had you seen some of this
5  relaxer product in the store before and
6  they had just run out?
7    A.   I had not been in Tiger Town
8  as far as a stylist before, so I didn't
9  know what they had or what they didn't
10  have.
11    Q.   Okay. So did you know that
12  the -- that you didn't have that product
13  before the customer showed up at the
14  salon?
15    A.   I was told that they would get
16  the stuff from Bruno's store and have it
17  transferred there.
18    Q.   Who told you that?
19    A.   Amy Grace.
20    Q.   When did she tell you that?
21    A.   When I realized I didn't have
22  any relaxer.
23    Q.   How much distance is there

Page 76

1  between the Tiger Town store and the
2  Bruno's store?
3    A.   Maybe two miles, three miles.
4  I'm not sure.
5    Q.   Were you aware that when the
6  customer came in the salon and this issue
7  came up that Delise Burdette was at the
8  Bruno's store?
9    A.   Amy told me that Delise said
10  no items would be transferred.
11    Q.   Did she tell you that Delise
12  had volunteered to bring over the Marcel
13  irons from that store?
14    A.   No.
15    Q.   Do you dispute that?
16    A.   I was not told that.
17    Q.   What did Amy Grace say to the
18  customer or how did -- was she provided a
19  service that day, the customer?
20    A.   No.
21    Q.   How was it left with the
22  customer?
23    A.   She was upset because she

AMY CARPENTER
REGIS CORP, INC.,

Page 77

1  couldn't get her hair done. She couldn't
2  get it relaxed. And Amy told -- she
3  apologized to her, and she said that she
4  would be ordering products that would be
5  fit for her hair. And she began to make
6  an order.
7      Q.   Okay. Do you know how that
8  ordering process works?
9      A.   You go on the computer and you
10  order it.
11      Q.   Okay. Was there any attempt
12  to schedule another appointment for the
13  customer?
14      A.   Not that day.
15      Q.   Was Ms. Calloway one of your
16  regular customers?
17      A.   Yes.
18      Q.   So she -- did you not have the
19  opportunity that morning to look and see
20  if you had the supplies you needed before
21  she made the trip down there?
22      A.   Well, I was trusting in my
23  manager, and she said that she would get

Page 78

1  the supplies I needed there.
2      Q.   So you deny making any kind of
3  call to the customer before she showed up
4  at the store?
5      A.   About canceling her
6  appointment?
7      Q.   Any kind of call whatsoever to
8  the customer that day.
9      A.   Not that I recall.
10      Q.   You didn't speak with the
11  customer on the telephone before she
12  showed up at the salon that day; that's
13  your testimony, right?
14      A.   I don't think so.
15      Q.   Okay. Would three customer
16  complaints within a 15-day period have
17  been troublesome to you as a manager
18  during the time you worked as a salon
19  manager?
20          MR. PARR: Object to the form.
21      A.   Would have been troublesome to
22  me?
23      Q.   Yes.

Page 79

1      A.   It would have made me aware
2  maybe that the stylist needed some help.
3      Q.   Suggested that maybe there was
4  some type of issue there --
5      A.   Yes.
6      Q.   -- that needed to be looked
7  into?
8          MR. PARR: Object to the form.
9      Q.   Have you seen what I marked as
10  Exhibit 8 before?
11          MR. PARR: Brian, I have
12  this --
13          MR. BOSTICK: Did I mark two?
14          MR. PARR: -- marked as
15  eight --
16          MR. BOSTICK: I'm sorry.
17          MR. PARR: -- also.
18          MR. BOSTICK: The full
19  complaint one.
20          MR. PARR: No, you marked that
21  one -- I don't know what you've got over
22  there. I've got the claims marked as
23  seven and then this marked as seven. And

Page 80

1  now I've got two eights.
2          MR. BOSTICK: I wouldn't put
3  it past me. Let's go off the record and
4  figure this out.
5          (Off-the-record discussion.)
6          MR. BOSTICK: We've just
7  corrected the identification exhibits so
8  that the exhibit previously identified as
9  Exhibit 7, which is Bates numbered 179
10  through 186 is now marked as Exhibit 7A.
11  And the document Bates numbered 91 through
12  D-0092 is now 8A.
13  (Whereupon, Defendant's Exhibits 7A and 8A
14          were marked for
15          identification.)
16      Q.   Have you ever seen what I've
17  marked as 8A before, Ms. Carpenter?
18      A.   No.
19      Q.   Is this the complaint that you
20  were referring to earlier about the
21  coloring of the daughter's hair?
22      A.   Yes.
23      Q.   Tell me what you recall about

20

Page 81

1  that complaint.
2      A.   The mother brought her
3  daughter in.  She had previously tried to
4  highlight her daughter's hair at home
5  several times.  The child hair was very
6  damaged.  I discussed this with the mother
7  and gave her my professional opinion on
8  what level to bring the child's hair up
9  to.  And I did that.  The mother was not
10  satisfied with the highlighted area.  She
11  said it wasn't bright enough.  I explained
12  to the mother that the child hair was
13  already very damaged from the previous
14  coloring that she had done at home.
15      Q.   Do you know if the customer
16  went to another salon to have some
17  additional work done?
18      A.   I found out later she did.
19      Q.   Who was the stylist who did
20  the additional work on the daughter's
21  hair; do you know?
22      A.   I don't know who done it.  But
23  Amy Grace is the one that called me.

Page 82

1      Q.   Amy Grace called you?
2      A.   Yes.
3      Q.   Okay.  And what was -- just so
4  I'm clear, did Amy Grace move to be the
5  salon manager at Tiger Town?
6      A.   Yes, sir.
7      Q.   Okay.  So she was your manager
8  at the time you were a stylist at Bruno's
9  and then she was your manager also when
10  you were a stylist at Tiger Town?
11      A.   Yes, sir.
12      Q.   Okay.  Up to the time that you
13  were demoted, had you had any prior
14  arguments or disagreements with Delise
15  Burdette?
16      A.   Arguments or disagreement?
17      Q.   Uh-huh.
18      A.   I don't think I've had
19  arguments with her.
20      Q.   Okay.  I mean, did y'all have
21  a good working relationship prior to that
22  time?
23      A.   She was my manager, and I did

Page 83

1  my best to do as she told me.
2      Q.   Okay.  I mean, had she ever
3  made any racially derogatory comments that
4  you were aware of?
5      A.   Racial?
6      Q.   Yes.
7      A.   Not that I can recall.
8      Q.   Okay.  And I know you said
9  that she had said something about her
10  saying about low-class clients.  I mean,
11  other than that comment, I mean, do you
12  know of any specific comments as you sit
13  here today that you contend Delise
14  Burdette made that were racist?
15      A.   No.
16      Q.   Okay.  How was your working
17  relationship with Toni Alvarez prior to
18  the time you were terminated?
19      A.   I really didn't work with
20  Ms. Alvarez.
21      Q.   Did you and she get along as
22  far as you knew prior to the time of your
23  termination?

Page 84

1      A.   We worked in a working
2  atmosphere together.
3      Q.   As far as you know, she didn't
4  have any ax to grind with you?
5      A.   Not that I know of.
6      Q.   I mean, I just want to make
7  sure there is not something when we get to
8  trial and you say Delise Burdette always
9  hated me because this happened six months
10  earlier.  I mean, is there any kind of
11  confrontation or reason that Delise had to
12  dislike you prior to -- during the time
13  that you worked at Regis?
14      A.   Prior?
15      Q.   Prior to.
16      A.   Me being employed at Regis?
17      Q.   Was there something that
18  happened prior to the time you were at
19  Regis?
20      A.   Yes.
21      Q.   What happened?
22      A.   When I began working at Sheer
23  Magic Hair Salon, Delise worked there

AMY CARPENTER
REGIS CORP, INC.,

Page 85

1   also.
2       Q.    Okay.  And did y'all not --
3   did y'all have any interactions there?
4       A.    She was already working when I
5   started.  And back then I was -- it was
6   micros and kinky twists were in style,
7   which brought a good clientele.  At that
8   time Sheer Magic was sort of a slow
9   business.  And she didn't like me or she
10  was disgruntled because I had a better
11  clientele.
12      Q.    What specifically did she say
13  to you that made you draw that conclusion?
14      A.    That I was hogging the
15  customers, and she made statements to that
16  manager.
17      Q.    Who was the manager at that
18  time?
19      A.    Susan Smith.
20      Q.    What period of time are we
21  talking about?
22      A.    I'm not sure right offhand.
23      Q.    Okay.  What time frame or are

Page 86

1   we in the '90s or --
2       A.    Yes, it was in the '90s.
3       Q.    But, you know, as you sit here
4   today, has anybody ever told you that
5   they've heard Delise say the N word or any
6   racist comments like that?
7       A.    No, sir.
8       Q.    Okay.  Are there any racial
9   comments that you heard of or someone told
10  you about at Regis that you say helps
11  support your case?
12      A.    No, sir.
13      Q.    Okay.  Other than your
14  divorce, have you been a party to any
15  other lawsuits other than this one?  We
16  talked about the criminal stuff earlier.
17      A.    Right.  No, sir.
18      Q.    Have you filed for bankruptcy
19  in the last five years?
20      A.    Yes, sir.
21      Q.    Okay.  When did you file most
22  recently?
23      A.    I filed in '07, and I recently

Page 87

1   converted to a Chapter 7.
2       Q.    Okay.  Has that been
3   discharged yet?
4       A.    Yes, sir.
5       Q.    When was it discharged?
6       A.    This year.
7       Q.    Did you disclose this lawsuit
8   on the reports for that?
9       A.    Yes, sir.
10      Q.    Have you ever sought social
11  security disability benefits?
12      A.    For myself?
13      Q.    Yes.
14      A.    No, sir.
15      Q.    Sought them for anybody in
16  your family?
17      A.    Excuse me?
18      Q.    Social security disability
19  benefits meaning that you represent you're
20  unable to work.
21      A.    I'm able to work.
22      Q.    Okay.  Have you ever tried to
23  recover disability benefits either through

Page 88

1   social security or through long-term
2   disability plan, anything like that?
3       A.    For myself?
4       Q.    Yes.
5       A.    No, sir.
6       Q.    Okay.  Did you have health
7   insurance through Regis?
8       A.    Yes, sir.
9       Q.    Was that something that was
10  offered to the stylists, or did you just
11  get that when you became a manager?
12      A.    It was offered as a stylist.
13      Q.    Okay.  And did you have that
14  throughout the time that you worked there?
15      A.    Yes, sir.
16      Q.    Okay.  Do you have health
17  insurance today?
18      A.    Yes, sir.
19      Q.    Who is your health insurance
20  through?
21      A.    Blue Cross Blue Shield of
22  Georgia.
23      Q.    Is that through an employer?

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                        http://www.TylerEaton.com

AMY CARPENTER
REGIS CORP, INC.,

AMY CARPENTER
January 30, 2008

(Pages 89 to 92)

Page 89

1     A.   Yes, sir.
2     Q.   Which employer?
3     A.   Columbus Hospice.
4     Q.   So run me quickly through your
5  employers from the time you left Regis.
6     A.   I was employed with Summit
7  Hospital.
8     Q.   Just give me the time frames.
9     A.   At Summit, 12/06 to July of
10 '07.  And Columbus Health of Georgia, I'm
11 currently employed with them, and I'm
12 currently employed with Columbus Hospice.
13    Q.   Do you have two separate jobs?
14    A.   Yes.
15    Q.   Okay.  Looks like you -- the
16 first place was Quality Care Nursing.
17    A.   Yes.
18    Q.   What did you do for them?
19    A.   Sat with patients.
20    Q.   Okay.  And what was your pay
21 there?
22    A.   I don't recall.
23    Q.   Was it an hourly wage?

Page 90

1     A.   Yes.
2     Q.   Was it a full-time position?
3     A.   Depending on your patient
4  load.
5     Q.   Why did you leave there?
6     A.   I started working at Summit.
7     Q.   What was your title at Summit?
8     A.   Support tech.
9     Q.   What was your pay there?
10    A.   I think it was 8.45.
11    Q.   Did you have benefits?
12    A.   Yes.
13    Q.   Health insurance?
14    A.   Yes.
15    Q.   Okay.  Why did you leave
16 Summit Hospital?
17    A.   I was laid off.
18    Q.   Okay.  Were you -- were you
19 discharged for performance issues, or were
20 you laid off due to a downturn in business
21 or what?
22    A.   They had several layoffs.  It
23 was issues with the hospital itself.

Page 91

1     Q.   Okay.  So to your
2  understanding, your performance wasn't an
3  issue in being laid off?
4     A.   No, sir.
5     Q.   Okay.  What's your position
6  with Columbus Hospice?
7     A.   Certified nursing assistant.
8     Q.   And what's your pay there?
9     A.   8.35.
10    Q.   Do you work 40 hours a week?
11    A.   Or more.
12    Q.   Or more.  Do you get overtime
13 for above 40?
14    A.   Yes, sir.
15    Q.   And do you get Blue Cross Blue
16 Shield's health insurance?
17    A.   Yes, sir.
18    Q.   What other benefits do you
19 get?
20    A.   403.
21    Q.   What's 403?
22    A.   It's a plan.  It's one of
23 their benefits that they have.

Page 92

1     Q.   Is it like a profit-sharing
2  plan or contribute money for retirement?
3     A.   Right.
4     Q.   Have you received any
5  promotions during the time you've worked
6  there?
7     A.   I recently was selected for
8  the Care Award Committee.
9     Q.   Okay.  What is that?
10    A.   They have a program where
11 everybody is selected for doing good work,
12 and they give them a care award, some for
13 the month, some for the year.  And it was
14 a committee, and I was chosen to sit on
15 that committee.
16    Q.   Okay.  Now, did you say you
17 worked for Columbus Hospice and another
18 entity right now?
19    A.   Right.
20    Q.   Who is the second entity that
21 you work for?
22    A.   Columbus Health of Georgia.
23    Q.   Were we just talking about

AMY CARPENTER
REGIS CORP, INC.,

AMY CARPENTER
January 30, 2008

(Pages 93 to 96)

Page 93

1  Columbus Hospice?
2      A.    Right.
3      Q.    What do you do for Columbus
4  Health of Georgia?
5      A.    I'm a certified nursing
6  assistant, sit with people that need
7  assistance.
8      Q.    What's your pay there?
9      A.    I'm not sure.  It's an agency.
10     Q.    Do you work there on PRN
11  basis?
12     A.    Yes.
13     Q.    So Columbus Hospice is your
14  first job, and then you take on extra
15  shifts on the side through the other
16  entity?
17     A.    If needed, yes, sir.
18     Q.    Okay.  And then you don't get
19  any benefits through them, the second
20  entity?
21     A.    No, sir.
22     Q.    How long have you been working
23  with Columbus Health of Georgia?

Page 94

1      A.    I'm not sure.
2      Q.    More than a year?
3      A.    I'm not sure.
4      Q.    Do you do any hair styling for
5  people in your house these days?
6      A.    No, sir.
7      Q.    Did you, after leaving Regis,
8  look for any work in the hair styling
9  business?
10     A.    Yes, sir.
11     Q.    Okay.  Did you interview with
12  any employers in the hair styling
13  business?
14     A.    Yes, sir.
15     Q.    Who all did you interview
16  with?
17     A.    I know one was Great Clips.
18     Q.    Did they offer you a job?
19     A.    Yes, sir.
20     Q.    Okay.  As a stylist or a
21  manager?
22     A.    As a stylist.
23     Q.    Do you remember what pay they

Page 95

1  offered?
2      A.    No, sir, I don't.
3      Q.    Did you -- I take it you
4  turned that job down?
5      A.    It had to do with porosity,
6  and I did not have time to wait for that.
7      Q.    Had to do with what?
8      A.    Porosity.
9      Q.    What do you mean by that?
10     A.    I have an Alabama cosmetology
11  license.  This was in Georgia, so I need a
12  Georgia license.
13     Q.    And I take it the jobs you
14  have now with Columbus, that's in
15  Columbus, Georgia?
16     A.    Yes, sir.
17     Q.    How far of a drive is that
18  from here?
19     A.    From here?
20     Q.    Or from your home.
21     A.    From my home, it's about 12 to
22  15 minutes.
23     Q.    Okay.  Did you have a

Page 96

1  cosmetologist license or a barber's
2  license?
3      A.    I have a cosmetologist
4  license.
5      Q.    And that Great Clips, was it
6  in Columbus, Georgia also?
7      A.    Yes.
8      Q.    Did you interview with any
9  other hair styling businesses other than
10  Great Clips after you left Regis?
11     A.    J.C. Penney's.
12     Q.    Did they offer you a job?
13     A.    No, sir.  They need -- I
14  needed more of a clientele, and me being
15  new to the area, I did not have that.
16     Q.    Anybody else?
17     A.    A couple of small -- I think
18  one was Head Hunters.
19     Q.    Doesn't sound like a good name
20  for a styling salon.  Was the J.C.
21  Penney's here in Alabama or was that a
22  Georgia location?
23     A.    It was Georgia as well.

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                                    http://www.TylerEaton.com

AMY CARPENTER
REGIS CORP, INC.,

Page 97

1    Q.    So are you talking about
2  reciprocity, where you have to take a
3  license here to get it converted to
4  Georgia, or would you have to go through
5  the whole testing process again?
6    A.    No.  I had to send the
7  information that I had off and wait for
8  them to send me the package in the mail.
9  It was like a six to eight-week process.
10    Q.    Have you done anything to
11  complete that process, or did you just
12  stop the process once you got the job with
13  the nursing assistant position?
14    A.    I haven't done anything.
15    Q.    Moving -- shifting back to our
16  earlier discussion.  The last we were
17  talking about I believe was about when you
18  learned of the demotion.  Approximately
19  how many days do you think you worked in
20  the Tiger Town store before you were
21  terminated?
22    A.    Maybe three or four.
23    Q.    Okay.  So less than a week?

Page 98

1    A.    Yes, sir.
2    Q.    Okay.  And at some point you
3  make a call to somebody in the home office
4  and make a complaint.
5    A.    Yes, sir.
6    Q.    Who did you call?
7    A.    The home office number, and I
8  remember speaking with Amy Edwards.
9    Q.    Now, I saw where there was a
10  letter that you wrote to Kris Bergly.  Who
11  is Kris Bergly?
12    A.    I don't have the handbook in
13  front of me.
14    Q.    But it looked like he was
15  listed as one of the people under the
16  harassment policy.  I mean, did you get
17  his name from -- or her name from the
18  handbook?
19    A.    I have to see what you're
20  talking about.  I can't remember right
21  off.  I'm sorry.
22    Q.    That's all right.  Look back
23  at Exhibit 4.  Look on the second page.

Page 99

1  It's got a contact information for the
2  home office and then some -- is that where
3  you got his name from?
4    A.    Yes.
5    Q.    Okay.  Why did you address
6  that letter to him as opposed to Amy
7  Edwards when you had spoken with
8  Ms. Edwards about this?
9    A.    I'm sure, because of the
10  situation that was going on, I wanted to
11  get someone else attention.
12    Q.    I mean, had you had any
13  problems previously with Ms. Edwards?
14    A.    I would have to see the date
15  that I written it on, and I might answer
16  that better.
17    Q.    Prior to your calling in to
18  Ms. Edwards about being demoted, had you
19  had any problems with her prior to that
20  time?
21    A.    No, sir.
22    Q.    Okay.  Tell me what you recall
23  telling Ms. Edwards in that conversation.

Page 100

1    A.    I recall telling her that I
2  had been keeping notes of situations that
3  had been happening at the salon and that I
4  felt that I was being treated unfairly and
5  that I had been demoted and was being
6  transferred against my wishes to another
7  salon and that I was told that if it
8  didn't work out that I could stay in the
9  salon where I had my clientele, which was
10  very important.  I had told her that
11  Delise had threatened me over the phone.
12  I had called Tina Cottle because I was
13  being demoted and transferred and I wanted
14  to stay there.  And she had told me not to
15  question anything that she does as my ass
16  would be fired.
17    Q.    You say that Delise Burdette
18  said that to you over the phone, that your
19  ass would be fired?
20    A.    Yes.
21    Q.    And is that what you're
22  referring to when you said Delise
23  threatened you over the phone?

25

Page 101

1      A.    Yes.
2      Q.    Did you tell her anything
3  about this low-class comment during that
4  conversation?
5      A.    It's a possibility.
6      Q.    Would your notes reflect your
7  conversation with her, with Ms. Edwards?
8      A.    It may.
9  (Whereupon, Defendant's Exhibit 9 was
10         marked for identification.)
11      Q.    Can you identify what I marked
12  as Exhibit 9 for me, please.
13      A.    It was notes or items I was
14  jotting down in a notebook.
15      Q.    When you said earlier that you
16  told Amy Edwards that you had been keeping
17  notes at the salon, is this what you're
18  referring to?
19      A.    Yes, sir.
20      Q.    Look through this whole thing.
21  Just tell me if this looks like all the
22  notes that you've compiled during the time
23  you were there at Regis.  I mean, does

Page 102

1  that look like all your notes just going
2  through it?
3      A.    Yes, sir.  I'm sorry.
4      MR. PARR:  Look at all the
5  pages and make sure that it appears to be
6  everything taken.  That's what he's
7  asking, are there any others that aren't
8  contained in that.
9      A.    Yes, sir.
10      Q.    Okay.  Are these notes that
11  you're making at the time these events
12  were happening, or did you write all these
13  notes at some point later in time?
14      A.    Probably both.
15      Q.    Okay.  Well, if you would
16  distinguish for me as we go.  You know,
17  for example, like here you have 8/4/06 on
18  the first page.  You see that?
19      A.    Yes.
20      Q.    Is that an entry that you made
21  on that day?
22      A.    I can't remember.
23      Q.    I mean, to the best of your

Page 103

1  recollection.  I'm just wondering did you
2  sit down after the fact, after you learned
3  you had been terminated and write out all
4  these notes?
5      A.    Oh, no, sir.
6      Q.    Okay.  On 8/4/06, it says
7  Christy and I and Destiny saw Katie at the
8  nail salon.  She said she left because she
9  didn't like me.  Was that the conversation
10  you referred to earlier about the manager
11  who left prior to you getting the job?
12      A.    That's what she told Christy
13  when we were at the nail salon.
14      Q.    But you were at the nail salon
15  at that same time?
16      A.    Yes.
17      Q.    Did you hear that as well from
18  Katie?
19      A.    No.  She was talking to
20  Christy at another station.
21      Q.    Who is Destiny?
22      A.    My daughter.
23      Q.    There is -- is Latoya a

Page 104

1  customer?
2      A.    Yes.
3      Q.    Is she a friend of yours as
4  well?
5      A.    She was.
6      Q.    And so would she come up to
7  the salon at times to -- when she didn't
8  have a service being performed?
9      A.    She was employed by Bruno's
10  grocery store, so she was always back and
11  forth.  Plus she had just finished
12  cosmetology school, so she would always
13  come over and watch us cut hair or
14  whatever because she was interested in
15  getting a job.
16      Q.    One of the security
17  regulations talked about not having
18  non-employees back in the service area
19  unless they were getting a service.  I
20  mean, did you understand that to be the
21  rule of operation?
22      A.    Yes, sir.
23      Q.    Okay.  And Delise tells you,

26

Page 105

1 according to your notes, "She couldn't
2 come to the shop anymore unless she was
3 getting a service, and we didn't want that
4 type of atmosphere. You know it's just
5 not right and it's unprofessional." Is
6 that consistent with your recollection,
7 what Ms. Delise told you?
8     A.    Yes.
9     Q.    You say, "She's curious about
10 my sexuality." Did Delise ask you any
11 questions about your sexuality?
12     A.    She asked another person that
13 worked there.
14     Q.    Who did she ask?
15     A.    Shannon.
16     Q.    Did Shannon tell you something
17 she asked?
18     A.    Yes.
19     Q.    What did Shannon say she --
20 Delise asked her?
21     A.    I can't remember her exact
22 words, but it was pertaining to me and
23 Latoya.

Page 106

1     Q.    Being lesbians?
2     A.    Yes.
3     Q.    And then you say, "My
4 sexuality didn't stop me from employee of
5 the month." When were you employee of the
6 month?
7     A.    I'm not sure, but I was given
8 a plaque.
9     Q.    Okay. What did you understand
10 from Shannon that Delise had specifically
11 asked her about you and Latoya?
12     A.    Were me and her gay, what was
13 going on and why was she there. And she
14 used to be there prior to me becoming
15 manager. When Amy Grace was manager, she
16 did the same thing, come over and watch.
17     Q.    Next sentence, it says,
18 "Delise stated that I wasn't management
19 material. I was low class." Is that
20 something you're saying Delise told you
21 directly?
22     A.    Yes.
23     Q.    Is that a conversation that

Page 107

1 took place on August 4, according to your
2 notes?
3     A.    Some of the ends are off. I
4 don't know the date there.
5     Q.    I mean, to the best of your
6 recollection, is August 4th when this
7 conversation took place?
8     A.    I'm not sure.
9     Q.    Okay. And then you say, she's
10 saying that company policy that when a
11 manager steps down they must transfer to
12 another salon. Delise told you at that
13 time?
14     A.    That's what she said to me.
15     Q.    Okay. Tell me about your
16 conversations with your old supervisor and
17 Tina Cottle. Is the old supervisor Amy
18 Grace?
19     A.    Amy Grace was my supervisor,
20 but Tina Cottle was over Amy Grace at one
21 point.
22     Q.    I mean, who were you referring
23 to when you say you called your old

Page 108

1 supervisor?
2     A.    Tina Cottle.
3     Q.    It seems like you're saying I
4 called my old supervisor and Tina Cottle.
5 Was there a second person that you called?
6     A.    I talked -- I talked to Tina
7 Cottle.
8     Q.    That's who you're referring to
9 with the phrase "old supervisor"?
10     A.    Yes.
11     Q.    Okay. Tell me about that
12 conversation.
13     A.    I told her what Delise had
14 said to me, and she told me that she would
15 not comment on that.
16     Q.    Okay. And then you say Delise
17 called you later.
18     A.    Yes, sir.
19     Q.    And that's when you say she
20 said don't question her authority or
21 she'll fire my ass, quote, unquote?
22     A.    Yes, sir.
23     Q.    Okay. And then you make

Page 109

1  reference in here, you say, "Tina Cottle
2  was the manager of Tiger Town.  And she
3  stepped down and she still cuts hair
4  there."  Do you know whether Tina Cottle
5  voluntarily stepped down from that
6  position?
7       A.    Yes, sir.
8       Q.    She did?
9       A.    Yes, sir.
10      Q.    Okay.  Do you know of any
11  salon managers who were involuntarily
12  demoted and then stayed at the same salon
13  as a stylist?
14      A.    When I requested that
15  information, it was not made available to
16  me.
17      Q.    Okay.  So you personally don't
18  know that?
19      A.    No, sir.
20      Q.    Okay.  What is Tina Cottle's
21  race?
22      A.    Caucasian.
23      Q.    Okay.  So then it says,

Page 110

1  "Delise told me I had to be gone by 5 p.m.
2  for the new management to come in.  As of
3  Tuesday, 8/15, there is still not a new
4  management."  I guess this is obviously a
5  statement that you wrote in here sometime
6  after August 15th, right?
7       A.    It's a possibility it was
8  written on 8/15.
9       Q.    Okay.  Or on 8/15.  Can you
10  tell where -- I don't see a date entry
11  past the 8/4/06 on page one.  Can you tell
12  what notes were put in here on what days?
13      A.    No, sir, if there's not a
14  date.
15      Q.    That next sentence under what
16  we just looked at says "Store was open at
17  ten by a reception plus that can't do hair.
18  And there was not a stylist there until
19  about 10:20, 10:30."  How did you know
20  that?
21      A.    Shannon told me.
22      Q.    Then 8/15.  You say, "Delise
23  told Shannon and Nancy that she fired me

Page 111

1  as a manager because I fucked up a lady's
2  color."
3       A.    Yes, sir.
4       Q.    Who told you that?
5       A.    Shannon and Nancy.
6       Q.    Did they say Delise had used
7  the phrase "fucked up a lady's color"?
8       A.    Yes, sir.
9       Q.    Who is Nancy?
10      A.    She was a stylist.
11      Q.    Was she at the Bruno's store?
12      A.    She was at the Tiger Town
13  store, then transferred to the Bruno's
14  store.
15      Q.    What is her race?
16      A.    Caucasian.
17      Q.    You say Delise told you to
18  tell people that you stepped down because
19  it was too stressful being a single mom
20  and being a manager.  Is that true?
21      A.    She did.
22      Q.    When did that conversation
23  take place?

Page 112

1       A.    I don't remember the exact
2  date, but it was when she was telling me
3  that I had to go to Tiger Town, and I was
4  telling her that I did not want to go
5  because my clientele was there.  And she
6  was saying I could go over there and start
7  a new clientele and that's what to tell
8  people.
9       Q.    Why -- did you say there was
10  about two miles separating the two stores?
11      A.    That's about right.
12      Q.    Why would your clientele not
13  be willing to go two miles difference to
14  see you at that store?
15      A.    A lot of people worked in
16  Auburn, more convenient.
17      Q.    Look on -- there is a page
18  that the first word on the page is
19  procedures.  Is this -- you may need to
20  look on the page prior to this.  Is this
21  complaint that we're talking about the
22  customer with the daughter and the
23  coloring, or is this a different

Page 113

1    complaint?
2        A.   No, sir.
3        Q.   What do you recall about this
4    particular complaint?
5        A.   It was an African-American
6    lady that went to Tiger Town to have
7    tracks removed.  They did not have what
8    she needed to do her hair or they couldn't
9    do it.  Shannon answered the phone.  I was
10   doing a color.  And from what I was told,
11   asked me could I work her in to remove the
12   tracks.
13       Q.   Did you do that?
14       A.   I did.
15       Q.   Okay.  What was the customer's
16   complaint?
17       A.   Amy told me that -- she said I
18   charged her too much and that it took me
19   too long to get to her.  But I was working
20   her in between my appointments.
21       Q.   Do you recall what you charged
22   her?
23       A.   No, sir, I don't.

Page 114

1        Q.   Did you ever charge any of
2    your customers more than what you showed
3    on the Regis documentation?
4        A.   No.
5        Q.   I'm looking on the page that
6    we referred to that had procedures as the
7    first word.  The second paragraph, it
8    says, "Delise said she heard rumors of
9    low-class people being in the shop like
10   gay people."  Is that a conversation
11   you're saying you had with Delise?
12       A.   Obviously it was.
13       Q.   I mean, what do you remember
14   specifically about that conversation?
15       A.   This conversation took place
16   after she had stopped by.  And it was
17   three ladies there that was waiting to get
18   their hair done.
19       Q.   Is this at Tiger Town?
20       A.   No.
21       Q.   Okay.  It's at Bruno's.
22       A.   Yes.
23       Q.   Tell me what all you remember

Page 115

1    about that conversation.
2        A.   I remember that it was about
3    Shannon and a couple more people in the
4    store and were they getting a service and
5    were they gay or whatever and what was
6    going on between them.
7        Q.   This is during the same
8    conversation you talked about earlier?
9        A.   Yes.
10       Q.   Okay.  On the next page, 8/15,
11   you're referring to canceling two
12   appointments because of not having
13   African-American hair products.  Do you
14   recall what the names were of the two
15   customers?
16       A.   Yes.  Latasha Cole and Gwen
17   Spratling.
18       Q.   What service was Latasha Cole
19   going to receive?
20       A.   Relaxer, rinse color, clip her
21   ends, Marcel iron.
22       Q.   And how about Ms. Spratling?
23       A.   Shampoo, finger waves.

Page 116

1        Q.   What do you need to do finger
2    waves?
3        A.   They didn't have the gel.
4        Q.   What type of gel?
5        A.   A brown protein gel.
6        Q.   Is it a sculpting gel, or what
7    type of gel?
8        A.   It's a holding gel.
9        Q.   I mean, were there any other
10   types of gel in the salon that --
11       A.   It wouldn't hold.
12       Q.   So there were other gels, just
13   other gels that you didn't feel would hold
14   it in place?
15       A.   Other gels I knew wouldn't
16   hold it.
17       Q.   When you say Delise said --
18   you say, "Delise said that she wouldn't
19   transfer the African-American hair
20   products over to Tiger Town because there
21   wasn't enough room for the ethnic irons
22   and products."
23       A.   Yes, sir.

29

AMY CARPENTER
REGIS CORP, INC.,

AMY CARPENTER
January 30, 2008
(Pages 117 to 120)

Page 117

1    Q.    Tell me what you recall about
2  that conversation.
3    A.    Amy was on the phone with her,
4  telling her that she had nothing there to
5  do African-American hair and that all the
6  stuff was there.
7    Q.    Was there at Bruno's?
8    A.    Yes, sir.
9    Q.    Delise is at Bruno's at the
10  time?
11    A.    Yes, sir.
12    Q.    So you didn't actually speak
13  to Delise during this conversation?
14    A.    I heard her over the phone.
15    Q.    Okay.  Was she on speaker
16  phone?
17    A.    It was loud.
18    Q.    She said she wasn't going to
19  bring over products or the tools?
20    A.    Right.
21    Q.    Are the two customers that
22  complained the two that you reference
23  above as well, Ms. Spratling and Ms. Cole?

Page 118

1    A.    Yes.
2    Q.    Did they tell you that they
3  were going to call and complain?
4    A.    They did.  I know she -- one
5  of them did in the salon.
6    Q.    Did you give them the phone
7  number to call?
8    A.    No.  Amy did.  Grace.
9    Q.    Is Latoya a lesbian?
10    A.    I've never seen her sleep with
11  a woman.
12    Q.    Has she ever told you she's a
13  lesbian?
14    A.    No.
15    Q.    I'm just looking on the next
16  page.  You say, "She was negative about
17  Latoya because of her sexual preference."
18  I mean, that's written as if you know what
19  her sexual preference is.
20    A.    You asked me had she ever told
21  me.  No, she never told me.
22    Q.    Has she -- is it your
23  understanding that she's a lesbian?

Page 119

1    A.    Yes.
2    Q.    Okay.  Do you know if Latoya
3  has dated any of the workers there in the
4  salon?
5    A.    She and Shannon liked each
6  other.
7    Q.    Tell me about this
8  conversation between Amy Grace and the man
9  who she said had followed her around the
10  Winn-Dixie or something.
11    A.    A man came in to the salon to
12  get a haircut, and she started screaming
13  and yelling that he wasn't supposed to be
14  there.  And I had cut his hair, and I
15  didn't know him.  But she said that he
16  wasn't supposed to be there because he had
17  followed her one night or something.
18    Q.    I'm looking down at the bottom
19  of the page.  It says, "Delise told Amy G.
20  I'm going to try to cause trouble because
21  she fired my ass because management but to
22  write me up for anything."
23    A.    Uh-huh.

Page 120

1    Q.    Who told you that?
2    A.    I heard her through the phone.
3    Q.    You heard?
4    A.    Delise through the phone.
5    Q.    Who was Delise speaking to?
6    A.    Amy.
7    Q.    Is Amy on the -- where is the
8  phone located in the salon?
9    A.    In the office.
10    Q.    But Amy didn't tell you that.
11  You said you heard that specifically
12  yourself?
13    A.    Yes, sir.
14    Q.    Okay.  So there is -- you
15  learned about a customer complained about
16  this conversation on August -- around
17  August 16.  I guess that's when you
18  learned there was a complaint?
19    A.    What customer?  I'm sorry.  I
20  don't understand.
21    Q.    I'm just looking on the page
22  that's got the indentation for 8/16.  It
23  may be the next page.

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                    http://www.TylerEaton.com

Page 121

1    A.    Yes, sir.
2    Q.    Okay. And what had you
3 understood that the customer complained
4 about?
5    A.    That there was a sexual
6 conversation being held.
7    Q.    Who was in the salon at that
8 time?
9    A.    Myself, Carolyn, Shannon,
10 Latoya, and it was one more girl. I think
11 her name was Cindy.
12    Q.    Okay. Shannon didn't work at
13 the Tiger Town store where this was going
14 on, right?
15    A.    She worked back and forth, but
16 she wasn't working then.
17    Q.    Okay. And then Latoya, had
18 she come with Shannon to the store?
19    A.    Yes, sir.
20    Q.    Were either of them scheduled
21 to receive services that day?
22    A.    Latoya had made an
23 appointment, and Tina took care of her.

Page 122

1    Q.    Okay. And so did -- but at
2 the time of this conversation, neither of
3 them were getting any services done,
4 right?
5    A.    Latoya was waiting for me to
6 finish the gentleman's hair because she
7 wanted to talk to me about a braid design.
8    Q.    Okay. But they weren't
9 receiving services at that time?
10    A.    No, sir.
11    Q.    Were you providing the service
12 to this male customer or was someone else?
13    A.    I was.
14    Q.    Okay. Do you know what his
15 name was?
16    A.    No.
17    Q.    Do you know who he made a
18 complaint to?
19    A.    Amy told me about it.
20    Q.    Amy?
21    A.    Grace.
22    Q.    What did Amy tell you?
23    A.    That the man said we was

Page 123

1 having a sexual conversation.
2    Q.    So were Shannon and Latoya
3 back in the area where you were performing
4 the service during the time you were doing
5 his hair?
6    A.    Yes.
7    Q.    Where was Cindy?
8    A.    She was talking to Latoya and
9 Shannon.
10    Q.    Was she working as well?
11    A.    She wasn't with a customer at
12 that time.
13    Q.    Have you seen the statements
14 that were taken from the different
15 employees from that day?
16    A.    No, sir.
17    Q.    Is Cindy Carlton the Cindy
18 you're referring to?
19    A.    I never knew her, you know,
20 last name.
21 (Whereupon, Defendant's Exhibit 10 was
22       marked for identification.)
23    Q.    After reviewing this statement

Page 124

1 I've marked as Exhibit 10, is her
2 recollection of the conversation back and
3 forth consistent with what you recall?
4    A.    No.
5    Q.    Do you recall Shannon playing
6 with her hair and putting some whipping
7 wax in her hair?
8    A.    No. Do you have the statement
9 that I made?
10    Q.    I'm just asking you about this
11 statement right here. Are you talking
12 about your letter to Kris Bergly?
13    A.    No. I wrote on there the
14 statements when I was written up.
15    Q.    Okay.
16    A.    And I wrote everything that
17 occurred that happened.
18    Q.    I'm just asking you about your
19 recollection compared to what this person
20 said for now. We can look at that in a
21 second.
22    A.    Okay.
23    Q.    I mean, do you recall whether

AMY CARPENTER
REGIS CORP, INC.,

AMY CARPENTER
January 30, 2008

(Pages 125 to 128)

Page 125

1 Shannon said something about whipping wax?
2    A.    I don't recall.  But this is
3 Cindy's recollection.
4    Q.    Right.
5          MR. PARR:  He's just asking
6 you what you remember.  Okay?  What you
7 remember sitting here today.
8    Q.    Did you ever have any problems
9 with Cindy Carlton when you worked there
10 at Regis?
11   A.    No, sir.
12   Q.    You hadn't worked with her but
13 more than a couple of days, I guess, at
14 this time?
15   A.    Right.
16   Q.    Was she white or black?
17   A.    Caucasian.
18   Q.    She says, "Amy Carpenter made
19 the comment that Latoya needed to tattoo
20 Shannon's name on back of her neck."  Did
21 you ever make that statement?
22   A.    I don't recall making that
23 statement.

Page 126

1    Q.    Did Shannon make the
2 statement, "You know I'm your boo"?
3    A.    I'm not sure.  If I could
4 refer back to my notes.  I just -- I'm not
5 sure.
6    Q.    The notes we were looking at
7 earlier?
8    A.    No.  I was written up that
9 day.  I made notes on it to what had
10 happened.  And I asked for a copy.
11   Q.    Did you make any mention of
12 this incident in your notes that we marked
13 as Exhibit 9?
14   A.    I can't remember.
15   Q.    Well, just a take a minute to
16 look through there and see if you can find
17 any.  We were talking about this -- there
18 was a reference on that 8/16.
19   A.    Can you repeat your question.
20   Q.    Yeah.  I guess we saw, where
21 this notation was made for 8/16, there is
22 a discussion of that incident.  But it
23 seems like this is talking more about the

Page 127

1 write-up.  I'm just wondering did you have
2 an entry other than that in your notes
3 talking about this incident on August 15th
4 where there was a customer complaint.
5    A.    No.
6    Q.    Okay.
7          MR. PARR:  Did you answer no?
8          THE WITNESS:  He's asking me
9 is this in my notes, right?
10         MR. PARR:  He's asking you if
11 there was another entry about this
12 incident in your notes other than the one
13 that he just talked about.
14         THE WITNESS:  No, sir.
15         MR. PARR:  I didn't hear your
16 answer.
17   Q.    In Ms. Carlton's statement she
18 says, "Carolyn was right behind them at
19 her station cutting a gentleman's hair."
20 Do you know if you were also performing a
21 service at that time for a gentleman?
22   A.    Yes, sir.
23   Q.    Then she says, "Shannon and

Page 128

1 Latoya stayed here at the salon until five
2 o'clock when Amy C. got off work and they
3 all left together."  Is that true?
4    A.    No.
5    Q.    What is your recollection
6 about that day?
7    A.    They came and Latoya wanted me
8 to braid her hair, and she did make that
9 appointment with Tina.  Then she said she
10 wanted to talk to me about the type of
11 design.  I told her I couldn't talk to her
12 right then.  She had to wait because I was
13 doing somebody else's hair.  Me and
14 Shannon ate lunch together.
15   Q.    Okay.  Did Shannon and Latoya
16 come in the salon at the same time?
17   A.    Yes, sir.
18   Q.    Okay.  But Latoya didn't go to
19 lunch with y'all?
20   A.    No.
21   Q.    What did she do while y'all
22 were going to lunch?
23   A.    I think she left.

AMY CARPENTER
REGIS CORP, INC.,

AMY CARPENTER
January 30, 2008

(Pages 129 to 132)

Page 129

1  Q.   And then she came back at a
2  later point?
3  A.   No, sir.
4  Q.   Okay.  So is it your
5  recollection that all of this incident
6  took place prior to lunchtime?
7  A.   Yes.
8  Q.   Okay.  Do you know if Carolyn
9  Perry was one of the people who was
10 working that day in the Regis salon there
11 at Tiger Town?
12 A.   Yes, sir.
13 Q.   She says she heard some
14 comments about whipping wax and tattooing
15 someone's name on one of the girl's neck.
16 You say you don't recall those comments
17 being made, those subjects being
18 discussed?
19 A.   Repeat your question.
20 (Whereupon, Defendant's Exhibit 11 was
21        marked for identification.)
22 Q.   I guess, what do you contend
23 that Carolyn Perry represents in her

Page 130

1  statement in Exhibit 11 that's untrue, if
2  anything?
3  A.   I wasn't carrying on and
4  laughing and talking with anyone because I
5  had a customer.
6  Q.   Okay.  Anything else?
7  A.   Was there a question?
8       MR. PARR:  Is there anything
9  else in there that's not true?
10 A.   I wasn't talking about
11 whipping wax or anything.
12 (Whereupon, Defendant's Exhibit 12 was
13        marked for identification.)
14 Q.   Can you identify Exhibit 12
15 for me.
16 A.   I'm ready.
17 Q.   Okay.  Is this the warning
18 notice you were referring to earlier?
19 A.   Yes, sir.
20 Q.   Okay.  And it looks like where
21 it starts with "I had no conversation" on
22 the first page -- do you see that?
23 A.   Yes, sir.

Page 131

1  Q.   Is that your handwriting there
2  with your response then on the next page?
3  A.   Yes, sir.
4  Q.   Okay.  You say, "I had no
5  conversation with Shannon or Latoya."  Is
6  that -- is that your contention, you
7  weren't speaking with them at all?
8  A.   Nothing sexual.
9  Q.   Okay.  So are you saying in
10 here that you were speaking with them but
11 nothing sexual was said or that you just
12 weren't speaking with anybody at all?
13 A.   I'm sure all of us probably
14 was carrying on a conversation, but
15 nothing sexual.
16 Q.   Okay.  And then she says,
17 "Shannon told Latoya to put her name on
18 her neck.  Latoya came to make an
19 appointment with me and Shannon came to
20 eat lunch with me."  You say Carolyn was
21 involved in the conversation as well.
22 Cindy.  I'm sorry.  And you say, "Carolyn
23 Perry was cutting a gentleman's hair and

Page 132

1  stated that she heard us laughing and her
2  client looked up at her but she heard
3  nothing sexual."  Are you saying that's
4  what Carolyn Perry told you?
5  A.   When this happened, yes.
6  Q.   What do you mean by this,
7  "Cindy said she heard something sexual but
8  couldn't conveniently remember"?
9  A.   That's what she said.
10 Q.   What do you mean by
11 "conveniently"?
12 A.   Because she said she heard
13 something sexual, but when Amy asked her
14 what, she couldn't remember.
15 Q.   Is this a conversation that
16 you overheard between Amy and her?
17 A.   All of us was there.
18 Q.   Do you think -- do you know
19 what the phrase "boo" means?
20 A.   It means a lot of things.
21 Q.   What does it mean to you?
22 A.   Halloween comes to mind first.
23 Q.   If Shannon said to Latoya,

Page 133

1  "You know I'm your boo," what would be
2  your understanding of what it would mean
3  in that context?
4       MR. PARR:  Object to the form.
5  Go ahead and answer.
6       A.   I couldn't tell you what she
7  would -- I don't know.  I can't interpret
8  someone else's meaning of it.
9       Q.   What would you think?  I'm not
10  asking you to put yourself in her mind.
11  I'm just asking you what your
12  understanding of that phrase would mean if
13  you heard it in that context?
14       A.   My friend, my buddy, my pal.
15       Q.   Have you ever heard it
16  referred to as meaning someone's
17  girlfriend?
18       A.   I think it's a term that could
19  be used for a lot of things.
20       Q.   My question is, have you ever
21  heard it being referred to as someone's
22  girlfriend?
23       A.   No.

Page 134

1       Q.   You've never heard boo in that
2  reference?
3       A.   That I can recall.
4       Q.   Have you ever heard the phrase
5  "shorty" before?
6       A.   Yes.
7       Q.   What is your understanding of
8  what that phrase means?
9       A.   My friend, my pal.
10       MR. PARR:  Did you say
11  "shorty"?
12       MR. BOSTICK:  Shorty.
13       MR. PARR:  Okay.
14       Q.   Anything else that you've
15  heard it mean other than friend or pal?
16       A.   No.
17       Q.   Nothing more specific than
18  that?
19       A.   No.
20       Q.   Have you ever heard the phrase
21  "boo" used in reference to someone that's
22  having a sexual relationship with someone
23  else?

Page 135

1       A.   No.
2       Q.   You ever heard the phrase
3  "shorty" used as referring to someone
4  involved in a sexual relationship with
5  someone else?
6       A.   No.
7       Q.   Whether or not you've heard
8  it, have you ever gained that
9  understanding, that the phrase "boo" or
10  "shorty" could be used in reference to
11  someone that another person is having a
12  sexual relationship with?
13       A.   I don't quite understand that.
14       Q.   I asked you had you heard
15  someone use it in that context.  Whether
16  or not you've heard it used by someone in
17  conversation with you, have you ever had
18  the understanding that one of the
19  definitions of boo could be someone that
20  you -- someone is having sexual relations
21  with?
22       A.   No.
23       Q.   Why don't we take a break here

Page 136

1  for lunch.
2       (Said deposition was in recess
3       at 12:51 until 1:51, after
4       which the following occurred:)
5       Q.   (BY MR. BOSTICK:)  Let's go
6  back to Exhibit 9, which is your
7  handwritten notes.  I'm looking at a page
8  probably two-thirds the way in.  The first
9  notation is a -- it says 3:54 H/C beard
10  trim.  I'm just looking down at the
11  bottom.  It says, "I overheard Delise on
12  the phone with Amy G., and she said
13  negative things about me."  If you look at
14  this, see if you can figure out what the
15  context is and tell me what you recall
16  Delise saying in that conversation that
17  you're referring to.
18       A.   It was she had called Delise
19  because it was after the write-up, if I'm
20  correct, and that she was saying that I
21  was going to try to make trouble because I
22  was mad because she had transferred me;
23  and that if I was late, to write me up,

AMY CARPENTER
REGIS CORP, INC.,

AMY CARPENTER
January 30, 2008
(Pages 137 to 140)

Page 137

1  write me up for any little thing.
2      Q.   Okay.  Anything else that you
3  overheard Delise saying?
4      A.   Not right off.
5      Q.   Tell me about this -- looking
6  on the next page, see the "Amy G. yelled
7  at me"?
8      A.   Yes.
9      Q.   Read that paragraph just
10 quietly, and I want to ask you something
11 about that.  Did you have this
12 conversation with Amy Grace after the
13 complaint by the customer over Latoya and
14 Shannon that we talked about earlier?
15     A.   Yes, sir.
16     Q.   Do you know if Amy Grace -- if
17 anything was said to her about that
18 incident by Delise or anyone above her?
19     A.   Yes.
20     Q.   What do you know about that?
21     A.   She told me that if it came
22 from Delise to write me up.
23     Q.   Do you know if Shannon got

Page 139

1      A.   I don't know.
2      Q.   Other than the fact that
3  Shannon hasn't told you that she was
4  reprimanded, do you have any evidence that
5  this document is not legitimate?
6      A.   No, sir.
7      Q.   I'm looking back at your
8  notes.  You see the paragraph that says,
9  "I've worked for Amy G. since 11/05"?  You
10 see that page?
11     A.   Excuse me.  I did make a
12 mistake.  I see in my notes where Shannon
13 said she did get wrote up.
14     Q.   Okay.  Okay.  Look at -- do
15 you see the page that starts, "I've worked
16 for Amy G. since 11/05"?
17     A.   Yes.
18     Q.   The next paragraph says, "Amy
19 G. said or did nothing to Carolyn for
20 saying what she said to me.  Now, how is
21 that keeping a professional atmosphere?"
22 What had Carolyn said to you?
23     A.   That she wished I had never

Page 138

1  written up as well over that incident?
2      A.   She didn't, not at that time,
3  that I know of, that I was talking to her.
4      Q.   What period of time are you
5  talking about?
6      A.   As of 8/16 Shannon said she
7  did not get written up.
8  (Whereupon, Defendant's Exhibit 13 was
9         marked for identification.)
10     Q.   Have you ever seen Exhibit 13
11 before?
12     A.   No, sir.
13     Q.   Did you talk to Shannon at any
14 point after August 16th of 2006?
15     A.   Yes.
16     Q.   Did she ever tell you she had
17 been written up?
18     A.   No.
19     Q.   She ever tell you she got a
20 verbal warning?
21     A.   No.
22     Q.   Do you know if that's her
23 signature at the bottom of Exhibit 13?

Page 140

1  came there, and that there was no problems
2  there until I came.
3      Q.   When did that conversation
4  take place?
5      A.   It was during the time that I
6  had been written up for the...
7      Q.   Was she talking about that in
8  response to the incident with the customer
9  that happened on the 15th?
10     A.   Yes, sir.
11     Q.   Had you gone to her and asked
12 her what she had reported about that
13 incident?
14     A.   Did I go to?
15     Q.   To Carolyn.
16     A.   No.
17     Q.   What was the context for her
18 to say that to you?  I mean, what was the
19 conversation prior to that time?
20     A.   Amy and myself were discussing
21 it, and she was telling me that Carolyn
22 overheard the conversation and that Cindy
23 had overheard the conversation.  And I was

Page 141

1  like, well, I want to know what they
2  overheard.
3      Q.   You said that to Amy?
4      A.   Yes.
5      Q.   Okay.  And was this said in
6  earshot where Carolyn and the other lady
7  could hear you?
8      A.   She was calling all of us in
9  the office at that time.
10     Q.   And then what else did Carolyn
11 tell you other than that statement?
12     A.   Nothing.
13     Q.   Okay.  Did Shannon -- I'm
14 looking on the page that starts with 8/16.
15 "I called corporate and expressed how I
16 was being treated from another management
17 or employee as well as other complaints.
18 Amy Edwards asked me to fax her things
19 I've written."  Tell me, was this the
20 conversation you had with Amy Edwards that
21 we talked about earlier?
22     A.   Yes.
23     Q.   Okay.  Had you been written up

Page 142

1  for the customer incident on the 15th when
2  you called Amy Edwards?
3      A.   Yes.
4      Q.   Okay.  What was the date on
5  that?
6      A.   8/16.
7      Q.   Okay.  Did you complain about
8  that write-up when you called Amy Edwards?
9      A.   I'm sure I told her I had been
10 written up.
11     Q.   Okay.  Did you know about the
12 customer complaint over the coloring when
13 you called Amy Edwards?
14     A.   With the child?
15     Q.   Yes.
16     A.   Yes.
17     Q.   Okay.  Had there been any
18 other customer complaints when you called
19 Amy Edwards -- any other customer
20 complaints that you knew about other than
21 those two since the first of August when
22 you called her?
23     A.   Not that I knowed about.

Page 143

1      Q.   Okay.  Was the 16th the first
2  time you called Amy Edwards?
3      A.   No.  I had tried to call
4  corporate once before and couldn't get
5  anybody.
6      Q.   Okay.  When did you try and
7  make that call?
8      A.   It's here on the page that
9  starts with "my sexuality didn't stop me."
10     Q.   Okay.  Where at?
11     A.   It's in the lower paragraph
12 when I attempted to call corporate I
13 couldn't get anyone.  That's when I called
14 Tina Cottle.
15     Q.   Okay.  So you didn't speak
16 with anybody at corporate on that
17 occasion?
18     A.   No, sir.
19     Q.   So the first time you actually
20 speak to someone at corporate to voice a
21 complaint is when you talk to Amy Edwards
22 on the 16th?
23     A.   Yes.

Page 144

1      Q.   Okay.  So when you -- when you
2  say -- you say, "I expressed how I was
3  being treated from another management or
4  employee as well as other complaints."
5  What did you tell her about that?
6      A.   How I was being treated.  I'm
7  sure I probably told her things from my
8  notes, and I'm sure I probably expressed
9  to her that I had been written up.
10     Q.   Who are you referring to when
11 you say "management or employee as well as
12 other complaints"?
13     A.   I assume the employees there
14 and the manager there.
15     Q.   I mean, to your recollection,
16 in your call with Amy Edwards --
17     A.   Yes, sir.
18     Q.   -- you said I am not being
19 treated fairly, correct?
20     A.   Yes, sir.
21     Q.   Who are the names of Regis
22 employees that you would have told her
23 were treating you unfairly?

Page 145

1    A.    I probably would have named
2  specifically Delise and Amy Grace.
3    Q.    Okay.
4    A.    And I probably would have told
5  her how the employees there didn't want me
6  there.
7    Q.    Those being the Tiger Town
8  employees?
9    A.    Yes, sir.
10    Q.    Okay.  And when it says, "Amy
11  Edwards asked me to fax her things I've
12  written," what had you told her you had
13  written?  Did you say you had kept your
14  notes?
15    A.    I had told her when I started
16  expressing feelings on how I was being
17  treated that I had talked to Tina and Amy
18  and they had just told me to get a
19  notebook and just start jotting down
20  things.  And she asked me to send her
21  those, and I did.
22    Q.    When did you send her those to
23  the best of your recollection?

Page 146

1    A.    I can't remember.
2    Q.    At some point you write a
3  letter of complaint, the one to Kris
4  Bergly we will look at in a second.  Did
5  you send the notes in with that letter?
6    A.    I faxed them to her.
7    Q.    Okay.  But did you fax them at
8  the same time you faxed the letter of
9  complaint?
10    A.    No, sir.
11    Q.    Okay.  Did you fax your notes
12  before or after that?
13    A.    I faxed my notes when she
14  asked me to.
15    Q.    Okay.  On the 16th?
16    A.    I'm not sure if they were on
17  the 16th.
18    Q.    You're not sure if you had the
19  conversation with her on the 16th or what?
20    A.    I'm not sure if I faxed the
21  notes to her on the 16th.
22    Q.    Are you sure you had the
23  conversation with her on the 16th?

Page 147

1    A.    That's what I have written
2  here.
3    Q.    Okay.  Are you saying it's
4  possible you faxed them the next day or
5  so?
6    A.    It's possible.
7    Q.    Okay.  When Toni Alvarez shows
8  up, did she have a copy of your notes?
9    A.    If she did, I didn't see them.
10  I don't think.
11    Q.    To the best of your knowledge,
12  she didn't.  You told Ms. Edwards that you
13  felt that you were being treated unfairly?
14    A.    Yes.
15    Q.    Did you tell her during that
16  conversation that you felt you were being
17  discriminated against?
18    A.    Yes.
19    Q.    What specifically did you say
20  about that?
21    A.    I had told her that I did not
22  have the things that I needed there and
23  that they weren't made available to me,

Page 148

1  and that I was not making money there, and
2  I felt that it was unfair.  And I also had
3  told her I had made a claim.
4    Q.    You said that you made a claim
5  with who?
6    A.    EEOC.
7    Q.    You told Amy Edwards that?
8    A.    No.  You said Toni Alvarez.
9    Q.    No.  I'm talking about your
10  conversation with Amy Edwards.
11    A.    That was over the phone.
12    Q.    Right.  Did you tell her -- my
13  question was, did you tell Amy Edwards in
14  that phone call on the 16th that you felt
15  you were being discriminated against?
16    A.    Yes.
17    Q.    There is a difference between
18  telling someone I'm being treated unfair
19  and calling somebody else a racist.
20    A.    Yes, sir, I understand.
21    MR. PARR:  Object to the form.
22    Q.    Okay.  So we understand that
23  difference.  I'm asking you, did you say

AMY CARPENTER
REGIS CORP, INC.,

AMY CARPENTER
January 30, 2008

(Pages 149 to 152)

Page 149

1 that you felt that Delise or Amy Grace or
2 these other employees were being racist in
3 your phone call with Amy Edwards?
4     A.    I'm not sure.  But I do
5 remember when I called her I was crying
6 and upset, so I don't remember exactly
7 what I said.
8     Q.    You know you told her that you
9 felt the other employees were being
10 unfair, right?
11     A.    Yes, sir.
12     Q.    My specific question is --
13 we're in a case where you're saying you
14 made claims of discrimination.
15     A.    Yes, sir, I understand.
16     Q.    I understand that you told her
17 you felt it was unfair.  Can you say today
18 under oath whether or not you told Amy
19 Edwards that you felt your race was a
20 factor in this unfair treatment in that
21 phone call on August 16?
22     A.    I can't recall if I said it in
23 that phone call on August the 16th.

Page 150

1     Q.    So you said earlier -- you
2 talked about a conversation with Toni
3 Alvarez, correct?  And you said you did
4 tell her that, right?
5     A.    Yes, sir.
6     Q.    Okay.  And you told her you
7 had called the EEOC, is your testimony,
8 right?
9     A.    Yes.
10     Q.    Can you show me anywhere in
11 these notes that you diligently prepared
12 where you make a reference to your call to
13 the EEOC or where you reference telling
14 someone that.
15         MR. PARR:  Object to the form.
16     A.    I don't see it.
17     Q.    You don't?
18     A.    No, sir.
19     Q.    Why did you not include that
20 in your notes?
21     A.    It's a lot of things that
22 happened that's not in my notes.  I can't
23 express why I didn't write that down.

Page 151

1     Q.    Is there some reason why you
2 made reference to this belief that Delise
3 Burdette didn't like you because of your
4 sexual -- whatever your sexual preference
5 is, but there is no reference in your
6 notes to her not liking you because of
7 your race?
8         MR. PARR:  Object to the form.
9     A.    No.  By this time I was, like
10 I said, very upset and crying, upset.  I
11 don't know why I left that out.
12     Q.    But it was important enough
13 for you to mention back on the first and
14 second page of your notes about your
15 belief that she thought that you might be
16 a lesbian, right?
17     A.    My state of mind probably was
18 different then.
19     Q.    Okay.  When you called the
20 EEOC, did they tell you that sexual
21 preference is not a protected class?
22     A.    I don't think we talked about
23 sexual preference.

Page 152

1     Q.    Did y'all talk about whether
2 or not lesbians can be discriminated
3 against?
4     A.    I don't recall that.
5     Q.    What's your recollection of
6 that conversation?
7     A.    They asked me to briefly
8 describe what I felt like happened to me,
9 and I'm sure I did so.  I don't remember
10 word for word.
11     Q.    In your conversation, did you
12 tell them my manager has been asking me
13 questions that I feel like are invasive of
14 my sexuality?
15     A.    I'm sure I told that I was
16 transferred to a different store and was
17 not made available to use my ethnic
18 products.
19         MR. BOSTICK:  Can you repeat
20 my question.  I don't think that answered
21 my question.
22         (Record read.)
23     A.    I don't remember.

Page 153

1    Q.    Do you know where Toni Alvarez
2  came from on the 17th?
3    A.    I remember her telling me she
4  was on her way somewhere and got the call
5  from Amy Edwards and she came to the
6  store. I don't remember where.
7    Q.    So it's your understanding she
8  made a special trip to come in and look
9  into this allegation based on your call to
10  Amy Edwards?
11    A.    I don't know was it a special
12  trip.
13    Q.    None the less, she's there
14  within 24 hours of you making that call to
15  Amy Edwards, right?
16    A.    Yes, sir.
17    Q.    Okay. Tell me what you recall
18  about your conversation with Toni. Where
19  did y'all meet?
20    A.    She came to Tiger Town, and we
21  went next door to a sandwich restaurant.
22    Q.    Was it a Quiznos?
23    A.    I think that's it.

Page 154

1    (Whereupon, Defendant's Exhibit 14 was
2        marked for identification.)
3    Q.    I'll represent to you that
4  these are notes Toni Alvarez made from the
5  time she came down here to meet with
6  employees. Is that consistent with your
7  recollection, that y'all met around 11:51
8  on the 17th of August of '06?
9    A.    I remember it was in the
10  afternoon.
11    Q.    Did you tell her you had
12  started a book in July keeping your notes
13  and what not?
14    A.    I probably did.
15    Q.    Did you tell her that nine
16  years ago that you and Delise had worked
17  together and that she quit because you
18  came in and made more money?
19    A.    Yes.
20    Q.    Did you complain that when Amy
21  Grace came over to Tiger Town you weren't
22  promoted?
23    A.    Can you repeat the question.

Page 155

1    Q.    Yeah. Did you tell Toni that
2  when Amy Grace came over to Tiger Town you
3  weren't promoted?
4    A.    Yes.
5    Q.    Okay. And she says -- did you
6  tell Toni that you asked Delise why you
7  didn't get the job and that Delise said to
8  you I don't have to tell you why and don't
9  question her?
10    A.    Yes.
11    Q.    Did you say to Toni that
12  Delise had said by you asking her that she
13  knew she had made the right decision?
14    A.    I do remember her saying that.
15    Q.    I guess it might be simpler to
16  say let's go through each paragraph that
17  she's got listed and tell me if there is
18  something that you disagree with being
19  said. Okay. Starting with the paragraph
20  that says "Katie was made manager on the
21  7th," is there anything in that paragraph
22  that you disagree with?
23    A.    I agree.

Page 156

1    Q.    You agree?
2    A.    Yes, sir.
3    Q.    How about the one that says,
4  "Delise hired Edwina part time"? Do you
5  agree with that one on "Delise hired
6  Edwina part time. She said to watch her
7  because she might steal"?
8    A.    Yes.
9    Q.    You tell her about this
10  working every day ten to seven. I leave
11  to feed my kids?
12    A.    I'm sure I did.
13    Q.    Did you tell her that you felt
14  Edwina was stealing color and Delise had
15  said deal with it, it's your store?
16    A.    Yes.
17    Q.    What made you think Edwina was
18  stealing?
19    A.    That particular time we had --
20  when I went back where the color was, some
21  tubes were missing that she had that she
22  had not used.
23    Q.    What type of tubes were they?

Page 157

1    A.   Color.
2    Q.   Is it some -- why would it be
3  Edwina who would have -- I mean, wouldn't
4  there be several stylists who would have
5  had access to the same thing?
6    A.   Yes, but she had them.
7    Q.   She had them in her hands?
8    A.   Yes.
9    Q.   Then do you recall this
10  conversation about -- starting with
11  "Latoya came into my store, she works at
12  Bruno's grocery"?
13    A.   I never told her that I was
14  not telling Latoya not to come in the
15  store.
16    Q.   Okay.  You didn't tell Toni
17  that you had told Latoya not to come in
18  the store?
19    A.   No.  This statement here says
20  I told her I wasn't telling her she could.
21  I never said that.
22    Q.   Okay.  Anything else?
23    A.   Not in that paragraph.

Page 158

1    Q.   Okay.
2    MR. PARR:  Was there a
3  question on the table?
4    Q.   Well, I'm looking through.  I
5  don't know that we need a specific.  Look
6  at this down at the bottom.  The paragraph
7  that says, "They called Christy.  I said I
8  would work her in."  Who is this customer
9  that we're talking about here?
10    A.   A lady that had walked in --
11  African-American lady that had walked in
12  Tiger Town store that had tracks.
13    Q.   And had that customer called
14  Delise?  Is that what it's saying?
15  "Delise said the customer called someone
16  and Toni said that was it."  What does
17  that mean, if you know?
18    A.   These are her notes.  I don't
19  know.  I can just read along and try to --
20    Q.   Do you remember Delise calling
21  you about this customer complaint?
22    A.   Amy is the one that told me
23  about this particular complaint.

Page 159

1    Q.   Had you heard someone tell you
2  that Toni Alvarez had said that was it
3  prior to the time you spoke with her?
4    A.   Prior time I spoke to who?
5  I'm sorry.
6    Q.   Toni Alvarez.  Had anybody
7  told you before you met with Toni Alvarez
8  that Toni Alvarez was upset with you over
9  any kind of performance issue?
10    A.   It says here that Delise said
11  it.
12    MR. PARR:  Amy, he's not
13  asking you about what it says there.  He's
14  asking you about what you remember.
15    A.   I don't remember.
16    Q.   Okay.  What service did
17  Latasha Cole want to have done?
18    A.   She wanted a relaxer, a color
19  rinse, a cut and a curl.
20    Q.   So she's the customer that you
21  didn't have the Marcel irons for?
22    A.   Nor the relaxer or the color.
23    Q.   Did you tell Toni Alvarez that

Page 160

1  Delise had told Shannon and Christy this,
2  quote, that I was low class and not
3  management material?
4    A.   Yes.
5    Q.   Okay.  I mean, does that sound
6  like the specific words you would have
7  told her?
8    A.   I'm sure I told her what she
9  told me as well.
10    Q.   What Delise told you --
11    A.   Yes.
12    Q.   -- directly?  But you recall
13  telling her Shannon and Christy had told
14  you that, right?
15    A.   Yes.
16    Q.   Did you tell Toni Alvarez that
17  Nancy had told Shannon and Christy that I
18  kept, quote, fucking up people's hair,
19  claiming what Delise had said?
20    A.   Did I tell her that?
21    Q.   Did you tell Toni Alvarez
22  that, yeah?
23    A.   I'm sure I did.

AMY CARPENTER
REGIS CORP, INC.,

Page 161

1      Q.    Would you have told Toni that
2  Cindy can't cut hair worth a damn?
3      A.    I'm sure I probably used Cindy
4  as an example if they was using that I
5  couldn't do hair.
6      Q.    I'm looking down.  It says, "I
7  was written up when Latoya came in to make
8  an appointment."  Do you see that?
9      A.    Yes.
10     Q.    Read that whole paragraph.
11  I'm going to ask you if you recall telling
12  her this last sentence about the only
13  thing said was about getting a tattoo on
14  Latoya's neck that said child boo.
15     A.    I don't see it.
16     MR. PARR:  Starting here.  And
17  he's talking about this last here.  The
18  whole thing.
19     A.    I see it.
20     Q.    Do you remember telling her
21  anything about this child boo statement?
22     A.    It's here, so I must have said
23  she said child boo.

Page 162

1      MR. PARR:  Amy, he's not
2  asking you what's on the paper.  You're
3  testifying about your memory.
4      THE WITNESS:  Okay.
5      MR. PARR:  Answer his
6  questions.  When he asks you if you
7  remember, tell him whether you remember or
8  not.  The paper can speak for itself.
9      THE WITNESS:  Okay.
10     A.    I don't remember.
11     Q.    Okay.  Now, Toni Alvarez in
12  her notes says you told her, you know,
13  that you didn't like being transferred to
14  Tiger Town.  And Alvarez says in this that
15  she explained to you that's normal
16  practice to help everyone get a fresh
17  start.  Do you remember that conversation?
18     A.    I don't remember that
19  conversation.
20     Q.    I mean, but Toni Alvarez told
21  you that that was normal procedure when a
22  salon manager was demoted?
23     A.    She told me -- I remember her

Page 163

1  telling me that that sometimes happens,
2  but she also told me that I could go back
3  to Bruno's.
4      Q.    That's the next sentence.  She
5  says our normal practice is this, but then
6  it says, "I did tell her she could go back
7  as a stylist upon completion of my
8  investigation.  She'd forward information
9  to Edwards."  Right?
10     A.    Can you repeat your question.
11     Q.    I'm looking at the last
12  paragraph on there.  I'm just saying --
13  and not worrying about what it says in
14  here.  She tells you, one, it's normal
15  practice when somebody gets demoted from
16  store manager to move her to another salon
17  to work as a stylist, right, and then
18  secondly, she said after you complain, she
19  said, let me wrap up the investigation,
20  but we can at the end of this put you back
21  in the old store -- in Bruno's store as a
22  stylist, right?
23     MR. PARR:  Object to the form.

Page 164

1      A.    I don't remember her telling
2  me that.
3      Q.    What do you remember her
4  telling you?
5      A.    That I would be allowed to go
6  back to the Bruno's store.
7      Q.    And it's your testimony she
8  never said anything about it being normal
9  procedure to move a demoted salon manager
10  to another store to get a fresh start or
11  words to that effect?
12     A.    I remember being told that,
13  but I'm not sure was it at that specific
14  time.
15     Q.    Okay.  Did you meet with Toni
16  Alvarez again between this meeting on the
17  17th and the time you were notified you
18  were being terminated?
19     A.    No, sir.
20     Q.    Okay.  Do you know when it was
21  that -- what was the date that you met
22  with Toni about your termination?
23     A.    The following day.

Page 165

1    Q.   Okay.  Did Toni tell you
2 anything about who she was -- who else she
3 was going to speak to or what she was
4 going to do as part of her investigation?
5    A.   No.
6    Q.   Did she tell you I'll get --
7 I'll -- I will or someone will follow-up
8 with you or words to that effect?
9    A.   She told me that she would
10 continue the investigation and that she
11 would.
12    Q.   Okay.  And so do you know who
13 Toni Alvarez spoke with other than you as
14 part of her investigation?
15    A.   No.  I can -- people can --
16 people have told me, but, no, I have not
17 seen her talk to nobody.
18    Q.   I mean, has anybody
19 told you they met with Toni as part of
20 that investigation?
21    A.   I can't remember.  I'll have
22 to refer to my notes.
23    Q.   Did you ever speak to Shannon

Page 166

1 and have Shannon say, Toni Alvarez spoke
2 to me?
3    A.   I remember talking to Shannon
4 and Christy about the investigation, and
5 they was -- they told me not to tell them
6 that they had talked to me.  Then they
7 started blocking their number out on the
8 phone.
9    Q.   Is that a joint call you had
10 with them?
11    A.   No.
12    Q.   I mean, tell me --
13    A.   They individually had called.
14    Q.   Tell me about your
15 conversation with Shannon.  Look at your
16 notes if you need to.
17    A.   On 8/17 -- 8/18 it said that I
18 did talk to Shannon and Christy.  And
19 Christy told me that Delise and Toni told
20 her not to talk to me, but she did, she
21 would block her number out.
22    Q.   Where do you see in your notes
23 that it says that Delise told them not to

Page 167

1 talk to you?
2    A.   At the top of the page.  7/06.
3 In parenthesis 1/7/06.
4    Q.   Okay.
5    A.   It's after the "at 8/17 8:25
6 p.m."  It starts with Christy --
7    Q.   I see.  You say that
8 Shannon left me a message on my cell to
9 call her.  She told me that Delise called
10 me a snake in the grass and that Delise
11 had Christy in the office for about 30
12 minutes.  Did you keep that voice mail
13 message?
14    A.   No, sir.  I don't have that
15 phone anymore.
16    Q.   You say "Shannon later called
17 back and said don't tell I called you, I
18 don't want to lose my job."  Is that true?
19    A.   Yes, sir.
20    Q.   Why do you say "then I knew
21 she wouldn't be honest because she said
22 Delise and Toni told her not to talk to me
23 but she called but would block the

Page 168

1 number"?  Why would that make you think
2 she wasn't being honest?
3    A.   Because she was blocking her
4 number.
5    Q.   Why would that -- what does
6 that mean to you?  I don't understand what
7 you're saying there.
8    A.   Because obviously she didn't
9 want them to know that she was talking to
10 me because she was scared she would lose
11 her job.
12    Q.   But if she was blocking her
13 number, it's just blocking on your end to
14 see who's called, right?
15    A.   Yes.
16    Q.   So then did Amy -- I'm sorry.
17 Did anybody ever tell you that Shannon had
18 said that she didn't like working with
19 you?
20    A.   No, sir.
21    Q.   Had anybody ever said Christy
22 didn't like working with you?
23    A.   No, sir.

AMY CARPENTER
REGIS CORP, INC.,

Page 169

1    Q.    Do you know whether or not
2  Toni spoke with Amy Grace as part of the
3  investigation?
4    A.    I don't know.
5    Q.    Where in the process did you
6  send in the Amy Grace letter?
7    A.    When I called corporate.
8    Q.    When you talked to Amy
9  Edwards?
10    A.    Yes, sir.
11    Q.    I mean, did you send that in
12  the same time that you sent the notes that
13  you said she told you to --
14    A.    I think I did.
15  (Whereupon, Defendant's Exhibit 15 was
16          marked for identification.)
17    Q.    Okay.  Can you identify
18  Exhibit 15 for me, please.
19    A.    It's a letter that I wrote.
20    Q.    It's got a mail date to Regis
21  on August 29th.
22    A.    Yes, sir.
23    Q.    Is that consistent with your

Page 170

1  recollection about when you mailed the
2  letter off?
3    A.    Yes, sir.
4    Q.    Did you fax the letter too, or
5  did you just mail it off?
6    A.    I think I just mailed them.
7    Q.    Did anybody help you draft
8  this letter?
9    A.    Yes.
10    Q.    Did anyone other than an
11  attorney help you draft this letter?
12    A.    Yes.
13    Q.    Who helped you draft it?
14    A.    Diane Jones.
15    Q.    Who is Diane Jones?
16    A.    A friend.
17    Q.    Now, I'm looking at paragraph
18  two.  You say, "On August 15th, 2006 I was
19  denied use of ethnic products and needed
20  accessories."  Is this referring to the
21  incident we talked about earlier with the
22  relaxer that was not in stock and the
23  Marcel irons?

Page 171

1    A.    Yes, sir.
2    Q.    Then you talk about this
3  conversation with Toni Alvarez on the
4  17th.  Is that the conversation we talked
5  about earlier that took place at the
6  Quiznos?
7    A.    Yes.
8    Q.    Okay.  Then the next paragraph
9  says, "After talking to Ms. Alvarez on
10  August 18, 2006 and informing her that I
11  had, in fact, filed a discrimination
12  complaint with EEOC on Monday August 14,
13  my employment was immediately terminated
14  without any reason given verbally or
15  written."  Is this a conversation where
16  you're notified of your termination?
17    A.    I don't understand.
18    Q.    You said you met with Toni
19  Alvarez two times, right?  Once on August
20  17th and then on the 18th, right?
21    A.    Yes.
22    Q.    She notified you of your
23  termination on the 18th, right?

Page 172

1    A.    Yes.
2    Q.    What did Ms. Alvarez say to
3  you about why you were being terminated on
4  the 18th?
5    A.    She told me that she had done
6  the investigation and nobody could
7  collaborate my events, and therefore, she
8  was terminating my employment.
9    Q.    Did she make mention of the
10  Amy Grace reference letter?
11    A.    No.
12    Q.    Did she make mention of any of
13  the complaints?
14    A.    No.
15    Q.    Did you see any documentation
16  related to your termination that day?
17    A.    No, sir.
18    Q.    Did she tell you that you were
19  terminated on the 18th before you made
20  mention of this EEOC complaint?
21    A.    On the 18th?
22    Q.    Yes.
23    A.    Excuse me?  Rephrase that.

Page 173

1    Q.   Did you know you were getting
2  fired on the 18th?  Had that been
3  communicated to you by Ms. Alvarez --
4    A.   I didn't know.
5    Q.   -- before you made mention
6  that you had called the EEOC?
7    A.   Did I know that -- can you
8  rephrase it.  I'm sorry.
9    Q.   Yeah.  You say in your letter
10  that -- we're talking about this
11  conversation on the 18th.  You say that's
12  when you told Ms. Alvarez that you filed
13  an EEOC charge.  You see that in your
14  letter?  My question is, had Ms. Alvarez
15  told you in that conversation on the 18th
16  that you were being terminated before you
17  told her you had gone to the EEOC?
18    A.   I don't understand.
19    MR. PARR:  I think he's asking
20  a real simple question.  And correct me if
21  I'm wrong.
22    Q.   Let me -- you had a
23  conversation with Toni Alvarez on August

Page 174

1  18th, correct?
2    A.   Right.
3    Q.   In your letter marked as
4  Exhibit 15, that's when you say you told
5  her that you had called the EEOC, correct?
6    A.   It's misworded.  I talked to
7  her on the 17th and informed her.  The
8  only conversation we had on the 18th was
9  that she had done her investigation and
10  nobody could collaborate and I was being
11  terminated.
12    Q.   So this is wrong when it says,
13  "After talking to Ms. Alvarez on August 18
14  and informing her that I had, in fact,
15  filed a discrimination complaint with the
16  EEOC"?  You're saying you didn't have --
17  that conversation didn't take place on
18  August 18th?
19    A.   I think I just worded it
20  wrong.
21    Q.   Well, you talk in the
22  paragraph before that about your
23  conversation with Alvarez on the 17th,

Page 175

1  don't you?
2    A.   Yes, sir.
3    Q.   And what did you tell her in
4  your letter that you talked about there?
5    A.   What did I tell Ms. Alvarez?
6    Q.   Yeah.  You don't mention
7  anything in the second paragraph where
8  you're discussing the August 17th
9  conversation about any reference to the
10  EEOC, correct?
11    A.   When I wrote this, maybe I
12  worded it wrong, but I know when I talked
13  to her on the 17th that's when it was
14  discussed.  But I was terminated on the
15  18th.
16    Q.   So your testimony as you sit
17  here today under oath is that you told
18  Toni Alvarez on August 17th at the Quiznos
19  store that you had contacted the EEOC?
20    A.   Yes.
21    Q.   What did you tell her in that
22  regard on the 17th?
23    A.   I told her all the events of

Page 176

1  everything that had been happening to me.
2    Q.   I just want to know what you
3  told Toni Alvarez on August 17th at the
4  Quiznos about the EEOC and any -- I mean,
5  what specifically about that did you tell
6  her, if you said anything?
7    A.   I specifically remember
8  telling her that I did contact them.  I
9  don't remember what I said.
10    Q.   Did you say that you had told
11  the EEOC that you felt you were being
12  discriminated on the basis of your race?
13  Or did you tell her anything about I felt
14  I was being discriminated because she
15  thinks I may be a lesbian or anything to
16  that end?
17    MR. PARR:  Object to the form.
18    A.   No.  I could not use my ethnic
19  products, and I was not allowed to have
20  them transferred.
21    Q.   I'm talking about what you
22  specifically told Toni Alvarez, not what
23  you said to the EEOC.  Did you tell Toni

Page 177

1    Alvarez anything more than I've called the
2    EEOC?
3         A.    And why.
4         Q.    And what was the why?
5         A.    Because I was not allowed to
6    use my ethnic products or bring the ones
7    from the other store.
8         Q.    And so did you tell -- so I
9    take from that you didn't tell Toni
10   Alvarez I think my demotion was based on
11   my race, right?
12        A.    No, I did not.
13        Q.    Okay.  And so you didn't tell
14   her that the write-up you had gotten the
15   day before over the customer complaint was
16   based on race, right?
17        A.    No, sir.
18        Q.    Okay.  So the complaint
19   related to not having the Marcel iron and
20   the relaxer, that you couldn't perform
21   that service, is that right?
22        A.    Many services.
23        Q.    Okay.  Did you say ethnic

Page 178

1    products when you referred to -- when you
2    talked to Ms. Alvarez?
3         A.    I'm sure I did.
4         Q.    Okay.  Did you tell
5    Ms. Alvarez you had filed a charge or that
6    you had just called the EEOC?
7         A.    I don't remember exactly how I
8    worded it.
9         Q.    But you didn't put anywhere in
10   your notes anything about calling the
11   EEOC, right?
12        A.    It's not there.
13        Q.    I mean, I saw the EEOC.  She
14   called the EEOC on the 14th, right?  I
15   mean, that's what the EEOC documents show.
16   And I'm just wondering -- I want to be
17   clear you're saying now in Exhibit 15 that
18   the third paragraph is incorrect if it's
19   to be read as saying that you were telling
20   Ms. Alvarez on August 18 about the EEOC
21   charge, right?
22        A.    I'm saying I worded maybe not
23   the best way.

Page 179

1         Q.    Well, I'm clear.  Your
2    testimony as we sit here today under oath
3    is you told Alvarez about calling the EEOC
4    on August 17th but that that topic did not
5    get raised at all on the 18th, right?
6         A.    No.  She only said to me on
7    the 18th when she was, you know,
8    terminating my employment.
9         Q.    That's all that was spoken
10   then, right?
11        A.    Yes.
12        Q.    Okay.  And then I'm looking
13   back at your handwritten notes on the
14   18th.  Do you see the one that's headed
15   8/18?  Was Amy Grace in attendance at this
16   termination meeting?
17        A.    Yes.
18        Q.    Okay.  And Toni says no one
19   collaborated your story of events and
20   therefore you were being terminated.  Is
21   that what you say she told you?
22        A.    Yes, sir.
23        Q.    Did you -- this says, "I said

Page 180

1    thank you for your investigation and shook
2    her hand."  Is that true?
3         A.    Yes, sir.
4         Q.    I mean, did you feel like she
5    had done a fair investigation?
6         A.    I think that I was trying to
7    handle myself in a professional manner.
8         Q.    I mean, did you do that in a
9    sarcastic manner?
10        A.    No, sir.
11        Q.    Okay.  I mean, did you get any
12   feeling that Toni Alvarez had some ax to
13   grind with you?
14        A.    I don't feel that the
15   investigation was done properly.
16        Q.    Okay.  You don't know, for
17   example, what Shannon told Toni Alvarez,
18   right?
19        A.    No, sir.
20        Q.    You don't know what Christy
21   told Ms. Alvarez, right?
22        A.    No, sir.
23        Q.    And you don't know what Amy

AMY CARPENTER
REGIS CORP, INC.,

AMY CARPENTER
January 30, 2008

(Pages 181 to 184)

Page 181

1 Grace told her, right?
2    A.   No, sir.
3    Q.   It looks like from your notes
4 that you knew you were going to get
5 demoted on August 4th or so, somewhere in
6 there, and you called the EEOC on the
7 14th.  Was there something that happened
8 on the 14th that led you to make the call
9 as opposed to when you learned of the
10 demotion?  Well, I guess you said earlier
11 you didn't say that the -- scratch all
12 that.
13          Was there something that
14 happened on the 14th that led you to call
15 the EEOC?  And I think you said that when
16 you called you talked about not having
17 your products or the thing.  Did that
18 incident with that customer take place the
19 same day you called the EEOC?
20    A.   I don't remember a very
21 specific incident that led me to call
22 them.
23    Q.   Okay.  Did you have any

Page 182

1 contact with Ms. Alvarez from the time you
2 were terminated other than seeing her at
3 the unemployment comp hearing?
4    A.   No, sir.
5    Q.   Same for Ms. Burdette?
6    A.   No, sir.
7    Q.   How about Amy Grace?
8    A.   No, sir.
9    Q.   Shannon or Christy?
10    A.   I've talked to them.
11    Q.   When did you talk to them?
12    A.   I don't remember the specific
13 day and time.
14    Q.   Since this lawsuit has been
15 filed?
16    A.   No.
17    Q.   Have you ever asked them to
18 give you a statement?
19    A.   No.
20    Q.   Have you ever recorded any
21 conversations with any Regis employees?
22    A.   Not that I recall.
23    Q.   Do you have any recordings at

Page 183

1 home that you -- where you've recorded
2 conversation between you and somebody from
3 Regis?
4    A.   No.
5    Q.   Has anybody that you know of
6 recorded a conversation for you?
7    A.   No.
8    Q.   Okay.  Why did you copy the
9 Lee County Commission and the mayor of
10 Auburn and state representative and the
11 NAACP and the Alabama State Board of
12 Cosmetology on this letter, along with
13 others?
14    A.   To make them aware of how I
15 was being treated.
16    Q.   Did you get a response back
17 from any of those people or entities?
18    A.   No, sir.
19 (Whereupon, Defendant's Exhibit 16 was
20       marked for identification.)
21    Q.   Have you ever seen Exhibit 16
22 before?
23    A.   No, sir.

Page 184

1    Q.   Did you ever have your
2 children there in the salon with you?
3    A.   Yes, sir.
4    Q.   Tell me about that.
5    A.   My children attended karate
6 right up the block from the salon.  And on
7 weekends Amy Grace would bring her child
8 and I would bring my child.
9    Q.   Do you know if you ever
10 charged customers for salon services at
11 prices other than those listed on the
12 Regis price list?
13    A.   Yes.
14    Q.   You did?
15    A.   Yes, sir.
16    Q.   Who did you do that for?
17    A.   I'm not sure.  This was
18 discussed between Amy Grace and myself.  I
19 performed services that weren't on the
20 board there.
21    Q.   Did you ever perform a service
22 that was posted on the board and charge a
23 different price than what was posted?

AMY CARPENTER
REGIS CORP, INC.,

Page 185

1  A.   I didn't charge -- no, I
2  wouldn't cheat anybody.
3  Q.   Okay.  Did you ever use
4  products other than approved back bar
5  items?
6  A.   I didn't use anything that my
7  manager didn't know I wasn't using.
8  Q.   Okay.  The back bar might have
9  different items than what's in the front
10  of the store, right?
11  A.   Sometimes.
12  Q.   Okay.  Did you ever bring any
13  of these products that you're referring to
14  about ethnic hair products with you for
15  your own use in the salon?
16  A.   After it was approved.
17  Q.   But those weren't Regis
18  products, right?
19  A.   No.
20  Q.   But there would be an
21  equivalent Regis product to the one you
22  were using?
23  A.   Depends on what I was doing.

Page 186

1  Q.   I mean, I just want to be
2  clear.  It's not your contention that
3  Regis, in all these stores you worked in,
4  just neglected African-American hair to
5  where they didn't have particular products
6  to do services for African-Americans, is
7  it?
8  A.   They did not have a supply,
9  no, they didn't.
10  Q.   I mean, they may have run out
11  at points, but they had it.  If it was in
12  stock, they would have it to do, right?
13  A.   No.  I distinctly remember
14  Tina Cottle saying they didn't have
15  anything there, and that's when Amy
16  ordered stuff.
17  Q.   So she's ordering it from
18  Regis, right?
19  A.   Yes.
20  Q.   Okay.  So I mean, it's a
21  matter of getting it on the shelf, right?
22  A.   Yes.
23  (Whereupon, Defendant's Exhibit 17 was

Page 187

1  marked for identification.)
2  Q.   Can you identify Exhibit 17
3  for me, please.  Can you identify that for
4  me?
5  A.   Yes.
6  Q.   Without the writing on the --
7  below the name Amy Grace, is that the
8  letter that you sent in to Amy Edwards?
9  A.   Yes, sir.
10  Q.   Okay.  I take it that none of
11  that below is your handwriting, right?
12  A.   This is my handwriting right
13  here.
14  Q.   Okay.  Then the dark black
15  that says "This is a copy of a reference
16  letter written around June 30, 2006 in my
17  behalf by my then immediate salon
18  supervisor," that's your handwriting?
19  A.   Yes.
20  Q.   But not that handwritten
21  letter written by Amy Carpenter?
22  A.   No.
23  Q.   Okay.  What was the original

Page 188

1  purpose that Amy Grace wrote this letter
2  for?
3  A.   Because I had been stating to
4  Tina and Amy that I felt like I wasn't
5  being treated fairly in the decision that
6  Delise made, and she had wrote this letter
7  for me if I would seek other employment.
8  Q.   Who were you seeking -- who
9  were you seeking employment with?
10  A.   I didn't.
11  Q.   It says, "I feel that Amy
12  would be a great asset to your company
13  because she has been a great asset to us."
14  You never applied for a job?
15  A.   No, sir.
16  Q.   It says, "Amy is someone who
17  is understanding, empathetic to others."
18  I mean, was there a type of field that you
19  were looking at going into?
20  A.   No, sir.
21  Q.   I mean, were you asking this
22  to -- with some thought of going into the
23  health care field?

47

Page 189

1    A.    No, sir.  I was already in the
2  health care field.
3    Q.    Back at the time this was
4  written?
5    A.    Yes, sir.
6    Q.    What do you mean you were in
7  the health care field at that time?
8    A.    I was already certified.
9    Q.    Okay.  But you weren't working
10 in the health care field at that time,
11 were you?
12   A.    I was PRN.
13   Q.    Okay.  During the time you
14 were working at Regis you were?
15   A.    Yes.
16   Q.    When do you -- you say she
17 wrote it around June 30th?
18   A.    Yes, sir.
19   Q.    Did she type this up on a
20 computer while you were watching?
21   A.    No, sir.
22   Q.    Did she just give it to you in
23 this form?

Page 190

1    A.    Yes, sir.
2    Q.    And you -- do you know why she
3  didn't hand sign it?
4    A.    No, sir.  I guess she forgot.
5  I don't know.
6    Q.    Do you know what phone numbers
7  these are that she's listed?
8    A.    The salon numbers.
9    Q.    What is the 466-4877 number?
10   A.    The Auburn store.
11   Q.    And what is the other one?
12   A.    The Tiger Town store.
13   Q.    What is the Auburn store?
14   A.    466.
15   Q.    I mean, is that the Bruno's
16 store?
17   A.    Yes, sir.
18   Q.    Which one of those would she
19 have been located at on June 30th or
20 around there?
21   A.    I don't remember the exact
22 date when she left.
23   Q.    You got to be a manager on

Page 191

1  July 11th, and that was at the Bruno's
2  store, right?
3    A.    Yes, sir.
4    Q.    Okay.  So she wasn't at the
5  Bruno's store at that time, right?
6    A.    No, sir.
7    Q.    Was she at the Bruno's
8  store -- did she leave the Bruno's store
9  immediately before Katie was promoted to
10 that position?
11   A.    Did she leave before Katie
12 came?
13   Q.    Yes.
14   A.    I think so.  I'm not sure.
15   Q.    Did you ever send this letter
16 to anybody other than to Amy Edwards?
17   A.    Yes, sir.
18   Q.    Who did you send it to?
19   A.    People that I sent this letter
20 to.
21   Q.    Okay.  They all got enclosures
22 on it?
23   A.    Yes, sir.

Page 192

1    Q.    I mean, has this letter ever
2  been used for its initial intended purpose
3  of using it as a reference letter for
4  other work?
5    A.    No, sir.
6    Q.    Where did you keep this letter
7  from June 30th on to August?
8    A.    At my -- in my house.
9    Q.    Is this -- is there another
10 version of this letter?
11   A.    No, sir.
12   Q.    Did you make any modifications
13 to this letter before you sent it to Amy
14 Edwards?
15   A.    No, sir.
16   Q.    Did you hear Ms. Grace say
17 this letter is different than what she
18 said she gave you?
19   A.    I heard her.
20   Q.    Okay.  Do you have any -- did
21 Ms. Grace have any reason to dislike you?
22   A.    She don't have any reason to
23 dislike me, no, sir.

AMY CARPENTER
REGIS CORP, INC.,

AMY CARPENTER
January 30, 2008

(Pages 193 to 196)

Page 193

1  Q. Do you have -- I mean, I
2  understand you disagree with her on that
3  point. But do you have any -- I mean,
4  you've never heard Amy Grace say anything
5  racist to you I take it?
6  A. No, sir.
7  Q. I mean, and you don't know
8  what Amy Grace told Toni Alvarez about
9  this letter back when you were terminated,
10 right?
11 A. No, sir.
12 Q. Did Ms. Alvarez ever speak to
13 you about this letter during that
14 investigation?
15 A. I don't recall.
16 Q. Do you know if she had a copy
17 of it?
18 A. I don't know if she had a
19 copy.
20 Q. Did Amy Grace say anything in
21 the termination meeting about this letter?
22 A. No, sir.
23 Q. Did Amy Grace say anything

Page 194

1  back during that time about, you know,
2  this letter not being what she gave you?
3  A. I can't recall when that
4  letter was -- when she said that she did
5  not write it.
6  Q. I guess you heard her say that
7  later during the employment compensation
8  stuff?
9  A. Yes.
10 Q. But during the time around
11 your termination, did you hear that at
12 that time?
13 A. From?
14 Q. From anybody.
15 A. I did hear that from somebody,
16 but I don't remember.
17 Q. Who it was that said it to
18 you?
19 A. Yes, sir.
20 Q. Okay. But that was around the
21 time you were being terminated, right?
22 A. No, sir.
23 Q. What was my -- no, sir, what?

Page 195

1  A. You asked me was that around
2  the time I was being terminated.
3  Q. And you are saying, no, I
4  don't know; or, no, it wasn't?
5  A. No, she didn't say anything
6  about that letter.
7  Q. My question was not about what
8  she said. You said somebody told you that
9  she said this letter was not true.
10 A. Right.
11 Q. Or that it had been
12 manipulated or whatever.
13 A. Right.
14 Q. And you said somebody told you
15 that.
16 A. Yes, sir.
17 Q. And I'm saying did someone --
18 whoever that someone was tell you around
19 the time you were terminated?
20 A. No, sir.
21 Q. Do you know when that was?
22 A. Later, when I filed for
23 unemployment.

Page 196

1  Q. Okay. Did you have people
2  that would come in the salon on Sundays to
3  meet with them about brides to do wedding
4  planning?
5  A. That's when Amy Grace was the
6  manager.
7  Q. Are you saying that Amy Grace
8  gave you permission to do that?
9  A. She gave me permission and a
10 key.
11 Q. And then did you -- did you
12 talk to Amy Grace before you sent in this
13 letter to Amy Edwards?
14 A. No.
15 Q. Did you tell Amy Grace that
16 you were going to send the letter in?
17 A. No.
18 Q. But Amy Grace wasn't writing
19 this letter to -- for you to use
20 internally at Regis at the time, right?
21 A. No.
22 Q. And you were a stylist at the
23 time she wrote this, right?

Page 197

1    A.    Yes, sir.
2    Q.    Okay.
3        MR. PARR:  Brian, can we take
4    a break for a second.
5        MR. BOSTICK:  Yeah.
6        (Said deposition was in recess
7        at 3:05 until 3:16, after
8        which the following occurred:)
9    Q.    (BY MR. BOSTICK:)  Looking
10   back on Exhibit 15, you make mention of
11   suffering monetary loss and embarrassment.
12   I assume those are damages that you are
13   claiming in this lawsuit.  Have you done
14   any type of calculation about what type of
15   monetary losses you've had as a result of
16   your termination?
17   A.    No, sir.
18   Q.    What do you estimate your
19   annual salary would have been at Regis if
20   you hadn't been terminated?
21   A.    I think I have in my notes
22   what I was making.  Here I have a
23   statement that I made 2500 to 34 every two

Page 198

1    weeks.
2    Q.    And then in your jobs that you
3    have today, do you make in that same
4    range?  Or how much would you say you make
5    every two weeks in those jobs?
6    A.    I can refer to my last check.
7    I don't really know.  1300, 1200.
8    Q.    That's after taxes?
9    A.    Before.
10   Q.    That's before taxes.  Are the
11   amounts that you refer to in your notes
12   from Regis before or after tax numbers?
13   A.    Those are the commissions.
14   You know, we just pull it up on the
15   computer.
16   Q.    You're making $1300 every two
17   weeks now?
18   A.    Most of the time.
19   Q.    Is that in your first job?
20   A.    Yes.
21   Q.    What about in the second job?
22   A.    It varies.
23   Q.    I mean, give me your best

Page 199

1    estimate of what you would make in a month
2    from them?
3    A.    Depending on how many hours I
4    work.
5    Q.    I know that.  But I mean,
6    what's a typical month going to be?
7    A.    Maybe four or five hundred.
8        (Whereupon, Defendant's Exhibit 18 was
9        marked for identification.)
10   Q.    Is 18 a correct copy of your
11   EEOC charge?  Is that a correct copy of
12   your EEOC charge?
13   A.    Yes.
14   Q.    Here again, I'm looking down
15   at your last sentence.  It says, "After we
16   continued to talk, I informed Ms. Alvarez
17   that I had filed a complaint with the EEOC
18   on Monday, August 14th, 2006.  Ms. Alvarez
19   immediately terminated my employment
20   without giving any reason."  Again, when
21   are you saying in this charge that you
22   told Ms. Alvarez about the EEOC complaint?
23   A.    On the 17th.

Page 200

1    Q.    I guess you claim in the
2    charge and then in your lawsuit today that
3    you've been discriminated against on the
4    basis of your race, correct?
5    A.    Yes, sir.
6    Q.    And I assume you contend
7    that -- are you contending that when you
8    were initially denied the promotion that
9    was awarded to Katie that that was
10   discriminatory?
11   A.    Yes, sir.
12   Q.    And you were awarded that
13   position by Delise Burdette, according to
14   this charge, within ten days after her
15   being initially awarded the position,
16   right?
17   A.    Yes, sir.
18   Q.    Okay.  Do you claim that your
19   demotion was based on your race?
20   A.    I believe my demotion and my
21   lack of training while I was manager was
22   all related to my race.
23   Q.    Do you know what training

50

Page 201

1  other managers got?
2      A.   I know that Katie received
3  training by Ms. Burdette.
4      Q.   In the how many days she was
5  there?
6      A.   I don't recall exactly how
7  many days she was there.
8      Q.   What training did you see
9  Katie receive?
10      A.   Ms. Burdette would come down
11  and work with her and show her how things
12  were supposed to be done and go through
13  materials and help her.
14      Q.   Did Ms. Burdette come and help
15  you?
16      A.   She just gave me CDs and a
17  manual.
18      Q.   Was she there in the store
19  with you at times?
20      A.   Not to help me, no.
21      Q.   How often would you say she
22  was in the store during the time you were
23  there?

Page 202

1      A.   I'm not sure.
2      Q.   Did you ever call another
3  store manager named Tameka for help?
4      A.   That I would call her for
5  help?
6      Q.   Yes.
7      A.   I don't think I called her for
8  help.
9      Q.   Did you call and ask questions
10  about how to do things?
11      A.   I remember having a
12  conversation with Tameka, but I'm not sure
13  what it was about.
14      Q.   Did you call Amy Grace with
15  these same kind of questions about how to
16  do things?
17      A.   I did.
18      Q.   Did Delise talk to you about
19  at some point if you got questions call me
20  instead of calling them?
21      A.   I don't recall.
22      Q.   You understood from the
23  manager expectations that if you had

Page 203

1  questions call Delise?
2      A.   I understand what the manual
3  said, but she did not make herself
4  available to me like that.
5      Q.   What does that mean?  Did she
6  not answer your calls?
7      A.   She was not there training me
8  like she was with Katie.
9      Q.   Is it your testimony that she
10  was not in the store training you at all
11  during the time you were manager?
12      A.   It's my testimony that I was
13  not treated as Katie was there when she
14  first arrived and when she took over as
15  manager.  I was given CDs and a manual.
16      Q.   So if -- do you know if Amy
17  Grace ever witnessed Delise providing
18  training to you when you were hired?  You
19  would say no, right?
20      A.   Right.
21      Q.   And same for Tameka?
22      A.   Right.
23      Q.   I mean, what specifically was

Page 204

1  she doing with Katie?  I mean, do you know
2  what specific training she was giving her?
3      A.   Not specifically.
4      Q.   How many days out of the five
5  or so days she was in the position was
6  Delise down there?
7      A.   Maybe three or four.
8      Q.   And it's your testimony during
9  your time in there there were not three or
10  four days when Delise was in your store?
11      A.   Not consecutively training,
12  no.
13      Q.   Ms. Burdette hadn't
14  disciplined you over your running of the
15  store prior to the demotion, right?
16      A.   No, sir.
17      Q.   Had she spoke to you about
18  things you needed to improve?
19      A.   I can recall an incident she
20  came in the salon, we was busy, and put on
21  a glove and wiped the top shelf and said I
22  needed to get it dusted and cleaned.
23      Q.   Did you -- have you told me

Page 205

1    about -- okay.  So we talked about your
2    not being promoted initially, training,
3    and the demotion.  And then I assume
4    you'll say your race was a factor in your
5    termination as well?  Or do you think that
6    was in retaliation?
7        A.    I feel that my race had a lot
8    to do with me not being given the position
9    in the beginning and not being trained
10   properly and then being demoted.
11       Q.    You were ultimately
12   terminated.  And in your charge you say I
13   received -- you say, "I believe my
14   discharge was in retaliation for me
15   informing Ms. Alvarez about my complaint
16   with the EEOC."  So I understand that
17   allegation.  My question is, are you
18   contending in this lawsuit that your race
19   was a factor in your termination as well?
20       A.    Yes, sir.
21       Q.    Okay.  Have you told me all of
22   the comments or remarks either made to you
23   or that you've heard that suggest that the

Page 206

1    people involved in these decisions you're
2    complaining about used race as a factor in
3    any of those decisions?
4        MR. PARR:  Object to the form.
5        A.    I'm not sure if I've told you
6    everything.  If I can remember something
7    later, I will tell you.
8        Q.    Okay.  You told me about -- I
9    just want to make sure.  You know, I think
10   it would stick out in your mind if
11   somebody called you the N word, right?
12       A.    Yes, sir.
13       Q.    Or if they used some racially
14   offensive remark, correct?
15       A.    Yes, sir.
16       Q.    And the only phrase I've heard
17   you mention that even hits on that
18   possibly is your statement that
19   Ms. Burdette may have used the phrase
20   "low-class clients" or something to that
21   effect, correct?
22       A.    She called me low class.
23       Q.    Called you low class.  Which

Page 207

1    you may or may not have interpreted to be
2    a reference to your race.
3        MR. PARR:  Object to the form.
4        Q.    Other than that comment, are
5    there any other comments that I'm going to
6    hear about if we get to trial that you say
7    someone made in that store that implicated
8    race?
9        A.    I feel that the treatment --
10       Q.    I'm not talking about the
11   treatment.  I'm talking about something
12   that somebody said.
13       A.    I can't recall.
14       Q.    Okay.  But you don't know of
15   any other racial comments made by Delise
16   Burdette, correct?
17       A.    I can't recall.
18       Q.    You recall anything that was
19   made by Toni Alvarez?
20       A.    Not to me, no.
21       Q.    To anybody else?
22       A.    Not that I know of.
23       Q.    Amy Grace?

Page 208

1        A.    No.
2        Q.    Okay.  Shannon or Christy
3    Boatwright?
4        A.    Not that I know of.
5        Q.    Are you taking any medications
6    today?
7        A.    I am.
8        Q.    What medications are you on?
9    I should have asked you this at the
10   beginning.
11       A.    I have asthma.
12       Q.    Okay.  What do you take for
13   that?
14       A.    I'm taking Zyrtec and
15   Albuterol.
16       Q.    Anything else that you're
17   taking?
18       A.    Ibuprofen.
19       Q.    Have you ever taken any
20   anti-anxiety or antidepressants?
21       A.    In '98.
22       Q.    Okay.  Is that when your
23   divorce was pretty heated and --

52

AMY CARPENTER
REGIS CORP, INC.,

Page 209

1    A.   No.  That's when I pulled the
2 child out of the swimming pool.
3    Q.   Okay.  Were you diagnosed with
4 depression or any particular issues during
5 that time?
6    A.   No.
7    Q.   Have you had to go over this
8 stuff that happened at Regis and seek any
9 kind of counseling or any kind of medical
10 treatment?
11    A.   I've seeked spiritual
12 counseling but not medical.
13    Q.   Is there a particular minister
14 you've gone to speak to?
15    A.   Yes.
16    Q.   Who is that?
17    A.   Reverend Bailey.
18    Q.   What church is he with?
19    A.   Saint James.
20    Q.   But you haven't been to a
21 psychiatrist or a psychologist?
22    A.   No, sir.
23    Q.   Did you just talk with him

Page 210

1 about generally the allegations we've seen
2 in this -- in your complaint?
3        MR. PARR:  Remember my rules
4 of evidence.  Aren't those protected
5 communications?
6        MR. BOSTICK:  With a minister?
7        MR. PARR:  Yes.
8        MR. BOSTICK:  I think with
9 like a psychiatrist, they're seeking
10 medical help.
11    Q.   Would he have anything that he
12 would testify to in your lawsuit?
13    A.   Containing?
14    Q.   I mean, does he know anything
15 other than what you've told --
16        MR. BOSTICK:  I mean, if you
17 want to stipulate he's not going to be a
18 witness.
19        MR. PARR:  He's not going to
20 be a witness.
21        MR. BOSTICK:  Okay.  That's
22 fine.  I just don't want the minister
23 getting on the stand talking about how

Page 211

1 wrecked she was over this emotionally.
2        MR. PARR:  No.  No.
3    Q.   So have you told me about --
4 you know, I've asked you all these
5 questions about your race claim, and I'm
6 trying to make sure I understand
7 everything you base it on.  I'm going to
8 ask the same question for your
9 retaliation.  Other than Toni Alvarez, did
10 you tell anybody else that you had gone to
11 the EEOC during the time you were there at
12 Regis?
13    A.   No, not that I can recall.
14    Q.   Okay.  Did Toni Alvarez ever
15 say anything to you to suggest she looked
16 negatively upon the fact that you had
17 called the EEOC?
18    A.   She didn't tell me, no.
19    Q.   Okay.  I mean, has she said
20 that to anyone else?
21    A.   Not that I know of.
22    Q.   Okay.  I mean, did she have
23 any response to you during this

Page 212

1 conversation when you said you had gone to
2 the EEOC?
3    A.   We was through with the
4 conversation.
5    Q.   What did she say?
6    A.   That she would further
7 investigate and would let me know.
8    Q.   But she didn't say damn you
9 for going to the EEOC or, you know, you
10 shouldn't have done that or anything like
11 that, did she?
12    A.   No, sir.
13    Q.   And so did anybody else ever
14 say anything negative to you along the
15 way, maybe at any of these unemployment
16 comp hearings, about the fact that you had
17 called the EEOC?
18    A.   No, sir.
19 (Whereupon, Defendant's Exhibit 19 was
20        marked for identification.)
21    Q.   Okay.  Can you identify
22 Exhibit 19 for me, please.
23    A.   It's where I responded to

Page 213

1   Ms. Guenster.
2       Q.   At the EEOC?
3       A.   Yes.
4       Q.   You say in here -- under the
5   paragraph under number one, it says,
6   "Previously Hair Masters had indicated
7   that I was fired for allegedly altering a
8   letter from another employee, a letter
9   that was provided to the company at their
10  request."  Who are you saying made a
11  request of you to provide that letter?
12      A.   Amy Edwards.
13      Q.   What did she -- tell me about
14  that conversation.
15      A.   During me telling her how I
16  was being treated, I had used, for
17  example, that I was not a bad employee and
18  that Amy Grace had wrote this letter for
19  me.  And she told me to send her a copy.
20      Q.   Look on the second page.  How
21  did you get telephone numbers for Latasha
22  Cole and Gwen Spratling?
23      A.   How did I get their numbers?

Page 214

1       Q.   Yes.
2       A.   Gwen Spratling is related to
3   me.  And Latasha Cole was a friend as well
4   as a customer.
5       Q.   Okay.  Did you refuse both of
6   them service?
7       A.   I didn't refuse service.  If I
8   couldn't do it because I didn't have a
9   certain product, but I never refused
10  anyone.
11      Q.   And Tina Cottle is the person
12  who -- she voluntarily stepped down to a
13  stylist position, is that right?
14      A.   Yes, sir.
15      Q.   And then you say Shannon
16  Meyers and Christy Boatwright can confirm
17  the statement that you contend
18  Ms. Burdette made?
19      A.   Yes.
20      Q.   And what comment is it that
21  you're saying that they can confirm?
22      A.   That I was low class.
23      Q.   What policies were you

Page 215

1   referring to when you say that Amy Grace
2   and Tina Cottle had also violated
3   policies?
4       A.   Coming into the salon after
5   hours or bringing their children.
6       Q.   When you say you had manager's
7   permission, who -- is it Amy Carpenter
8   you're saying that gave you that?
9            MR. PARR:  She is Amy
10  Carpenter.
11      Q.   I'm sorry.  Amy Grace.
12      A.   When Amy Grace was my manager,
13  she and I both brought our children to
14  work.
15  (Whereupon, Defendant's Exhibit 20 was
16       marked for identification.)
17      Q.   Can you identify Exhibit 20
18  for me.
19           MR. PARR:  Amy, the question
20  is do you know what it is.
21      A.   I'm sorry.  Yes.
22      Q.   What is that letter?
23      A.   A letter from Ms. Guenster.

Page 216

1       Q.   Is she an EEOC representative?
2       A.   Yes.
3       Q.   Have you spoken with her
4   during the course of the investigation?
5       A.   During this time?
6       Q.   Well, I guess this is dated
7   March 8th of 2007.
8       A.   I'm sure I had.
9       Q.   Is she the same lady you sent
10  your letter to earlier?
11      A.   Yes, sir.
12      Q.   Did you follow up with this
13  letter with any kind of response
14  suggesting her findings were incorrect?
15      A.   I'm not sure.
16  (Whereupon, Defendant's Exhibit 21 was
17       marked for identification.)
18      Q.   21 was a compilation of clock
19  in and clock out.  Have you seen this
20  before?
21      A.   No, sir.
22      Q.   This was provided to the EEOC.
23  I was just wondering if you had reviewed

Page 217

1  it and if you had any -- if you disputed
2  these findings or felt they were done in
3  error in any way?
4        A.   I've never seen this before.
5        Q.   Okay.  You have time sheets
6  that would show when you were supposed to
7  be scheduled?
8        A.   Yes, sir.
9        Q.   And then is there an actual
10 clock that you clock in and out?
11       A.   Yes, sir.
12       Q.   Okay.  What was your standard
13 requirement for work?  What time should
14 you be there?
15       A.   Ten I think.
16       Q.   Did the store open at nine on
17 Saturdays?
18       A.   Yes.
19       Q.   And then would y'all close at
20 seven?  Or what time would the store
21 close?
22       A.   I think it was six.
23       Q.   Six.  And then if you took a

Page 218

1  lunch break, how long would they request
2  you take a lunch break?
3        A.   I don't remember exactly.
4        Q.   Be an hour or less?
5        A.   I think so.
6        Q.   I'm not going to mark this as
7  an exhibit but just wanted to go through
8  your initial disclosures.  These are
9  people you've identified as potential
10 witnesses.  Is Latoya Cannon the customer
11 that was in the store we've seen reference
12 to a Latoya?
13       A.   Yes, sir.
14       Q.   Shannon and Christy were
15 workers at the Tiger Town store?
16       A.   Yes.
17       Q.   Latasha Cole and Gwen
18 Spratling were your friend and the
19 relative that came in the store in August?
20       A.   Yes.
21       Q.   I think I recognize the rest
22 of the names.  Did you -- after your
23 termination -- you know, I was talking

Page 219

1  about any type of damages.  And one
2  question, I understood you didn't go to
3  any doctors other than a counselor.  Did
4  you have any weight gain or weight loss
5  during that time?
6        A.   I had a lot of weight gain.
7        Q.   How much weight do you
8  estimate that you gained?
9        A.   60 pounds.
10       Q.   Did you have any other stress
11 factors going on in your life at that
12 time?
13       A.   Yes.
14       Q.   What else was going on?
15       A.   During my time that I was
16 employed there, I had filed bankruptcy and
17 so I was trying to pay it back through
18 them.  When I lost my job, I couldn't do
19 it.
20       Q.   And then it looks like you've
21 had to pursue litigation against your
22 ex-husband to try to get child support.
23 Was that going on during that time?

Page 220

1        A.   Yes.
2        Q.   Any other factors going on
3  during that time?
4        A.   Just being stressed without
5  having a job and not being able to support
6  my kids.
7        Q.   How long after your
8  termination -- I noticed the first job you
9  had you said -- it said couple of months
10 in 2006.  I mean, do you remember how long
11 it was before you got the first job you
12 had after Regis?
13       A.   Not right offhand.
14       Q.   But consistently since
15 December of '06, you've had work?
16       A.   Yes, sir.
17       Q.   Okay.  I mean, do you think it
18 was September or October, November that
19 you got the first job?
20       A.   I'm not sure.
21       Q.   Were you employed as of
22 Halloween?
23       A.   I can't remember.

Page 221

1    Q.   Okay.  Thanksgiving, do you
2  remember?
3    A.   I can't remember.  I know I
4  was employed in December, though.
5    Q.   Okay.
6    MR. BOSTICK:  Let me look
7  through my notes.  Give me about five
8  minutes.  Do you have any questions you
9  wanted to ask?  I just need to follow-up
10  in my notes and talk with Delise, and I
11  think I may be done.
12    MR. PARR:  I don't think I
13  have anything.
14    (Said deposition was in recess
15    at 3:45 until 3:48, after
16    which the following occurred:)
17    Q.   (BY MR. BOSTICK:)  When you
18  said that Amy Grace had sometimes brought
19  her children in to work, do you know if
20  that was during the time Delise was above
21  her or was that when someone else was a
22  supervisor?
23    A.   I'm not sure of the date when

Page 222

1  Delise took over.
2    Q.   Okay.  I mean, did you ever
3  hear from Amy Grace that Delise had said
4  that she didn't want that happening?
5    A.   No.  Not then.
6    Q.   Did -- do you know if Delise
7  Burdette knew about your bringing children
8  into the workplace?
9    A.   Delise had told me after I had
10  become manager that I would have to find a
11  better place for my kids to be.
12    Q.   So as far as you knew from
13  her, that wasn't okay with her for you to
14  bring your children into work, right, for
15  Delise?
16    A.   It was okay when Amy was
17  there, that she allowed Amy to bring hers.
18  But when I became manager, then it became
19  a problem.
20    Q.   Do you know that Delise was
21  above Amy when Amy was bringing her kids?
22    A.   At some point I'm sure.
23    Q.   You're sure?

Page 223

1    A.   Like I said, I don't know the
2  exact date that she became Amy's
3  supervisor.
4    Q.   Well, do you know whether or
5  not Delise even knew Amy was bringing her
6  children in the store?
7    A.   I don't know.
8    Q.   Okay.  Just so I'm clear,
9  Delise Burdette is the person who made the
10  decision to promote you to salon manager,
11  correct?
12    A.   As far as I know.
13    Q.   Okay.  And she knew you were
14  African-American when she promoted you,
15  right?
16    A.   Yes.
17    Q.   And then you have this
18  contention that she denied you training
19  that Katie got, right?
20    A.   Yes, sir.
21    Q.   And I guess do you know
22  whether or not Delise -- Delise's
23  performance is reviewed or her performance

Page 224

1  is impacted by how stores like the store
2  you're assigned to do under her
3  supervision?
4    A.   Yes, sir.
5    Q.   They are.  So she wouldn't
6  have a financial incentive to -- it
7  wouldn't be in her best interest to put
8  you in a store for you to fail, right?
9    MR. PARR:  Object to the form.
10    A.   With a company as big as
11  Regis, all their companies are not going
12  to succeed.  Some will fail.
13    Q.   Is it your contention she put
14  you in that position and didn't give you
15  this training you felt you needed in an
16  attempt to make you fail as salon manager?
17    A.   Yes.
18    Q.   What evidence do you have to
19  suggest that?
20    A.   When I asked Ms. Burdette to
21  hire people to help get the salon back on
22  its feet, she wouldn't.
23    Q.   Well, you had the ability to

Page 225

1    hire in that spot, didn't you?
2        A.    Only with her approval.
3        Q.    Did you ever interview
4    anybody?
5        A.    Yes.
6        Q.    Did you go around to the local
7    salons and look for people?
8        A.    I took applications, and
9    everybody that I brought in, she didn't
10   hire.
11       Q.    Can you name for me one person
12   who -- by name that you recommended for
13   hire that she didn't approve?
14       A.    Yes.  Teresa Smith.
15       Q.    What is her race?
16       A.    She's African-American.
17       Q.    Anybody else?
18       A.    Latoya Cannon.
19       Q.    Latoya is the customer who's
20   engaged in the conversation with Shannon?
21       A.    Yes.
22       Q.    Anybody else?
23       A.    Not of African-American

Page 226

1    decent.
2        Q.    Were there any white people
3    that she said no to?
4        A.    There were several
5    applications, but none of them were hired.
6        Q.    Did you hire anybody during
7    the time you were salon manager?
8        A.    Ms. Edwina was hired, but she
9    was hired by Delise.
10       Q.    She was black, right?
11       A.    Yes.
12       Q.    So was there any discussion
13   when you got demoted by Delise about her
14   firing you instead of just demoting you?
15       A.    Between her and I?
16       Q.    Yes.
17       A.    No.
18       Q.    Okay.  So if she was going to
19   take disciplinary action, presumably one
20   thing she could have done was terminate
21   you, right?
22       A.    Yes.
23       Q.    And so she chose to demote

Page 227

1    you, though, rather than terminate you,
2    right?
3        A.    She chose to demote me and
4    transfer me to a store where I would not
5    make money.
6        Q.    A store two miles away from
7    the store you were in, correct?
8        A.    Right.
9        Q.    Okay.
10             MR. BOSTICK:  That's all I've
11   got.
12             MR. PARR:  I don't have
13   anything.
14
15             FURTHER THE DEPONENT SAITH NOT
16
17             (Said deposition of AMY
18             CARPENTER was concluded at
19             3:52 p.m. on January 30,
20             2008.)
21
22
23

Page 228

1              C E R T I F I C A T E
2
3    STATE OF ALABAMA)
4    JEFFERSON COUNTY)
5
6            I hereby certify that the
7    above and foregoing deposition was taken
8    down by me in stenotypy, and the questions
9    and answers thereto were reduced to
10   typewriting under my supervision, and that
11   the foregoing represents a true and
12   correct transcript of the deposition given
13   by said witness upon said hearing.
14           I further certify that I am
15   neither of counsel nor of kin to the
16   parties to the action, nor am I in anywise
17   interested in the result of said cause.
18
19
20
21
22           COMMISSIONER - NOTARY PUBLIC
23           ACCR NO. 445

57

**BoRics**
HAIRCARE

REGIS CORPORATION • 7201 METRO BOULEVARD • MINNEAPOLIS, MINNESOTA 55439 • 952-947-7777 • 952-947-7900

## APPLICATION

Date 11-7-05

Name Amy Slaughter Carpenter      Soc. Sec. # ▓▓▓▓▓▓

Home Address ▓▓▓▓▓▓      Home Phone 745-5357 (6634681)

City Opelika      State Al      Zip 36801

Age (if under 19) _____

Have you ever worked for a Regis Corp. salon? NO   Which one? _____ When? _____

(Regis, MasterCuts, Trade Secret, Beauty Express, Supercuts, SmartStyle, HairMasters, The Barbers, City Looks, Cost Cutters, First Choice H.C., Best Cuts, Saturday's, Style America, Magicuts)

PREVIOUS EMPLOYMENT: (starting with present position and working back)

Employer #1 CCD      From current to _____
Duties: Care for Residents   Name of Supervisor Blossom Harris
Reason for leaving have not

Employer #2 Beauregard Salon      From 1/97 to 7/97
Duties: Cut, Style, Perm, etc.   Name of Supervisor Self co/owner
Reason for leaving Death of child

Employer #3 Shear Magic      From #/95 to 12/96
Duties: Cut, Style, Perm, etc.   Name of Supervisor Susan Smith went into own Business
Reason for leaving went into own Business

EDUCATIONAL BACKGROUND: Did you complete High School? yes   College? yes
Beauty School Attended Southern Union

States in which you hold operator or salon manager licenses.

Operator license: Alabama Cosmetologist

Manager license: _____

Have you ever been convicted of a criminal offense? ✓ yes ___ no
If yes, please explain: in 1992 Break up w/ Boyfriend conduct

A prior criminal conviction will not absolutely prohibit employment but will only be considered in relation to specific job requirements.

#37357 Printed in the USA 2.04

NOV 3 0 200:

```
EXHIBIT
   /
Carpenter
```

Mon Nov 14 10am

List specialized or advanced training in beauty field - where? when?
List styling competitions you have won - where? when?

Did the Bridal Shows for Jim masseys cleaners
for 2yrs, Hair Shows, platform, wedding Bridal Parties

COSMETOLOGY REFERENCES:
Name Santasha Durbill   Address 1750 Opelika Rd. Al Aub   Phone 821-1316
Name Jim Pollard   Address 15500 Opelika Rd   Phone 826-0690
                              Aub, Al

**Previous Address History**

Address ▓▓▓ ▓▓ ▓▓ ▓▓
City Opelika ▓▓           State AL   Zip 36804
Occupancy Dates (month and year) From 9/93   To 10/2004

Address _____
City_____   State ____   Zip _____
Occupancy Dates (month and year) From _____   To _____

IMPORTANT - Please read the following statements carefully before you sign and return this application.

I understand that this application is not a contract, offer, or promise of employment and that if hired, I will be able to resign at any time for any reason. Likewise, Bo Rics can terminate my employment at any time with or without cause. Furthermore, I understand that no person other than the President of Regis Corporation has the authority to enter into an employment contract with me and that any exception to my at-will relationship must be evidenced by a written agreement signed by me and the President of Regis Corporation.

I authorize persons, schools, my current employer (if applicable), and previous employers and organizations named in this application (and accompanying resume, if any) to provide any relevant information that may be required to arrive at an employment decision.

I hereby affirm that the information provided on this application (and accompanying resume, if any) is true and complete to the best of my knowledge. I also agree that falsified information or significant omissions may disqualify me from further consideration for employment and may be considered justification for dismissal if discovered at a later date.

Signature Amy Carpenter   Date 11/7/05

Printed in the USA   © Regis Corporation 2004 #32357

# Personnel Data Sheet

PAY 101

PLEASE PRINT! Salon Name: Hair Masters    Salon Number: 008895

Salon Location: 1530 E. Glenn Ave. Suite B ___ Aubur n ___ AL ___ 36830
Mall Name                City                State

## Employee Information:

Employment Date: [ ][ ] [ ][ ] [ ][ ][ ][ ]
M M   D D   Y Y Y Y

Social Security #: ██████████

First Name: Amy

Date of Birth: ██████████
M M   D D   Y Y Y Y

Last Name: Carpenter

Middle Initial: N

143483

Mailing Address: P. O. Box 2254

City: Opelika

State: AL

Zip code: 36801

County: Lee

Phone #: 334 - 663 9681

Cosmetology License #: 089801

License Type (circle one): Manager / Cosmetologist / Barber / Masseuse / Esthetician / Manicurist

Expiration Date: 11 01 2005
M M   D D   Y Y Y Y

---

Job Title: cosmetologist

Full-Time ✓    Part-Time ___
(Please check one)

Hourly Wage: $ 10.00 Per Hour:

Service Commission: 40 %;    Retail Commission: 10 %;

EXHIBIT 2
Carpenter

Payday: The 10th and 25th of each month (except where local law requires payment on a different schedule).

By signing below I acknowledge that I have received, read and understand the materials titled "Important Information for the New Employee". I have been given the opportunity to request a complete explanation of any information, policy or procedure which was unclear to me. I understand that the information contained herein is not a full statement of company procedure and policy and may be modified by the company at its discretion.

I further understand that no provision contained in "Important Information for the New Employee" is intended to create a contract or guarantee of employment between Regis Corporation and any employee, or to limit the rights of the company and its employees to terminate the employment relationship at any time, for any reason in the company's sole discretion.

I also acknowledge that I have read and that I understand the policies of Regis Corporation regarding discrimination and harassment. I understand my obligation as an employee to promptly report to the appropriate persons activities and/or conduct which may constitute a violation of the Regis Corporation Non-Discrimination and Workplace Harassment Policy.    12.2.05

Employee: _____

Date: 11-16-05    ENTERED MP

Manager: _____

Date: 11-17-05    NOV 30 2005

**IMPORTANT!** Both sides of this form must be completed and mailed to the Payroll Department by the salon manager immediately upon hiring a new staff member.

revision 11/04

15

# Salon Policy Acknowledgement

**PLEASE PRINT!**

Employee's Full Name _Carpenter_ _Amy_ _N._
                                   Last                      First                      Middle Initial

Employees Social Security Number: _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_    Salon Number _____

# Acceptance of Workplace Non-Discrimination and Harassment Policy

I acknowledge that I have read and understand the Non-Discrimination and Workplace Harassment Policy, I also acknowledge that I have viewed the Regis Educational Video titled "Anti-Harassment Policy". I agree to comply fully with all corporate policies and procedures contained in the Non-Discrimination and Workplace Harassment Policy.

Employee's Signature _Amy N.S. Carpenter_    Date: _11-16-05_

# Safety Checklist

Please check the boxes below after the employee has satisfied the following requirements:

- ☑ Read the Written Safety Program (Refer to Safe Styles Manager's Information Kit)
- ☑ Viewed the Safety DVD's
- ☑ Trained in handling Hazardous Materials

I acknowledge that I have completed the above checked items, and fully understand the contents of each area.

Employee's Signature _____    Date: _____

Manager's Signature _[signature]_    Date: _11-17-05_

**SALON MANAGER:**

Please send this form to the Home Office with the W-4, application for employment, and arbitration agreement.

This form is to be filed in the employee's personnel file.

Please send the I-9 and 8850 Form directly to ADP.

revision 11/04                  16

**EXHIBIT**

**3**

_Carpenter_

# XIV.  The Americans with Disabilities Act of 1990

Under certain circumstance, the ADA requires that an employer make reasonable accommodation for a qualified individual with a disability. If you require reasonable accommodations for a disability in order to perform your job, you must make the need for the accommodation known to your salon manager or area supervisor. The Company does have the right to request medical documentation of the disability.

# XV.  Non-Discrimination and Workplace Harassment Policy

**Purpose.** Regis Corporation believes in respecting the dignity of every employee and expects every employee to show respect for all our team members, customers, and vendors. Respectful, professional conduct furthers the Company's mission, promotes productivity, minimizes disputes, and enhances our reputation. Accordingly, this policy forbids discrimination in the terms and conditions of employment including termination that is based on an individual's race, color, religion, gender, national origin, age, disability, or any other protected status. Any unwelcome conduct that is based on an individual's race, color, religion, gender, national origin, age, disability, or any other protected status is also prohibited. The Company is thus committed to providing a work environment that is free of discrimination, including harassment, that is based on any legally protected status. The Company will not tolerate any form of harassment that violates this policy.

**Coverage.** The policy forbids any employee, supervisor, coworker, professional, contractor, vendor, client, or any non-employee who conducts business with a Regis Corporation salon from harassing any Company employee or applicant.

**Prohibited Conduct.** The conduct prohibited by this policy includes any discrimination or any unwelcome conduct whether verbal, physical, or visual, that is based upon a person's protected status, such as sex, color, race, religion, national origin, age, physical or mental disability or other protected group status. The Company will not tolerate harassing conduct that affects tangible job benefits, that interferes unreasonably with an individual's work performance, or that creates an intimidating, hostile, or offensive working environment. Among the types of unwelcome conduct prohibited by this policy are epithets, jokes, slurs, and negative stereotyping based upon a person's protected status. Even where the conduct is not sufficiently severe or pervasive to constitute actionable harassment, The Company discourages any such conduct in the workplace.

**Sexual Harassment.** Sexual harassment deserves special mention. Unwelcome sexual advances, requests for sexual favors, and other physical, verbal or visual conduct based on sex constitute sexual harassment when: (1) submission to the conduct is an explicit or implicit term or condition of employment, (2) submission to or rejection of the conduct is used as the basis for an employee decision, or (3) the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment. This policy forbids conduct based on sex, whether directed towards a person of the opposite or same sex, and regardless if it rises to the level of a legal violation. Examples of conduct in violation of this policy include explicit sexual propositions, sexual innuendo, suggestive comments, sexually orientated "kidding" or "teasing," circulation of sexually suggestive printed or visual material, and offensive physical contact such as patting, pinching, or brushing against another person's body.

**Reporting Procedures and Company Responses.** All the Company's employees are responsible to help assure that our workplace is free from prohibited harassment. **If you feel that you have experienced or witnessed any conduct that is inconsistent with the policy, you are to notify a Regional Manager or any Salon Director at the Home Office in Minneapolis, Minnesota. This policy does not require reporting harassment or discrimination to any individual who is creating the harassment or discrimination.** The Company's policy is to investigate all such complaints thoroughly and promptly. To the fullest extent practicable, the Company will keep complaints and terms of their resolution confidential. If an investigation confirms that a violation of the policy has occurred, the Company will take corrective action, including discipline, up to and including immediate termination of employment. If the person who engaged in harassment is not employed by the Company, then the Company will take whatever corrective action is reasonable and appropriate under the circumstances.

D - 00068  Carpenter v. Regis

## XV.  Non-Discrimination and Workplace Harassment Policy (con't)

**No Retaliation.** The Company forbids retaliation against anyone for reporting harassment, assisting in making a harassment complaint, or cooperating in a harassment investigation. If you feel you have experienced or witnessed any conduct that is retaliatory, you should follow the reporting procedures stated above.

**Contact information:**

Regis Corporation  Home Office:        7201 Metro Blvd.
                                       Minneapolis, MN  55439
                                       1-888-888-7778 (employees only)

Salon Directors/ VPs:

| Name | Extension |
| --- | --- |
| Kris Bergly (COO) | 7350 |
| John Fraser (VP) | 1976 |
| Amy Edwards (VP) | 7351 |
| Julie Jergens (D) | 7357 |
| Dennis Margo (D) | 1789 |

Regional Managers

| Name | Extension |
| --- | --- |
| Bill Rooker | 1873 |
| Tracey Nelson | 1482 |
| Pam Stewart | 1136 |
| Sue Farrell | 1502 |
| Carole Kupiec | 1387 |
| Toni Alvarez | 1595 |
| Denise Plentz | 1518 |
| Joe Corrigan | 1963 |
| Cecile Hemphill | 1598 |
| Cindy Margo | 1790 |
| Cathy Williams | 2256 |
| Jean Bell | 2264 |
| Patti Courser | 2278 |
| Karen Hendricks | 1160 |
| Shawn Rafferty | 1959 |
| Leona Mundt | 1317 |

## XVI.  Policy Against Discrimination in the Provision of Services

The Company welcomes and desires to serve all customers. We do not discriminate with respect to the provision of services on the basis of a protected status under federal or state law.

Refusing to perform a service or delaying a service because of a customer's protected status is a discriminatory act, which is legally and morally wrong. If your salon offers a service, it must be available to all customers. You are not required to perform a service that your salon does not now offer. Violation of this policy may subject an employee to discipline, including dismissal without prior notice.

## Conclusion

Having read **Important Information for the New Employee**, you should now be familiar with our general policies and philosophy. Make sure that you go through the Checklist for New Employee Orientation with your manager for more specific information. We wish you much success in the start of your career with the Company.

# Company Security Regulations

The following conduct is against the best interests of the company, its employees and its customers. Any employee who engages in any of the conducts listed below will be subject to discipline up to and including dismissal. This list is not necessarily complete and may be amended from time to time.

1. Allowing persons other than Company employees behind the reception desk or in the salon dispensary.

2. Leaving the cash drawer open between transactions.

3. Moving merchandise or products into or out of the salon without proper documentation and authorization.

4. Leaving the salon unattended during work hours.

5. Leaving the salon keys unsecured.

6. Failure to make at least one bank deposit daily as assigned by salon manager.

7. Failure to comply with company policy regarding acceptance of personal checks as payment for salon services and/or products.

8. Cashing personal checks in the cash drawer for oneself, another employee, or non-employee.

9. Theft, intentional destruction or the unauthorized use of any property belonging to the Company, a customer or a co-worker, including but not limited to merchandise, money or supplies.

10. Failure to charge for products, supplies or services rendered for ANY reason without prior approval of either the manager or a supervisor.

11. Failure to accurately record payments on the P.O.S. or to place monies received from customers into the cash drawer or register immediately following the completion of the service or product sale.

12. Charging customers for salon services at prices other than those posted on the salon's price list or as ticketed, unless such price is authorized by an appropriate Company supervisor.

13. Rendering free or discounted services to anyone other than a Company employee without the prior approval of a supervisor or manager.

14. Discarding or voiding a sales ticket without authorization.

15. Use of product other than approved "back-bar" items when performing services.

16. Intentional falsification of Company records, including but not limited to time sheets, payroll records, appointments books, tickets, or any P.O.S. entry.

17. Failure to accurately report all hours worked, including attendance at company meetings and training sessions.

18. Failure to follow salon closing procedures, including bank deposit procedure.

19. Sale, use or possession of illegal drugs or alcohol on salon premise or reporting to work under the influence of illegal drugs or alcohol.

20. Possession or use of a weapon on salon premises or at any company-sponsored function.

21. Any other misconduct which adversely affects the Company.



EXHIBIT
5
Carpenter

# What I expect of a manager

- Make schedules, and cover schedules
- Have meetings monthly two hours or less, call me when you schedule them so I can attend
- Make orders on time
- Keep paper work for one year in separate labeled containers per month
- Make sure deposits are made daily
- Make sure daily paper work and deposit slips are done and filed correctly
- Make sure salon is clean, every stylist will have a area and a retail line to clean
- Make sure monthly collateral is put up by the 3rd of every month
- Call all other issues in to me
- Refer to manager guide for hiring procedures , and all other personnel issues. or call me if you have any questions.

I have read and understand all of these expectations. I have read and understand managers help book concerning hiring, write-ups , and terminations and all other information in it. I under stand that failure to comply with these procedures will result in poor management and may also result demotion

Sign _____

EXHIBIT

6

Carpenter

D - 00089  Carpenter v Regis

11-05-2003 13:11   DELISE 2562376570                                                PAGE1

# REGIS

REGIS CORPORATION • 7201 METRO BOULEVARD • MINNEAPOLIS, MINNESOTA 55439 • 612-947-7777 • FAX 612-947-7900

**To:**   Salon Manager

**Re:**   Compensation — Annual and Monthly Bonus

Congratulations on your appointment as Salon Manager. You, as Salon Manager, are eligible to earn a bonus based on the salon service sales.

**Annual Sales Bonus:** You will be eligible to receive a bonus equal to 1% of the total annual (twelve months) salon service sales. The bonus year begins on the first of the month after your appointment as Salon Manager and runs for twelve months. You must be in employment as Salon Manager for the complete bonus year to be eligible to receive this bonus. The bonus will be paid to you approximately 45 days after the completion of your bonus year. If you are discharged for misconduct that violates Company policy or mismanagement of Company funds after the end of the bonus year, but before the payment has been made, the bonus will not be paid.

**Monthly Sales Bonus:** You will be eligible to receive a bonus to 1% of service sales if you reach your monthly total sales quota.

**Product Sales Bonus:** You will be eligible to receive a bonus for salon product sales if you reach your monthly product sales quota.

_____   7/11/06   _____
Manager                   Date      Supervisor

_____ 143483 _____
Manager Social
Security/Insurance Number

608 95 / HairMasters Auburn Al
Salon Number, Salon Name, City, State

___ 7/11/06 ___
Effective Date of Appointment

Top copy to payroll department          Bottom copy to employee

**EXHIBIT**

7

Carpenter

11-05-2003 13:11   DELISE 2562376570                                    PAGE2

# REGIS corporation



# PERSONNEL DATA CHANGE FORM

**IMPORTANT:** This form must be completed and mailed by Salon Manager whenever a payroll related change (such as change of name, address, payroll rate, job position, or federal withholding status) occurs for any employee. Fill out the top section and the section to which the change applies.

## PLEASE PRINT

Salon Name & Location: Auburn Al - Bunas ShopCtr Hm
Salon Number: 60895        Mall Name        City        State
Employee's Name Amy S Carpenter        S.S. No. ID# 143483
Hire Date: 11/17/03
Change is in: Name ____; Address ____; Payroll Rate ____; Federal Withholding ____
Effective Date of Change: 7/10/06
                          mo.  day  yr.
Is Employee Enrolled in Any of the Health Insurance Benefit Plans?
(Yes)                                    No

## NAME

Employee's Former Name: _____
Employee's New Name: _____

*ENTERED BY MELISSA P. 8/3/06*

## ADDRESS

Employee's New Home Address: _____
                              Number and Street
                              City        State        Zip
Telephone Number: (_____) _____

## PAYROLL RATE

Job Title: Manager        Check One: Full Time ____; Part Time ____
Salary Guarantee: $ 6.00 per hour.
Commission Rate: 50 % of Service Sales
Other (please specify): From Stylist to Manager

## TRANSFER

Old Salon # _____ New Salon # _____ Effective Date _____

If you wish to change your Federal Withholding Status, please attach a new W-4 form.

Signature of Manager or Supervisor        Employee Signature

4633 Rev. 1/03  Printed in the U.S.A.

## All Claims

Period 11/01/2005 - 08/31/2006

**60885    Opelika,AL-Pepperell Pkwy-HM**

*Director:* AMY EDWARDS

*Supervisor:* DELISE BURDETTE

| Service Date | ServiceType: | Complaint Codes | Refund Amt | Gift Cert Amt | Stylist | Resolution |
|---|---|---|---|---|---|---|
| 2/4/2006 | Hair Cut | BC | $14.95 | | Jamie? | Apology |
| 8/15/2006 | Other | NSO | | | | Contact Supervisor |
| | | | | | Amy Carpenter | Apology |
| | | | | | | Contact Manager |
| 8/15/2006 | Hair Cut | NSO | | | Cindy | Contact Manager |
| | | | | | | Goodbye Letter |



EXHIBIT
7A
Carpenter

*Monday, September 18, 2006*

D - 00179  Carpenter v Regis

109673
110260
110487

## All Claims

**60895    Auburn,AL-Bruno's Shop Ctr-HM**

Period 11/05/2005 - 08/31/2006

*Director:* AMY EDWARDS

*Supervisor:* DELISE BURDETTE

| Service Date | ServiceType: | Complaint Codes | Refund Amt | Gift Cert Amt | Stylist | Resolution |
|---|---|---|---|---|---|---|
| 12/15/2005 | Shampoo/Set | SIC | | | Jennifer | Salon Incident Report |
| 3/12/2006 | Hair Cut | SIC | | | Amy Carpenter | Salon Incident Report |
| 8/1/2006 | Color | NSC | | | Amy Carpenter | Apology |
| | | | | | | Coupons |
| | | | | | | Redo Service |
| 8/11/2006 | Hair Cut | BC | | | Amy Carpenter | Apology |
| | | | | | | Redo Service |
| | | | | | | Contact Manager |

*Monday, September 18, 2006*

D - 00180  Carpenter v Regis



D - 00181  Carpenter v Regis



**Customer's Name**   Andy

## Complaint Information

| | | |
|---|---|---|
| Service Type | Hair Cut | Date of Service   3/12/2006 |
| Products Used | | Redo? ☐ |
| Complaint Codes | SIC | Patch Test? ☐ |
| Cost of Service | | Permission Signed? ☐ |
| CXLAccount ☐ | Refund at Salon ☐ | Stop Payment ☐ |
| | Date Cancelled | |

## Resolution Information    Claim Closed   7/18/2006

| | | |
|---|---|---|
| Resolution | Salon Incident Report | Refund Amount |
| | | Gift Cert Amount |
| Charge Card # | | Expires |
| Card Type | | |
| Refund Includes | | |

**Notes**   Clippers cut C ear. M and S applied direct pressure to try to stop the bleeding. S used antiseptic wipe to clean area and placed bandage on ear. C didn't complain during service.

(for reference on Check Request)

Page:  1  2

Notes

### Calendar — March 2006

| Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---|---|---|---|---|---|---|
| 27 | 28 | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |

### PRINT
- Customer Letter
- Envelope
- Check Request
- Credit Request





**Customer's Name** Heather Collins

**Complaint Information**

Service Type: Hair Cut    Date of Service: 8/1/2006    Redo? ☑    Patch Test? ☐

Products Used:

Complaint Codes: BC

Cost of Service:    Refund at Salon ☐    Permission Signed? ☐    Stop Payment ☐

CXL Account ☐    Date Cancelled

**Resolution Information**    Claim Closed: 8/15/2006

Resolution: Apology    Refund Amount:

Redo Service

Contact Manager    Gift Cert Amount:

Charge Card #    Expires:

Card Type

Refund Includes:

PRINT — Customer Letter, Envelope, Check Request, Credit Request

(To reference end of Check Request)

**Notes:** C was not happy with her cut. She stated 1 side of head has layers and the other is longer with no layers. I apologized and contacted the M of #60885. She is willing to do a redo.

Page: 1 | 2    Notes

Calendar: August 2006

| Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|-----|-----|-----|-----|-----|-----|-----|
| 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |

D - 00184  Carpenter v Regis



D - 00185  Carpenter v Regis



**Customer's Name**   Nicole Calloway

## Complaint Information

Service Type    Other

Products Used

Complaint Codes    NSO

Cost of Service

CXLAccount ☐    Refund at Salon ☐    Date Cancelled

Date of Service    8/15/2006

Redo? ☐
Patch Test? ☐
Permission Signed? ☐
Stop Payment ☐

## Resolution Information

Resolution    Apology
Contact Manager

Charge Card #

Card Type

Refund Includes

Claim Closed    8/17/2006

Refund Amount
Gift Card Amount

Expires

(for reference on Check Request)

### Notes

C called and scheduled appt. for a shampoo/cut/blow dry with S. S called her 1 hr before service and stated salon does not have products for highly textured hair so she wouldn't be able to do her hair. I apologized and contacted the M. M stated S was aware of the appointments she had that day and knew she used her own special tools on these C hair. S neglected to bring them and blamed it on salon. M is also in process of ordering more products for ethnic hair. She feels S is setting up salon for harassment case. RS and AS are aware.

Page   1  2    Notes

PRINT

📠 Customer Letter

Envelope

✎ Check Request

✎ Credit Request

August ▾    2006 ▾

| Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|-----|-----|-----|-----|-----|-----|-----|
| 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |

D - 00186  Carpenter v Regis

# PROMENADE SALON MANAGER CHANGE FORM

SALON #60895  HOME SALON?  YES ☒ NO ☐

NAME AMY S CARPENTER  PAYROLL ID# 143483

SOCIAL SECURITY 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
: Required for Metafile Entry

MANAGER START ☐ MANAGER END ☒
(Check One)

START/END DATE        BONUS START/END DATE 8/1/06
(Date must be beginning of month)

## NEW MANAGER INFORMATION

☐ 100% BONUS TO NEW MANAGER
☐ 50% SPLIT WITH
(Other Manager's Name)

☐ MONTHLY QUOTA BONUS 1/2% SERVICE SALES
☐ MONTHLY QUOTA BONUS 1% SERVICE SALES
☐ ANNUAL BONUS 1/2% SERVICE SALES
☐ ANNUAL BONUS 1% SERVICE SALES
☐ RETAIL BONUS 2%-4%-6%
☐ MANAGER BONUS – HOLIDAY HAIR
☐ MANAGER BONUS – HOLIDAY HAIR (MEGABRUSH)

HOURLY RATE/SALARY    VACATION RATE
% COMMISSION      %RETAIL

*ENTERED BY MELISSA P. 8/17/06*

## FORMER MANAGER INFORMATION

☐ TERMINATE ☒ TRANSFER ☒ STEP DOWN ☐ OTHER

NEW HOURLY RATE/SALARY      NEW VACATION RAT

NEW POSITION Stylist NEW SALON #60885
(If managing a new salon, please also submit a form with the New Manager Information for this employee)

AUTHORIZATION: Amanda Fisher    DATE 8/2/2006

H:\Documentation\Promenade\PROMENADE SALON MANAGER CHANGE FORM.doc
11/12/2004



EXHIBIT

tabbies

Carpenter

Add Record    Search    Call ID#    1096773

## Customer Information

Last Name: Ledbetter
First Name: Sylvie
Address:
City: Auburn
State/Province: AL
Postal Code: 36830
Country:
Home Phone: (334)
Work Phone:
Work Extension:

Ms.

CsrRep: Sara Fox
CallDate: Customer
RejectedBy:
DateRejected:
ClaimClosed: 8/9/2006
Inactive:
ClaimTerminatedBy:
ReasonTerminated:
Terminated:

SlsMgr: Amy Carpenter
Manager: KARLA ARMSTRONG
Director: AMY EDWARDS
Redline: TONI NAVAREZ
Supervisor: DEUSEBURGBETTIE

8/9/2006

## Salon Information

Salon Search

Salon: 60895
Main: BRUNO'S SHOPPING CENTER
City: AUBURN
State: AL
Division: HM

NAVIGATOR St Andrus Shop Ctr-HM

Company: 011



EXHIBIT
8 A
Carpenter

D 00001 Carpenter v Basic



**Customer's Name:** Sylvie Ledbetter

## Complaint Information

**Date of Service:** 8/1/2006

**Service Type:** Color

**Products Used:**

**Complaint Codes:** NSC

☐ Redo?
☐ Patch Test?
☐ Form Letter Signed?
☐ Stop Payment?

**Cost of Service:**

☐ Refund at Salon

**CXL/Account** ☐ ☐ Date Cancelled

## Resolution Information

**Claim Closed:** 8/9/2006

**Resolution:**
- Apology
- Coupons
- Redo Service

**Refund Amount:**

**Gift Card Amount:**

**Extra:**

**Charge Card #:**

**Cancel Fee:**

**Refund Includes:** (Gift Card and Check Request)

PRINT

- Customer Letter
- Envelope
- Check Request
- Credit Request

**Notes:** C was not happy with the way her daughter's hair color turned out. C stated it did not look good and was very damaged. C ended up going to different Hair Masters to get it fixed. I apologized and sent a coupons.

Page: 1 2 Next

August 2006

| Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|-----|-----|-----|-----|-----|-----|-----|
| 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |

- Delise called wanted to
Know how often is latoya
visiting the shop.
F.Y.I that Girl just isn't
right I don't like her.

8/4/06
Cristie and I and Destany
Saw Katie at the nail salon
she said she left b/c she
didn't like me.

- Delise called back to the
salon and asked. was
latoya being funny when she
spoke to her I said I
didn't think so let me ask
Shannon. Delise asked me whats
going on between shannon and
latoya? Delise told me to
tell latoya she couldn't come
to the shop anymore unless she
was getting a service we just
don't want that type of atmosphere
You Know its just not right
and its unprofessional
she's curious about my sexuality
but if she continues these ques.
shell be over the ...

EXHIBIT
9
Carpenter

my sexuality didn't stop me from)
- Employee of the month
- Rewards for Retail
  (1) (over) 1000.00 in 1 mos.
  (2) Highest Despnline
  (3) Waxing (4) Weekends prmes
- Mgt up until July 1 letter of
  great Refrence
- Delise stated that I wasn't
  mgt. material I was low class
- Delise stated that she got rid
  of me so the store would grow
  and that she wanted a high class
  of people coming to the salem
  I was told to pack my stuff
  and be out of there by 5 p.m.
  that I could not work out a notice
  for my customers, I wanted to
  tay there because of my clientell
  s there she said (Delise) its
  ompany policy that when a manager
  e steps Down they must transfer
  Andther salon. When I attempted
  call corporate and couldn't get
  nyone. I called my old supervisir
  d Tina Cattle said she wouldn't
  mment and that question. about
  )min later Delise called me
  nd said if I call anyone else

and question her authority or what she tells me she'll fire my ass. I said yes mam. Tina Cottle was the manager of Tiger Town she stepped down she still cuts hair there and Amy Groce is the new manager there which she was over Brunos.

- Delise told me I had to be gone by 5pm for the new mgs. to come in. As of Tuesday 8/15 there's still not a new mgt.

- The store was open at 10:00 by a receptionist that can't do hair she doesn't have enough hours a stylist was not there to do customers hair until about 10:20 - 10:30 8/15 Delise told Shannon/Nancy that she fired me as a mgt b'cause I fucked up a ladys color.

- Delise told me to tell people I stepped down because it

was to stressful being a
single mom and being in mgt.

When Delise came into the shop
around 7/1 after Amy Grace
had left she said we could
not have personal Appt/Calendar
books and that it was
considered to be Regis property
the customers names and
phone numbers. but Today
when I worked at Tiger Town
Tina Cattle still has hers and
Delise knows it

- I have never been Verbally
warned for anything
- I have never been written up
for anything
- There's no corporate Rule
for hair color mistakes
Just fix it. at no charge
I've had several cuts
come back to Brunos
from cindy Delise said
just Redo it told Amy Grace
Don't fire her we need
her for right now.

8/15/06

Today I helped Amy Grace
smooth o Relaxer.

- Delise said I had a
Complaint that I had another
stylist to shampoo a customer
this particular Day I was
booked Amy Grace called me
said she had a lady that
wanted her tracks (weave) out
and her hair shampoo No-one
there Knew how to do it
she told Cristie to Ask me
could I work her in I said
I was doing a color at the
time but could work her
between the two clients that
had appt. ask her would that
be o.k. they replied yes.
"So I don't understand"
bcause they lady was fine
when she left told me where
she worked said she would
get me to redo her tracks
b'cause they lady who did
them in tuskeagee did them
Wrong.

- procedures for complaints were definitely not followed because no-one called back to the shop. Delise said they have them recorded at corporate this was on Friday 8/11 when I was told to pack up and leave

- Delise said she heard rumors of low class people being in the shop like Gay people. I told her I do anyone's hair white / black / hispanic straight / bi or Gay as long as they pay for a service.

8/15
Shannon told me that today Delise met w/ Nancy a Caucausian stylist and will be making her the new mgt or hopes to for Brunos but she will be working out a 2 wks notice to her clients at Tiger Town so her customers

Will follow her. she will start
at Brunos after Labor Day.

- 8/15
I had to cancel two Appts
because the Tiger Town store
has no African American
hair products they are all at
Brunos. Delise said she
wouldn't transfer them over
and that there's just not
enough Room at Tiger Town
for all my ethnic Irons and
products.

- ~~Two~~ ~~One~~ of my customers called
corporate because they feel
violated they even asked
why I can't do their hair

Today at Tiger Town I could
Do no ~~a#~~ ethnic hair
I only did $135⁰⁰ today
I normally do twice
as much at Brunos
I built my Clientell up
there and when I became
~~met~~ ordered a lot of

products for Blk hair
and I told Delise she
is cutting my throat w/this
deasion she said oh well.
I made at Brunos 2500-340x
every two weeks.

- She was negative about latoya
b'cause of her sexual prefrence
and wuen called me back
to ast did latoya pay
for her highlights ~~and your~~
I said yes christie did
five foils straight back
and charged her $20.00
b'cause of 20% centi
discount

8/15/
Amy Grace told a man
name Ted he wasn't
suppose to be in the
Salon and made a
Scine and had asted
me to witness the
conversation The man
kept saying he didit
know what she was saying

about Amy G. said she
had made advances towards
her and followed her one
night when the store was
next to Winn Dixie as
Hair Cuts etc... the man
was embarrased and
humiliated he said he's
been coming to that salon
and didn't know what she
was talking about.

- Shannon told Latoya not to
come to the shop because
Delise was there.

- Delise told me to tell everyone
I stepped down but now
she's telling people I was
not mgt. material and had
a low class of customers it
shouldn't matter they paid
for a service

- Delise told Amy G. I'm
going to try to cause trouble
because she fired my Ass
as mgt. but to write me

up for anything
— minute late
— not doing clean-up.

8/16
Today I got written up and put
on probation for 60 days
because Amy G. said a customer
complained about inappropriate
conversations. Its strange b/c
the conversation was said to
be sexual it was not Carolyn
said she heard us laughing but
didn't hear the conversation
Cindy said she heard sexual
conversation but conviently she
don't know what. Shannon and
Latoya did not have a sexual
conversation but I was the
only one who got written up
and why Cindy was in the
conversation. Carolyn was there
and Shannon was to. Latoya
came to make an appt. which
Tina made. and Shannon and
I ate lunch together but
wanted me to shampoo her
hair but I got busy.

3:54    H/C Bam Beard Trim
4:10    Waxing
4:33    H/C
5:00  -  H/C

In  9:56 (3:09 - 3:42)  5:03 home
        Lunch

Carolyn said I didn't have
a client but I did obviously
from the check out times I
did Amy6. said well we don't
have company up here I told her
that hatoya was discussing how
I was going to do her hair
b/c I told her it depended on
how busy I was could I do a
braid design. I feel that
nothing I said mattered
b/c Carolyn made the statement
wasn't any problems until I
came. That sure makes u fee grd

- I overheard Delise on the
phone w/ Amy G. and she
said neg. things about me
I told Amy G. to tell Delise
that it was very unprofessional
and as an employee of Rocis

disrespectful. Amy 6. showed her true
self today.
8/16/06

Christie called me complaining
about Nora, We talked about
everything thats going on
I told her that I had talked
to Amy Edwards and told her
about Delise I told her that
I had gave her. her name as
well as a witness she said Amy
Im just gonna say I don't Know
anything bk I don't want
Delise to fire me. I said
Christie I understand but just
tell Amy you want to talk
in confidence just be honest
and tell the truth. she said
she don't want to loose her
job look how Delise did you.

- Amy 6. yelled at me and said
We don't have that at my store
I said have what? then she
said company. I told her
heatonya was and is a customer
and Shannin is an Reals Employee.

She said this is her store and
we don't have company or visitors
but thats strange b/c Cindy's
boyfriend who is not a Regis employee
or customer was visiting her
Tuesday she replied worry about
yourself not everyone else I
told her I am and I needed
to be treated just like everyone
else.

- No one wants me at Tiger Town
b/c of Delise negative talk
about me No one talks or Assoc.
w/me its not pleasant. I use
to love to go to work now I
cry and pray before I go to work.

- Its strange whenever Delise
came to the store she praised
my work and the store but
behind my back she talked
neg. about me and the way I
ran Brunos store low class mgt.
w/ low class customers

- I've worked for Amy G since 11/05 and have always worked the same and carried myself in the same manner but today 8/16 I got written up the first time and put on probation and talked to like I was a dog. She was not professional at all.

- Amy G. said or did nothing to Carolyn for saying what she said to me now how is that keeping a professional Atmosphere. But I must remember that my first day there Amy G. called me into the office and said I Don't Know whats going on between U and Delise and I don't want to know but we aint got no problems in this store.

8/16.
Shannon said she talked to Amy G. And she didn't get Note up. She has nothing to worry About.

8/16 I called Corporate and expressed How I was being treated from another mgt. or employee as well as other complaints Amy Edwards Asked me to fax her things Ive written

8/17 Tony from Corporate came to do an investigation but Delise is at Brunos store talking to Cristie and Shannon, Shannon said she got wrote up b/c Delise said I signed a complaint about everything being her fault * wrote up by Delise (During the investigation)
Nancy was also transfered to Brunos today b/c I told them it wasn't "fair" about me being transfered to Tiger Town but they need help at Brunos And I want to be there.

Tony Told me not to discuss the case w/ Shannon or Christie

hannon left me a message on

1-(906)6623576
4:01 p.m
8/17

my cell to call her she told me
that Delise called me a snake in
the grass and that Delise had
Cristie in the office for about
30min.

- Shannon later called me back and
said Don't tell I called you I
don't want to loose my job

- AT 8/18 7:05 a.m
- AT 8/17 8:25 p.m
Cristie called me and said she
was scared that she didn't want to
loose her job. During these calls
she kept blocking her I.d. # 
then I knew she wouldn't be honest
b/c she said Delise and Tony told
her not to talk to me but she
called but would block the # she
was crying saying she needed her job
Gary would be upset w/ her he'd
divorce her if she lost her job
Amy I must keep my job. I
told her think about me Im a
single mom w/ three kids she
said yeah but you'll be o.k.

8/18.

Tony called me into the office w/ Amy G.
(she said I asked for an investigation
and (she did. She said No one
Collaberated my storys of events
(so therefore I'm Terminating Your
Employment. I (said Thank You
for your Investigation and (shook her
hand. I packed my combs/brushes
and personal items and clocked out.

1.) I was mgt of Brunos
2.) I was demoted and told I had
    to be out by (5pm that day and
    report to Tiger Town by 9:00a.m.
    the next morning.
3.) Another mgt. who stepped down was
    not treated the same.
4.) I asked for an investigation.
5.) I'm terminated
6.) what?

8/19/06  1:04 p.m

Shannon called me and
said whats going on that
Amy told her that I
was going to be transfured
back to the Burnes store
I said she told me that
also but I don't know what
happened. all I know she
Terminated my employment.
She said yeah Cristi told
her that Delise called her
and Nancy and said Amy's
gone. I said well ill call
you back!


# Delise intemidated Cristi
and wrote up Shannon they
both were afraid of loosing
their jobs

On Tuesday August 15, 2006, Shannon & LaToya came over to the Salon to visit Amy Carpenter. During their visit, I was talking to Shannon about Neil (who is my current boyfriend), as we were talking, Shannon being messing with her hair and put some whipping wax in her hair, someone asked her what she put in her hair, She said whipping wax, Latoya said whippyr. what? From there Amy C. made the comment that Latoya need to tatoo Shannon's name on back of her neck, they begin to laugh & Shannon said you know I'm your Boo. Carolyn was right behind them at her station cutting a gentlemen's hair



EXHIBIT
10
Carpenter

I walked around the corner
and begin picking up towels,
Carolyn said I already gathered
the towels, I told her I was
trying to find something to
do.
Shannon & LaToya stayed here
at the salon until 5:00, when
Amy C. got off work then they
all left together.

Cindy Carlton

Jimmy Carpenter
ID- 143483

August 15-06

On August 15-06, Amy Carpenter had two visitor
on her job. They were talking about whiping wax
and tatooing some one name on one of the girls neck
and the comentent was made you know i am your Boo
I was cutting a customer hair at that time and
they Preceside to Carer on Laugh out Loud
and talking with each other very Loud it gd
the customer attention.

Carolyn Perez

EXHIBIT

Carpenter

# WARNING NOTICE

2 Stylist
Documentation
attached

EMPLOYEE NAME: Amy Carpenter    SOCIAL SECURITY #: 143492

CITY: Opelika    MALL: Tiger Town    SALON #: 60885

TODAY'S DATE: 8/16/06

**REASON:**

_____ ATTENDANCE    __✓__ CONDUCT    _____ TECHNICAL SKILL    __✓__ OTHER

**TYPE OF WARNING:**

__✓__ VERBAL    __✓__ WRITTEN    _____ FINAL

**REMARKS:**

I had a client complaint that inappropriate conversations were being carried on while he was getting his hair cut. He stated that a stylist (Amy) and 2 other ladies were having a conversation that had sexual innuendo. This is a violation of #81 of our security regulations.

I had no conversation w/Shannon or Latoya. Nothing sexual was stated. Shannon only told Latoya to put her name in her kneel. Latoya came to make an appt w/me and Shannon came to eat lunch w/me. Cindy another

**ACTION TO BE TAKEN:** Amy is being placed on 60 day probation. If this occurs again it could result in termination.

*Signature not required for verbal warning.*

MANAGER SIGNATURE: _____    DATE: 8/16/06

EMPLOYEE SIGNATURE: _____    DATE: _____

White Copy: Mail to Salon Director    Yellow Copy: Salon File    Pink Copy: Supervisor

#8449 (Rev02) Printed in the U.S.A.

EXHIBIT
12
Carpenter

EXHIBIT

_____

# WARNING NOTICE

EMPLOYEE NAME: _Amy Carpenter_    SOCIAL SECURITY #: _143403_

CITY: _Opelika_    MALL: _Tiger Town_    SALON #: _600805_

TODAY'S DATE: _9/16/06_

## REASON:

_____ ATTENDANCE    _____ CONDUCT    _____ TECHNICAL SKILL    _____ OTHER

## TYPE OF WARNING:

_____ VERBAL    _____ WRITTEN    _____ FINAL

## REMARKS:

Stylist was leaning on the counter laughing and involved in the conversation. As well. Carolyn Perry was cutting a Gentlemens hair and stated she heard us Laughing and her client looked up at her but she heard nothing sexual. Cindy said she heard something sexual but couldn't conviently remember. I deny this charge and feel that the disciplinary action is unappropriate. I Refuse to Sign because All parties involved did not recieve the same disciplinary

**ACTION TO BE TAKEN:** Action shannon is also a Regis employee And I Did not hear her say anything sexual inappropriat I also had a client doing a haircut, I Asked for A copy of this.

_Signature not required for verbal warning._

MANAGER SIGNATURE: _____    DATE: _____

EMPLOYEE SIGNATURE: _____    DATE: _____

31-13-2004  17:21   DELISE 2567418652                                    PAGE1

EXHIBIT

13

Carpenter

# WARNING NOTICE

EMPLOYEE NAME: _Shannon Martin_     SOCIAL SECURITY #: _160 364_

CITY: _Hoover_          MALL: _____     SALON #: _6085_

TODAY'S DATE: _8/16/06_

**REASON:**

_____ ATTENDANCE     _____ CONDUCT     _____ TECHNICAL SKILL     _✓_ OTHER

**TYPE OF WARNING:**

_✓_ VERBAL          _____ WRITTEN          _____ FINAL

**REMARKS:** _Went to 6085 to speak with another employee. Customer made complaint that conversation was not of professional nature._

**ACTION TO BE TAKEN:** _Verbal, Advised Shannon to not talk with employees unless they are not working on clients._

_signature not required for verbal warning._

MANAGER SIGNATURE: _D. Lee Ruditt_     DATE: _8/16/06_

EMPLOYEE SIGNATURE: _Shannon Martin_     DATE: _8/16/06_

White Copy: Mail to Salon Director     Yellow Copy: Salon File     Pink Copy: Supervisor

449 (06/02) Printed in the U.S.A.

D - 00104  Carpenter v Regis

Conversations Pertaining to
Employee Amy Carpenter
8/17/06 11:51AM
Quiznos next to the Hairmasters 60885
The following are my notes from my conversation with Amy Carpenter.
I asked Amy to fill me in on what was going on between her and Delise. The following is what she told me.
I started a book in July because I didn't know if it was about me. Nine years ago we worked together, I came in and made more money than her so she quit.
When Amy Grace came over to Tiger Town I wasn't promoted. I asked why I wasn't given the job, Delise said she didn't have to tell me why and not to question her. She said by me asking she knew she made the right decision.
Katie was made manager on the 7th. She quit and said she didn't like me. Delise came in that day and gave me the job. She said I had 90 days to see if the job would work out. I made arrangements for my kids, she said she would train me. All she did was give me One Minute Manager tapes and a purple book.I had to call Tina and Amy G. to ask how to order.
Delise hired Edwina part time. She said to"Watch her because she might steal".
I'm working everyday 10-7, I leave to feed my kids.
Edwina is stealing color and Delise said "deal with it it's your store".
Christie started taking a day off and then Delise said I could hire.
LaToya came in to my store, she works at Brunos Grocery. Delise said " she wasn't the kind of person we hire, isn't she gay. We need a higher class of people". She said is she with Shannon? I said you need to ask her and Shannon. She told me Latoya had to stop coming in the salon to hang out. I told her I wasn't telling her she could. She asked if Latoya paid for her service and I told her Christie charged her half price it's the mens price.
I asked for help. She left and came back and said Toni called about a customer complaint and said I had to be gone by 5:00. I asked if I could think about it and she said I could go to Tiger Town and that's it.
They called Christie I said I would work her in.(The woman with the complaint) I was doing Ms Rebecca's color and I asked April if I could take the tracks out and she would wait. The lady was talking about how bad her hair was before. The lady was talking about where she lived before she was talking about after school care. The lady said thanks for fitting me in. The color timer went off and the lady said she would start taking the tracks down. I told Christie to help and I gave her my prices, she was fine. Delise said the customer called someone and Toni said that was it. I asked if I could have an investigation into the complaint and she said if I wanted an investigation I would not have a job. I asked why do I have to leave this store, can I talk to Toni? She said no the decision has been made. I called Amy G and talked to Tina. Then Delise called and said if I call anyone else or corporate or question her authority she would " fire my ass", I said yes mam she hung up and I packed my stuff.
Tasha Cole called, I couldn't do her hair.Delise said I couldn't do ethnic hair or have ethnic products in this store there's no room. Diane Jones said she wasn't coming back because I couldn't do ethnic hair.

EXHIBIT

tabbies'

Carpenter

Delise told Shannon and Christie I was "low class and not management material". Amy G. asked to transfer my things and was told no.

She (Delise) has not trained me. She trained Katie.

She got pissed off when I asked for attention from her. She said she had 24 hours to respond to me.

I have never been trained why take me out.She said the decision had been made.

She told Nancy and Nancy told Shannon and Christie I kept "fucking up peoples color".

She told me to say I was stepping down because the job was to stressful.I said no.

Anyone can call and complain. My Ex. Would call everyday if he thought it would get me in trouble because he's 20,000.00 behind in child support.

I said I had a customer complain. The lady said she had an appt. at University. They told her they didn't take appts.I did the womans hair. I didn't call anybody.

Cindy can't cut hair worth a damn, but Delise told Amy G. don't fire her we need her.

A man came into Tiger Town and said "Howdy" to the girls. He said they looked at him like he was crazy. He came into my store and I said "Howdy" right back. He liked that, but I didn't call customer service.

Amy G. said if I was doing good with my paperwork, I would be o.k., but I was under a microscope. I smell a rat. I've prayed about it. When Katie came it was me and Christie then Shannon transferred over. Delise hired Edwina the one that steals. She finally told me I could hire Nora.

I have not given anyone sat off. Shannon went to a reunion and requested the 25th and 26th off.

I would let people leave early if we weren't busy. Christy is married so I'd let her go. She really didn't care, she don't give a damn that I never got a day off except Sunday.

I was told I could stay at the Bruno's shop. No one cared what I was told. Everyday I would work 10-7. I leave to go home and feed my kids and get them to bed then I come back to the shop.

I needed to be trained but I didn't get any help.

I was written up when Latoya came in to make an appt. She was asking me questions about what to do with her hair but customers kept coming in so she sat down to wait. I heard nothing sexual about the conversation with Latoya and Shannon. Cindy said she did but she can't remember what it was. Carolyn said she didn't hear anything. The only thing said was about getting a tattoo on Latoyas neck that said "Child Boo".

That's just slang, I really don't know what it means. Cindy lied about this, nothing was said. I don't know how Delise found out. I don't think Carolyn's customer really complained. I think it was Cindy.

I felt like I was under a microscope. I wouldn't do anything wrong. I think everyone should be written up not just me. I think Shannon is only being written up because I said something.

All I want is to go back to Bruno's with my old job.

I (Toni) explaind to Amy C. That I was the who recommended she be moved to the Tiger Town location after she was demoted, and that was a normal practice to help everyone involved get a fresh start. I told her I was sorry she felt like her title was stripped away from her but Delise had already hired a new manager. I did tell her she could go back as a stylist and upon compleating my investigation, I would forward all information to Amy Edwards. End time 1:00

Conversation with employee Amy Grace
Quizno's next to HairMasters 69885 1:30 pm
Everyday Amy C. calls me with an emergence. It's always something that she could
leave on Delise's voicemail, but she will call and take me away from customers for
nothing. She even calls me at home on my day off. She would say things about Delise
telling her to do something and she wouldn't want to do it. I told her policies and things
change and she should do what Delise says.
She has told lies on me, Tina, and two other stylist. We have all caught her.
Her and Delise have been at wits end over scheduling. She worked open to close over at
Bruno's but here she said she couldn't close. She called the other day over and over while
I was with a client. When I took her call she wanted to know if Delise made me close at
least 2 nights and work Saturday. I told her yes.
I told her when she came over here I didn't know what happened over there and I didn't
want to. I wanted everything to stay positive here. She said she was just trying this store
out

Friday she kept calling, then told Tina she needed to tell me her schedule. She called back at least a ½ dozen times. Delise called and I told her to tell Amy C. she would call back when she could. Amy C. told Delise she had not called. Amy C. said she was booked for 2 weeks. Delise said give me the name and numbers and we will schedule them at Tiger Town. Amy C. told Amy that she was just told to leave.

Lady calls for color and relaxer. Tina said you can't do both services in one day. The products were ordered for Amy before she came over.

Lady comes in at 12:00 asking me what is the problem. You don't have stuff to do my hair? We have the relaxer.

Amy C. used her personal iron at Bruno's and told Amy G. she didn't bring them because they were in her closet. (She had told the other customer)

Told the lady she could do her relaxer but we don't have the iron you need. Are you telling me that you only do certain peoples hair?

Amy C. said no she has ordered the stuff it will be about 2 weeks.

Lady said I need it done today who is your supervisor? Delise Burdett. Amy C. and lady exchanged glances and she said no I want her supervisor. Her supervisor is Toni. My supervisor is at Bruno's let me call her. Delise said use the plug in iron and I said she needs the iron. Delise said I can bring you an iron. I said Amy C. didn't bring her irons. Amy C. wanted me to go buy a plastic bin to put her irons on. I asked her why she didn't use the travel bag like Theresa. She said her irons would get stolen like that.

Latoya- Threatens to sue us because we didn't give her a job.

She called me before she got management to complain against Delise and Katie Tuesday I left at 4:00.

Carolyn was doing a cut on a man. Shannon and Latoya just as I was leaving went to lunch at 3:00 with Shannon. Cindy was talking to Shannon about her boyfriend. Shannon was at Amy C. station putting whip wax on her hair then started talking about whip cream, tattoos. Cindy walked away and started folding towels. Carolyn's customer started looking towards Amy C. station then Carolyn started listening to the conversation. Both Carolyn and Cindy had said at different times the same thing about the conversation.

Carolyn's customer called and said he was uncomfortable about the conversation at the station about putting names on each other and using products that were offensive.

Every time I do a write up, I put a 60 day probation.

I wrote her up about the conversation.

Green Chrysler
Red Chevy Malibu

She was mad and everyone should be written up. I said why when they were not in the conversation. She said she wasn't in the conversation it was Shannon and Latoya. I said it was her company visiting at the salon who shouldn't have been there anyway. She said Shannon should be written up and I said she would be dealt with at her salon.

She pulled me and Tina aside and said she was documenting all the stuff and called corporate and made a complaint.

Everything is being investigated and I'm going back as a manager because they stripped me of my title.

She and Shannon have both tried to get me and Timika fighting.

I finally told Delise to tell Timika if she is saying all this stuff about me to tell her to stop after Amy C. saw I was I wasn't getting mad at Timika she stopped talking about her. Amy C. said Christi and Shannon told her Delise told them she wasn't letting Amy Transfer any product out because she didn't want that kind of people at Tiger Town. I know Delise would not talk to a stylist or receptionist about a manger much less say that. She listened in on the phone when I was talking to Delise. Amy C. said I should turn the volume down on the phone because she heard everything. I didn't have the phone on speaker and the door was closed. I think it was Cindy who said Amy C. was listening on the phone in the back.. Delise had said it sounds to me like she is trying to to keep things stirred up and if she is we need to nip it in the bud. Amy C. came back and opened the door and said I want to show you this list of clients I did when you wrote me up. You might want to turn the volume down on your phone I heard everything you said.

I've had to fix several colors from Amy C.

Heather Collins came to me at Tiger Town. Sara at home office sent her to me. I had done her hair at Bruno's the week before and she wasn't happy. She didn't have a good cut and I could see why. She wasn't happy. It was a mullet! She asked when we went up on our prices and I told her we didn't. She said she paid $48.00 for a cond. Even with a blow dry this wouldn't have been more then 34.95.

Last week a woman called and wanted her tracks removed. I asked her if they were glued or sewn. I told her I hadn't done that but Amy C. at Bruno's can. I called and Christi answered I asked if Amy C. was busy. She said she was doing a blow dry but didn't have anything after so I sent the lady over I was telling Christi what the lady wanted and then Christi said ugh oh. The lady in her chair doesn't like her color. Stop the lady, I can't she already left. What am I suppose to do. Explain the situation and schedule for later. The lady came back over here and said she sat in the lobby and took out all but 4 tracks and the receptionist shampooed her and she left with a wet head and was charged $40.00. She wanted the number to corp.

Amy said she was making 3600 a pay period and she wasn't making enough money to support her kids. She was to work Saturday the 12th and she came in and said she was scheduled at Bruno's 9-11 so she could move. She said she was off for Monday also to move. Delise said she was scheduled 9-6 on Saturday.

She told me on Tuesday she needs off 24, 25, 26 of August. (Thurs, Fri, Sat) and she wants Monday's off

Wednesday she asked if I made the schedule out yet and I said if things keep going like this I might be moving.

Amy F. got your fax yesterday I didn't fax anything I still have the transfer in my car.

Last month Cindy got mad when Delise called and asked if someone could go help Amy at Bruno's (resulted in documentation) Just wrote her up for #21 because Delise always wants a number by the violation. 3:45

Shannon 706-662-3576

Amy C. told Amy G I said she was going back to Bruno's as the Manager.

Amy C told staff in backroom that I was going to get her job back.

Amy C called Bruno's 4 times while I was talking to Amy G and told her what to say to me when I got there. Christy told Delise she didn't want to lie for Amy C.

Amy C called while I was on the phone with Amy E. She said Shannon left her a message on her cell today saying Delise was calling here low life, poor manager and that Amy C was a back stabber.

I called Amy C., Christi and Shannon and told them not to talk to each other until I talked to them tomorrow.

Electra was a customer who went to Amy C at Bruno's. She went to TT list and Amy G told her she had never taken down seven tracks but Amy C at Bruno's could. Amy G called Bruno's and Christy answered Amy G asked if Amy C was available. Christi said she was just about through with a blow dry and didn't have anyone waiting. Amy G. told the customer to go on over and then began to explain to Christy what the customer wanted. Christy said the customer in the chair was getting upset about her color and to tell the customer to wait. Amy G said she had already left.
Electra called Amy G to tell her she didn't like the amount she was charged and would like to come see her. Amy said fine. I was standing outside talking to a customer/friend of Amy C when Electra drove up. Amy G met her at the door and thanked her for coming in. I went in and asked her about her service and she said she waited in the lobby and started taking out some of the tracks. Amy C finally came up and took out about six and then the receptionist took out the rest and shampooed her hair. She left without even sitting under the dryer. She was charged $40.00 dollars. I asked her if she was happy with the service at the time and she said no. I asked if she talked to Amy C about the kids going to the day care she worked at like Amy C had told me earlier. She said no, that Amy C only talked to her for a minute about the bad job on her hair and that she talked mostly to Amy C's other customer about where she worked. We gave the woman some product and set up an appt. with Amy G.

8-18-06

Cristie

(1) Did you go from not having a day off to getting one? Yes, when Katie left Amy C started giving me a day off.
(2) Did Latoya ever come in for service with you? Yes, I put in a few foils for her and was told by Amy C I could charge her $5.00 per foil.

(3) Did Amy G call you about a customer coming in for Amy C to take out trucks?
Yes. Is Amy C busy, she's got 2 customers here but she's almost through. Amy G
said she was sending a woman over as I was talking to her. Amy C's customer
said she wanted her darker. Amy G said the woman had gone. I told Amy C I
would talk to her when she came in. When she came in I told her we had her
signed in but Amy C had to redo the other customer's color. Electra was very nice
when I talked to her. Amy C kept talking about how bad her tracks were and I
didn't think it was appropriate. Amy took the tracks down then I finished taking
them down and conditioned her. She was charged $40.00 and I thought that was
high. Did you hear Electra tell Amy C to get her kids to come to her daycare? No.
Were you with Electra the whole time she was in the salon? When she sat out
front, I was at the desk, then when Amy took her back she told me to watch her
take them out then she told me to take her back to the shampoo bowl and take the
rest of the tracks down. I then shampooed, conditioned, put mouse in her hair and
she left.

(4) Did Delise tell you & Shannon that Amy C was low class and not management
material? No, never once. The only thing she ever told me were things weren't
being run correctly and she needed to make a change.

(5) Did Nancy tell you & Shannon that Delise told her she was being demoted
because she kept "fucking up people's color". I have not even talked to Nancy
about this at all. Have you ever heard Delise cuss in that way? No. I haven't
heard her use profanity at all.

(6) Did Amy C. let you leave early because you were married? She only let me leave
early once and even when she gave me a day off, I still came in. I'm glad she's
not here anymore. I've only been here 2 months and I was worried about my job
with all this stuff going on. I work well Nancy and I work OK with Shannon. I
just know she goes over and stirs up things. I didn't like Amy C's clientel, like
Latoya always coming over here and hanging out even after Delise said she
wasn't supposed to be hanging out. She would talk to my clients and say let me
do your hair. They were making me feel like I was working in a low class salon.

I don't want Amy C calling over here to talk to me. I wish Delise was here everyday. I
like working with her and Nancy and positive people. Amy C was always negative. She
would leave and to get her friend Erica. When I asked to go get my step-son, she gave me
1 hour to eat and get him, then when I got back, she left.
I clocked out.
Anything else you want to tell me? I don't want any more communication with Amy C
here or at home. My husband is an assistant at Wal Mart and he agrees that I shouldn't
have to deal with this drama. Amy C always complained that she didn't get a day off but
she never scheduled one. She left early every day at about 2:30, came back around 4:00
after getting her kids. She would schedule her self on the book 8 to 11. We didn't open
until 10.
It's been so much more positive here with her gone. It's a lot better now. One more thing
the other day, Shannon came in and said Amy G wrote her up because Latoya and her
went over there. Shannon said Latoya was on her way over there because Cindy said they

were talking bad on the floor. Shannon said Cindy won't think it's funny when her van is sitting on four flats.

Shannon 8/18/06 12:38

Christy wasn't here. Delise was interviewing managers and she said we were going to get a higher standard of people in here. I don't know if she was referring to Amy C. She just said she was sorry for bouncing managers in here but she wanted to get a higher class in here. She said Amy C was still under 90 days.

Nancy didn't tell me anything about Amy getting demoted. Amy C told me she was getting demoted. Amy C told me she was getting demoted because a black lady complained about getting her tracks removed.

I knew about the color situation because Tiger Town kept calling here. A lady came in and wanted highlights. Amy C pulled her through the cap with a blond color. She liked it when she left. About an hour later, the lady called and said she didn't like it. She came back in and said she wanted it foiled. Amy C foiled it and the lady left happy. Tiger Town called later and the lady was there, not happy. Not that I recall, Did Delise say anything to you about "fucking up color". No, only Amy C said something about the color.

Have you ever heard Delise cuss on the floor? No, when she comes in, I'm usually gone because she's not here long.

After I talked to you yesterday, did you talk to Amy C? No, not until she called up here this morning to ask about an appointment.
Are you aware that she has said, this morning that you told her you lied to me yesterday about the message you left her? I haven't talked to her at all except this morning. What did the message say you left her? It was about Delise telling me that she was demoted because she wasn't suited for the job. She said she's a good stylist but not the type of manager that we need and to be careful about what I was saying to people. Anytime Amy C says anything to me, it's always someone else, not her.

Do you feel that Delise has harassed you, or been negative? No, she has always been good to me.
The only thing I didn't understand was the other day, me and Latoya went over for Amy C to do my hair before school. I talked to Cindy about how her and her boyfriend were doing. Amy said she was sorry she was busy and couldn't do my hair. We started talking about 80's bands with Cindy. Amy told Latoya, are you getting Shannon's name tattooed on your neck? I left then. Latoya made an appointment to get her hair braided. We left Amy G said Cindy told her, her client was complaining. I told Amy G there was not anything inappropriate about the conversation. 1:11

Amy C is not happy and feels like the complaints are nothing she knew about. She feels like Delise is out to her. I told her Delise has never said anything to me except the thing

about getting a higher standard in here and I think it was just the way she worded it. I told Amy C I don't have time for all this talking. 1:15

Amy Carpenter had asked for an investigation about customer complaints filed against her. After speaking with stylists, managers, and customers involved, we feel Amy Carpenter has falsely accused Delise and other stylists of misconduct. One complaint about a customer stated that she felt that she was over charged. After following up on the charges, we discovered Amy Carpenter had, in fact, overcharged a customer stating it was a conditioning treatment. No conditioning treatment was charged on the computer. However, a $40.00 misc. charge was. Other employees in the salon stated that they felt the customer was also overcharged for the service. Amy Carpenter has also called other customers at home and asked them to call me to complain about Delise and the company. Amy Carpenter sent a letter to Amy Edwards stating that it is was from Amy Grace as referenced to her current job. The letter Amy Grace had given her for a school application. The letter had been altered to look as though it applied to her present performance. After following up on her statements to me, I found that she had not only taken things out of context, she had also lied to make her point. All notes from the conversations are being forwarded to the corporate office to the attention of Amy Edwards.

8/18/06 11:30

My name is April. I'm a customer of Amy C.
Why are you calling me? Because I came in and she was moved. It's too far for me to go the Op.
When was the last time that you talked to her? Friday or Saturday. She just got there Tuesday. She called me on Saturday and said she was moved over there. I'll tell Amy C that you called and want her back over here. I can't talk about individual employees but thank you for calling.

The April lady was out of town until today.

Amy C told Amy G that Shannon told her she lied when she talked to me about when she left Amy C a message. Amy C said I have the message saved. I can prove that she left it yesterday.

I told April to call Toni and tell her that she was in the shop the day Electra came in. I told her that she didn't need to call clients and get them involved.

Dear.Mr.(Mrs.) Kris Bregly

I have been employed by Regis Corp. since November 2005, On July11, 2006 I was promoted to salon manager. I had been previously turned down without cause for that position, The position was then given to someone else of Caucasian decent with less experience and less qualifications. On August11, 2006 I was demoted from salon manager to stylist by the district manager Delis Burdett and I was told at that time that I could no longer work at the Bruno's location because of company's policy that states when a salon manager is no longer manager of that salon they can no longer work at the same salon location. I do know that there are stylist that were salon managers working at the same location in which they were managers and I wanted equal treatment. (Tina Cottle was salon manager of the Tiger Town location, now she is working at the same store as a stylist.) I was told in an unprofessional manner to have my belongings packed by 5 o' clock and report to the Tiger Town store the next morning by 9 a.m.

After reporting to work at the Tiger Town location, On August 15, 2006 I was denied use of Ethnic products and needed accessories. This is a violation of company's policy XVII page 12 of the employee's handbook. On Wednesday August16, 2006 I contacted Ms. Amy Edwards regarding my demotion, transfer and other unprofessional treatment that I had received. Ms Toni Alvarez came on August 17, 2006 to investigate at my request, at which time she apologized to me regarding my being told against company's policy to move to another store location. Ms Alvarez further stated that I would be able to return to the Bruno's location.

After talking to Ms. Alvarez on August18, 2006 and informing her that I had in fact filed a discrimination complaint with E.E.O.C. on Monday, August 14, 2006,  My employment was immediately terminated without any reason given verbally or written. I feel that this action was a form of cruelty and retaliation.

During this period (August-Today) I've suffered monetary loss and embarrassment (mentally, physically, and professionally) and offered no reasons for my demotion, relocation, and termination. I would therefore request in writing any and all materials you have regarding my complaints and your conclusion. I strongly disagree with Ms. Burdett and Ms. Alvarez decision to demote and terminate my employment. I request and plea from you a hearing regarding this matter

Thank you in advance for your immediate and prompt cooperation.

CC:
Lee. Co.Comm. John Harris
Mayor of Auburn Bill Ham

EXHIBIT
15
Carpenter

State Rep. George Bandy
N.A.A.C.P. President Irene Dowdell
Alabama State Board of Cosmetology
Delise Burdett
The E.E.O.C.

MONTGOMERY AL 361

29 AUG 2006· PM 3 T

Regis Corporation
Attention: Mr. (Mrs.) Kris Bergly (COO)
7201 Metro Blvd.
MinneAplis, Mn.
55439

Ms. Amy Carpenter
P.O. Box 2254
OPELiKA, Al
36803

55439+2131

Aug 25 06 10:35a    Scott Alvarez                    321-939-0291              p.1

# REGIS

*143483*

REGIS CORPORATION • 7201 METRO BOULEVARD • MINNEAPOLIS, MINNESOTA 55439 • 952-947-7777 • FAX 952-947-7900

## TERMINATION FORM

**IMPORTANT:** Please call you salon coordinator as soon as an employee <u>quits</u> or is <u>terminated</u>. You must also complete this form and mail it to the Home Office, Attn: Payroll Department.

Name of Salon  **HairMasters**
(i.e. Regis          MasterCuts          SmartStyle)

Salon Number  **60885**

Salon Location  **Tiger Town**          **Opelika**          **Al.**
                              Mall Name                    City                    State

Employee's Name  **Amy Carpenter**

Social Security Number  ▓▓▓-▓▓-▓▓▓▓          Today's Date  **8/18/2006**

> **LAST DAY WORKED:**  **8** / **18** / **2006**
>                                Mo.    Day    Yr.

Check One: Voluntary Termination _____          Discharged  ✓

   If voluntary termination, reason for leaving: _____

_____

_____

_____

   IF DISCHARGED, GIVE SPECIFIC REASON: **Amy is being terminated for violating the following security regulations # 1, 12, 15 & 21. All notes following Amy's request for an investigation are being sent with this Termination** ~~notes~~

   Would you recommend for re-hire? (Yes)  No (Circle One)
                                                            If no, reason: _____

_____

If moving to another city and/or state. Where? _____

Signature of Manager or Supervisor: *Toni Alvarez*

4524 Rev. 34/02 Printed in the U.S.A.

EXHIBIT
16
Carpenter

D - 00018  Carpenter v. L

**To Whom It May Concern:**

Amy Carpenter has worked at Hairmasters since November 2005. She has been a team player in all aspects. She is a reliable, which is hard to find. Amy is a devoted and hard worker. She is also a devoted mother of three. When not at work, she is with her children. Amy is someone who is understanding, empathetic to others. I feel that Amy would be a great asset to your company because she has been a great asset to us! If you have any questions, please contact me at (334) 466-4877 or (334)745-4400.

Sincerely,
**Amy Grace**

1IS IS a COPY OF a refrence letter written around June 30, 2006 in my behalf by my then immediate Salon supervisor.

letter written by Amy Carpenter, Amy Grace told is she didn't write this.



EXHIBIT
L7
Carpenter

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 420-2006-04443 |
| | | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Ms. Amy Carpenter** | **(334) 444-0616** | ~~████████~~ |

| Street Address | City, State and ZIP Code |
|---|---|
| **Post Office Box 2254, Opelika, AL 36803** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **HAIR MASTERS** | **15 - 100** | **(334) 448-7471** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1530 E. Glenn Avenue, Suite B, Auburn, AL 36830** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

RECEIVED
EEOC
SEP 1 8 2006
BIRMINGHAM DISTRICT OFFICE

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest       Latest |
| ☒ RACE   ☐ COLOR   ☐ RELIGION   ☐ NATIONAL ORIGIN | **07-01-2006**       **08-18-2006** |
| ☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify below.) | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began my employment with the above named employer in November 2005. I was employed as a stylist. On July 1, 2006, I applied for a salon manager position. The position was given to a white female with less qualifications and seniority. The white female was trained and quit after seven days and I was given the position on July 11, 2006. On August 11, 2006, I was demoted from my position. Ms. Delis Burdett, the District Manager, told me that I was being demoted because I was attracting low class clients. She also transferred me to another location because she stated company's policy is that when a manager is demoted they can no longer work in that same location. However there are white employees that has been demoted and/or stepped down from a position and remained at that same location. On August 16, 2006, I called the corporate office and complained about the treatment I was receiving. There was an investigation conducted on August 17, 2006, by Ms. Toni Alvarez, the Regional Manager. Ms. Alvarez stated that to be transferred was not company policy and I would be able to return to my previous location. After we continued to talk, I informed Ms. Alvarez that I had filed a complaint with EEOC on Monday, August, 14, 2006. Ms. Alvarez immediately terminated my employment without giving any reason.

I believe I have been discriminated against because of my race, black, in violation of Title VII of the Civil Rights Act of 1964, as amended. I also believe my discharge was in retaliation of me informing Ms. Alvarez of my complaint with EEOC. I received my only disciplinary action on August 17, 2006, when Ms. Burdett, instructed Ms. Amy Grace, to write me up for one of my customers allegedly making sexual innuendoes.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| _Sept 15, 06_   _Amy Carpenter_<br>Date            Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EXHIBIT 18

EEOC FORM 131 (5/01)

# U.S. Equal Employment Opportunity Commission

| | | | PERSON FILING CHARGE |
|---|---|---|---|
| Human Resource Director<br>REGIS CORP./HAIR MASTERS<br>7201 Metero Blvd<br>Minneapolis, MN 55435 | RECEIVED<br>SEP 2 6 2006 | | **Amy  Carpenter** |

PERSON FILING CHARGE

**Amy  Carpenter**

THIS PERSON (check one or both)

☐ Claims To Be Aggrieved

☐ Is Filing on Behalf of Other(s)

EEOC CHARGE NO.
**420-2006-04443**

## NOTICE OF CHARGE OF DISCRIMINATION
### (See the enclosed for additional information)

This is notice that a charge of employment discrimination has been filed against your organization under:

☒ Title VII of the Civil Rights Act        ☐ The Americans with Disabilities Act

☐ The Age Discrimination in Employment Act        ☐ The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. ☐ No action is required by you at this time.

2. ☒ Please call the EEOC Representative listed below concerning the further handling of this charge.

3. ☒ Please provide by  **19-OCT-06**  a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to this request will make it easier to conclude our investigation.

4. ☐ Please respond fully by                     to the enclosed request for information and send your response to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to this request will make it easier to conclude our investigation.

5. ☐ EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources.  If you would like to participate, please say so on the enclosed form and respond by
to
If you <u>DO NOT</u> wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above.  Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| Eddie D. Abdulhaqq,<br>Enforcement Supervisor | **Birmingham District Office - 420**<br>**Ridge Park Place**<br>**1130 22nd Street, South**<br>**Birmingham, AL 35205** |
|---|---|
| EEOC Representative | |
| Telephone  **(205) 212-2078** | |

Enclosure(s):  ☒ Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

☒ RACE    ☐ COLOR    ☐ SEX    ☐ RELIGION    ☐ NATIONAL ORIGIN    ☐ AGE    ☐ DISABILITY    ☒ RETALIATION    ☐ OTHER

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| September 19, 2006 | **Bernice  Williams-Kimbrough,**<br>**District Director** | Bernice Williams-Kimbrough |

Enclosure with EEOC
Form 131 (5/01)

# INFORMATION ON CHARGES OF DISCRIMINATION

## EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14   Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge,* for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

## NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

*Rec'd*
*12/21/06*
*SbG*

19 December 2006

US Equal Employment Opportunity Commission
Birmingham District Office
Attn: Ms. Sheri Guenster
1130 22nd Street, Suite 2000
Birmingham, Alabama 35205

RE:    Amy Carpenter (Charge Number 420-2006-044430

Dear Ms. Guenster:

I am writing in response to your letter of 5 December 2006, in which you requested my response to Hair Masters' assertions in relation to my claim.

## 1.    Rebuttal

Hair Masters has now provided several different explanations for my firing. In your letter, you indicate that Hair Masters said I was fired because I made a complaint of discrimination "maliciously and without good faith belief that discrimination had occurred, and that I had coerced coworkers to lie. Previously, Hair Masters had indicated that I was fired for allegedly altering a letter from another employee – a letter that was provided to the company at their request. Prior to that allegation, Hair Masters had informed the Alabama Department of Industrial Relations that I was discharged because I performed unsatisfactorily, and prior to that the reason was that I allegedly had inappropriate sexual conversations at work. While all of these allegations are untrue, it is telling that the company continues to change its story depending in the forum and audience.

Regarding the issue of bringing my children to work, such activity was authorized by my supervisors. Additionally, Amy Grace, a white employee, also brought her children to work and is still working at the company. In fact, given the hours we were working due to being short of staff, Amy Grace and Delise Burdette had given permission for the receptionist to pick my children up from karate and bring them to the store. No complaint was made during the time I worked at Hair Masters when Amy Grace was the Manager. Once I became manager, Delise Burdette told me that my children could no longer come to the store, and I stopped allowing them to come to the store at that time.

I admit that I did come into the store on Sundays. This was a normal practice authorized by my supervisors. Often, I had to come in to the store to clean up on Sundays due to the long hours we were working because of staffing shortages. I was working 10 until 7, six days a week. For instance, on one Saturday during this time, Delise Burdette came into the store with a white glove and began checking for dirt and telling me how dirty the store was (Witness – Dianne Jones, 334-821-5410). With the shortage of staff, there was no time for cleanup, so I came in on Sunday to clean. Delise

**EXHIBIT**
*19*
*Carpenter*

was aware of this. There was never any complaint made about anyone being in the store on Sunday. Tina Cottle was often in the store on Sundays with her children.

Regarding the complaint about visitors at the store, no complaint was ever made known to me about visitors. Hair Masters claim that I falsely said the store did not have ethnic hair products is absurdly false. When I transferred, they would not send my products. Amy Grace even apologized to the customer for not having the products in the store. The individual was a regular customer of mine, and there was no reason for me to refuse service if I could have treated her hair, because that cost me money. The customer in question is Latasha Cole, and she is willing to discuss the matter with the Commission (334-524-4075). There was also a second customer for whom I could not provide services because of the lack of ethnic products. Her name is Gwen Spratling, and her contact number is (334) 332-3934.

Hair Masters has admitted that I was discharged as a result of my complaint. While the company may be able to influence certain employees who still work there and are afraid for their jobs, they cannot change the facts. I was treated differently because I am black, and they fired me for complaining about it.

2.    **Names of White Store Managers who were demoted but not transferred**

Tina Cottle was not demoted, but she was the manager and now works in the same store as a stylist. Additionally, Ms. Alvarez told me that I should have been given a choice. Of course, that statement was made before she found out I had filed an EEOC complaint.

3.    **Name and contact information for anyone who witnessed Burdette's comment.**

Shannon Meyers and Christy Boatwright. Both individuals still work at Hair Masters by Bruno's, and I believe they are afraid for their jobs, so I do not know if they will corroborate the statement. LaToya Cannon has information about the statement, and her contact number is (334) 559-4034.

4.    **Name and race of store managers who have violated the same policies.**

Amy Grace, white.
Tina Cottle, white.

Please contact me if you require additional information. Thank you.

Sincerely,

Amy Carpenter



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

Ms. Amy Carpenter
P. O. Box 2254
Opelika, AL 36803

Reference:    Amy Carpenter   v.   Hair Masters
              Charge Number 420 2006 04443

Dear Ms. Carpenter:

This correspondence is in reference to the above-styled charge of discrimination and summarizes the facts obtained during the investigation of this charge.  You alleged that you were not promoted, were later demoted, were transferred, and were discharged because of your race, Black.  You also alleged that you were discharged in retaliation for complaining of discrimination. As you know, the employer denied your allegations.

The investigation revealed no evidence to indicate that Respondent failed to promote you to the position of Salon Manager because of your race.  Evidence showed that the employer had legitimate, nondiscriminatory reasons for selecting Kathryn Kilgore and that after Kilgore resigned, you were promoted to the position.  Evidence indicated that the employer demoted you a month later because of performance problems.  According to the evidence, your were transferred to another salon after your demotion, pursuant to the employer's practice.  Finally, the investigation revealed no evidence to indicate that the employer discharged you because of your race or in retaliation for opposing an unlawful employment action.  Evidence showed that after your complaint, the employer investigated the matter.  Its investigation revealed numerous policy violations and customer complaints and that you had made the allegations without a good faith in their veracity.  Evidence showed that the employer discharged you because of the information which it obtained during its investigation.

Based on this analysis, the Commission cannot conclude that you were subjected to discrimination in violation of Title VII.  Enclosed you will find a Dismissal and Notice of Rights signed by the District Director of this office.  Please note the indicated time limitations for filing a lawsuit in federal district court.

Sincerely,

_Booker Lewis, for_

8 MAR 2007
_____
Date

Sheri Guenster/Investigator

Enc:  Dismissal and Notice of Rights

EXHIBIT
20
Carpenter

Amy Carpenter
Scheduled Hours and Time On the Clock While Store Manager

| Day and Date | Salon Schedule In | Salon Schedule Out | Time In | Time Out | Time In | Time Out | Time In | Time Out | NOTES |
|---|---|---|---|---|---|---|---|---|---|
| Tuesday, July 11, 2006 | 10:00 AM | 7:00 PM | 9:39 AM | 1:36 PM | 2:02 PM | 2:30 PM | 3:48 PM | 7:21 PM | 1 hr. 15 min. absence + meal break |
| Wednesday, July 12, 2006 | 10:00 AM | 7:00 PM | 9:44 AM | 3:43 PM | 4:42 PM | 7:24 PM | | | 1 hr. absence. |
| Thursday, July 13, 2006 | 10:00 AM | 7:00 PM | 9:50 AM | 3:29 PM | 3:43 PM | 7:47 PM | | | 15 min. break only - kids? |
| Friday, July 14, 2006 | 10:00 AM | 5:00 PM | 10:49 AM | 7:48 PM | | | | | No break/absence - kids? |
| Saturday, July 15, 2006 | 9:00 AM | 6:00 PM | 8:53 AM | 4:01 PM | 4:54 PM | 6:28 PM | | | ~ 1 hr. absence. |
| Sunday, July 16, 2006 | CLOSED | | | | | | | | |
| Monday, July 17, 2006 | 10:00 AM | 7:00 PM | 9:37 AM | 10:25 AM | 12:12 PM | 7:23 PM | | | ~ 1 hr. 45 min. absence. |
| Tuesday, July 18, 2006 | 12:00 PM | 7:00 PM | 9:32 AM | 12:52 PM | 2:41 PM | 7:19 PM | | | ~ 1 hr. 45 min. absence. |
| Wednesday, July 19, 2006 | 10:00 AM | 7:00 PM | 9:48 AM | 7:49 PM | | | | | No meal break or absence - kids? |
| Thursday, July 20, 2006 | 10:00 AM | 5:00 PM | 9:56 AM | 3:40 PM | 4:49 PM | 7:19 PM | | | ~ 1 hr. absence. |
| Friday, July 21, 2006 | 10:00 AM | 7:00 PM | 9:45 AM | 4:54 PM | 5:23 PM | 7:18 PM | | | Meal break - kids? |
| Saturday, July 22, 2006 | 9:00 AM | 6:00 PM | 9:04 AM | 6:21 PM | | | | | No break/absence - kids? |
| Sunday, July 23, 2006 | CLOSED | | | | | | | | |
| Monday, July 24, 2006 | 10:00 AM | 7:00 PM | 9:31 AM | 2:47 PM | 3:20 PM | 7:26 PM | | | Meal break only - kids? |
| Tuesday, July 25, 2006 | 10:00 AM | 7:00 PM | 9:31 AM | 3:02 PM | 3:54 PM | 7:12 PM | | | 52 min. absence. |
| Wednesday, July 26, 2006 | 10:00 AM | 7:00 PM | 9:01 AM | 2:32 PM | 3:09 PM | 7:26 PM | | | Arrived 1 hr. before store opens; meal break only - kids? |
| Thursday, July 27, 2006 | 10:00 AM | 7:00 PM | 9:40 AM | 10:43 AM | 11:30 AM | 1:17 PM | | | |
| Friday, July 28, 2006 | 10:00 AM | 7:00 PM | 9:48 AM | 4:42 PM | 6:09 PM | 7:27 PM | 2:14 PM | 7:26 PM | Total of 2 hrs. 45 min. absence. |
| Saturday, July 29, 2006 | 9:00 AM | 6:00 PM | 8:47 AM | 5:05 PM | 5:54 PM | 6:20 PM | | | ~ 1 hr. 30 min. absence. |
| Sunday, July 30, 2006 | CLOSED | | | | | | | | 49 min. absence or meal break - kids? |
| Monday, July 31, 2006 | 10:00 AM | 7:00 PM | 10:58 AM | 8:45 PM | | | | | 1 hr. late; worked 1 hr. 45 min. after store closes. |
| Tuesday, August 1, 2006 | 10:00 AM | 7:00 PM | 9:53 AM | 7:14 PM | | | | | No break/absence - kids? |
| Wednesday, August 2, 2006 | 12:00 PM | 7:00 PM | 12:44 PM | 7:23 PM | | | | | 44 min. late; no break/absence - kids? |
| Thursday, August 3, 2006 | 8:00 AM | 5:00 PM | 11:21 AM | 12:54 PM | 1:51 PM | 5:23 PM | | | Scheduled herself 2 hrs. before store opens; arrived 1 hr. 20 min. late; ~ 1 hr. 20 min. absence. |
| Friday, August 4, 2006 | 11:00 AM | 7:00 PM | 11:03 AM | 1:24 PM | 2:17 PM | 7:29 PM | | | ~ 1 hr. absence. |
| Saturday, August 5, 2006 | 9:00 AM | 6:00 PM | 8:45 AM | 10:05 AM | 10:57 AM | 6:14 PM | | | ~ 1 hr. absence. |
| Sunday, August 6, 2006 | CLOSED | | | | | | | | |
| Monday, August 7, 2006 | | | 12:44 PM | 8:19 PM | | | | | Worked 1 hr. 20 min. after store closes. |
| Tuesday, August 8, 2006 | | | 9:47 AM | 2:30 PM | 4:04 PM | 8:21 PM | | | ~ 1 hr. 30 min. absence; worked 1 hr. 20 min. after store closes. |
| Wednesday, August 9, 2006 | | | 9:36 AM | 2:46 PM | 4:29 PM | 7:14 PM | | | 1 hr. 45 min. absence. |
| Thursday, August 10, 2006 | | | 9:50 AM | 2:18 PM | 6:21 PM | 7:19 PM | | | 4 hr. absence. |
| Friday, August 11, 2006 | | | 9:39 AM | 10:56 AM | 11:56 AM | 6:59 PM | | | 1 hr. absence. |



EXHIBIT 2

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

AMY CARPENTER,

       Plaintiff,

v.

REGIS CORP., INC.,

       Defendant.

Civil Action No.:
3:07-CV-00501-WKW-CSC

## DECLARATION OF DELISE BURDETTE

1.     My name is Delise Burdette. I am over eighteen (18) years of age, and I have personal knowledge regarding the information contained in this Declaration.

2.     I work for Regis Corporation as an Area Supervisor. I have held this position since 2005. I oversee approximately eight HairMasters Salons in Alabama and Georgia. In my capacity as Area Supervisor I was an immediate supervisor over Amy Carpenter during the time she worked as a salon manager. She also worked as a stylist in stores that were under my supervision for a period of time. The two stores in which she worked, the HairMasters in the Bruno's shopping center in Auburn, Alabama (hereinafter "Brunos"), and the HairMasters Salon located on Tiger Town Parkway in Opelika, Alabama (hereinafter "Tiger Town"), are both under my supervision. I assumed responsibility for those stores on June 1, 2006.

3.     In late June/early July of 2006, the store manager at the Bruno's salon, Ms. Amy Grace, was moved to the Salon Manager position at the Tiger Town store, which created an opening in the Salon Manager position at the Bruno's store. As Area Manager, I was responsible for filling that open Salon Manager position. I decided to

1

promote Katherine Kilgore to the Salon Manager position effective on approximately July 7, 2006. At that time, Ms. Kilgore was working as a stylist at our College Street store in Auburn, Alabama. I made that decision because I concluded that Ms. Kilgore was the best qualified candidate.

4.      I selected Ms. Kilgore over Ms. Carpenter and Tina Chinowith, a Caucasian stylist in the College Street store. All three took the test to be considered for Salon Manager. The tests are not numerically graded; they will merely reflect a "red" or "green" score. The "green" score means the candidate can be considered for the position; the "red" score suggests that the employee might not be a good candidate. I did not further consider Ms. Chinowith after she scored "red" on the test. Ms. Carpenter and Ms. Kilgore both scored "green."

5.      Ms. Kilgore had approximately 15 months of experience with the company, working as a stylist, and had demonstrated successful customer service skills, which I think is a very important part of being a successful Salon Manager. Ms. Kilgore had previously worked for Regis from approximately October of 2004 until August of 2005 and was subsequently rehired in February of 2006. I had previously worked as the Salon Manager in the College Street store and observed that Ms. Kilgore was very good in working with her customers.   At the time I made this promotion decision, Ms. Carpenter had only been with Regis Corporation for approximately seven months. During the time that Ms. Carpenter worked with the company, Ms. Carpenter had failed to demonstrate customer service skills that would match those of Ms. Kilgore. In the short time that I worked over these additional stores, I had received some customer

complaints about services provided by Ms. Carpenter, but had not had any such complaints against Ms. Kilgore.

6.      Ms. Kilgore voluntarily stepped down from the Salon Manager position on or about July 11, 2006. Ms. Kilgore advised me that she was resigning the position partially because Ms. Carpenter was extremely rude to her when she became the new Salon Manager for the store. She felt overwhelmed by the situation. Ms. Kilgore returned to her stylist position at the College Street store in Auburn.

7.      After Ms. Kilgore stepped down from the position, I again considered Ms. Carpenter for promotion to the position. Although I had concerns about her customer service skills, I decided to give her a chance in the position. I promoted Ms. Carpenter to the Salon Manager position on or about July 11, 2006. When I placed her in the position, I discussed with Ms. Carpenter that she would have a 90-day probationary period in which she would need to prove herself and that if she did not perform successfully, she could be demoted back to a stylist position. She stated that she understood and that she was willing to work to improve her performance. I did not tell her that she could remain in the Bruno's store as a stylist if I demoted her, because that would be contrary to company practice.

8.      I provided Ms. Carpenter with the same training that I provide to all other Salon Managers. I spent approximately two days at the Bruno's salon training Ms. Carpenter on ordering, scheduling, and other management responsibilities. I also visited the store at least two times a week throughout the time she worked as Salon Manager. During the training period, I made my expectations clear and instructed Ms. Carpenter to contact me with any questions. I gave her all of the Regis Salon Manager materials and

3



reviewed them with her. I also provided her with a written copy of a document entitled "What I Expect of a Manager," a copy of which is attached hereto as Exhibit 1, which describes my expectations of managers that report to me.

9.      Unfortunately, soon after the promotion, Ms. Carpenter demonstrated significant difficulty in meeting the company's expectations.    For example, she frequently called Salon Manager Amy Grace instead of myself to ask questions regarding how to perform her job. The management expectations document that I provided her clearly informed her that she should direct her questions to me. In addition, I discovered that Ms. Carpenter had violated the company's time clock and scheduling policies by bringing her children to work; leaving the salon during her shifts (while remaining on the clock) to go home to care for her children; scheduling stylists for fewer evenings or weekends than required; and frequenting the salon without authorization when the business was closed. There were several times that I visited the store when Ms. Carpenter was not there and she had not clocked out.  Some of the stylists were complaining that they were not being assigned an adequate number of night shifts. Finally, during the short period of time that Ms. Carpenter managed the salon, she received an excessive number of customer complaints which she was unable to appropriately resolve at the salon level. I attach a true and correct copy of several of the customer complaints levied against Ms. Carpenter through the corporate office as Exhibit 2.  There were also several complaints against Ms. Carpenter that I was aware of that did not go through the corporate office. Based on these facts, I demoted Ms. Carpenter from salon manager to stylist on August 10, 2006.

4



10.     When a Salon Manager is involuntarily demoted, it is Regis' practice to send the employee to a new store to prevent friction between the old manager and the new one.  This was a legitimate concern in Ms. Carpenter's case, given that she had previously had difficulties getting along with Ms. Kilgore when she was the Salon Manager.  In her deposition, Ms. Carpenter mentioned Tina Cottel, who voluntarily stepped down as the Salon Manager at the Tiger Town store, and was allowed to remain as a stylist in that store.  Ms. Cottel worked as a Group Manager. She served as the Salon Manager over the Tiger Town store and she also oversaw the Bruno's and the College Street stores.  I had no involvement in her stepping down, or in her assignment as a stylist in the same store.  I was assigned responsibility for these three stores immediately after she stepped down.

11.     On or about August 10, 2006, I informed Ms. Carpenter that she was being demoted.  I informed her that her performance as a manager had not met expectations and that she did not appear to be a good fit for management at that time.  I did not tell her that she was "low class" or anything to that effect.

12.     Ms. Carpenter was offered a transfer to one of two nearby HairMasters locations.  She chose to go to the Tiger Town location which is only about two miles from the Bruno's salon.  Other employees have likewise been transferred following demotion from the salon manager position. Since I have been an Area Manager, there have been six Salon Managers who I have demoted, and all were moved to different salons.  Three persons were demoted before Ms. Carpenter and two afterwards.  All of these demoted Salon Managers were Caucasian, except Ms. Carpenter.

5

13.    Ms. Carpenter started work at the Tiger Town salon on Tuesday, August 15, 2006. In spite of the change, she continued to receive customer complaints, disregard Regis' policies, and violate my directives. For example, I had already counseled Ms. Carpenter against having personal visitors loitering in the salon while she was at work. Yet on her first day at the new location, Ms. Carpenter had two friends (Shannon Martin and a non-employee named LaToya) in her work area in the salon for an extended period of time. Ms. Martin worked as a receptionist at the Bruno's store. A customer present that day complained about a conversation he overheard between Ms. Carpenter and her two visitors. Attached as Exhibit 3 are true and correct copies of statements taken from Ms. Carpenter's co-workers as a result of this incident. Ms. Grace issued the warning notice, attached to this Declaration as Exhibits 4, to Ms. Carpenter. I issued the warning notice attached to this Declaration as Exhibit 5 to Shannon Martin based on her inappropriate behavior.

14.    In another incident on August 15, 2006, Ms. Carpenter failed to perform services for an African-American client, claiming erroneously that the salon did not have products and tools for ethnic hair. While the company provides tools and products to perform the most common services, including those for highly textured hair, stylists may request specialized products and use their own tools if they wish to offer additional services. In Ms. Carpenter's case, when she worked at the Bruno's location she supplied her own Marcel thermal irons in different sizes than the four alternatives provided by the company. When Ms. Carpenter transferred to the new location she opted not to transport her own tools despite the fact that she knew this particular client had an appointment with



her and preferred the alternative Marcel irons. I never instructed Ms. Carpenter that she could not take her Marcel irons to the new location.

15.    Although electric Marcel irons and Regis back bar products were available for Ms. Carpenter's use at Tiger Town, it was her responsibility alone to ask her new salon manager, Amy Grace, to order and back bar the particular Regis-supplied products that she preferred to use and to transport any personal tools she had used at her previous location. Nevertheless, all of the services the client had requested could have been performed that day using the available tools and products, yet Ms. Carpenter chose to misinform the client that the salon was not prepared to perform ethnic hair services.

16.    In addition, when Ms. Grace contacted me for assistance regarding this particular customer, I was at the Bruno's store. I immediately offered to drive over an oven and Marcel irons from the Bruno's store to the Tiger Town store for Ms. Carpenter's use. The stores are located only two miles from each other. Such tools, although not necessary to perform the client's services, could have arrived within minutes to satisfy the client. The client left the store without having the service performed.

17.    I was aware that Ms. Carpenter made a complaint to corporate that was investigated by Ms. Toni Alvarez. I spoke with Ms. Alvarez as part of her investigation and she asked me if I had cursed Ms. Carpenter or whether I had refused to allow her to take her Marcel irons to the Tiger Town store. I told her I had done neither thing. We discussed Ms. Carpenter's claim that I had treated her unfairly. I denied that I had treated Ms. Carpenter unfairly and reported my version of the different events consistent with what I have stated in this Declaration.

18.    It is my understanding that Ms. Carpenter accuses me in this lawsuit of discriminating against her on the basis of her race.  I did not take race into consideration in any of my decisions with regard to Ms. Carpenter or otherwise.  I made my decisions based purely on my review of her performance and her unwillingness to follow company policies.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct and that any additions, modifications or deletions have been made and initialed by me.

Executed on this the 27 day of February, 2008.

DELISE BURDETTE

8



# What I expect of a manager

- Make schedules, and cover schedules
- Have meetings monthly two hours or less, call me when you schedule them so I can attend
- Make orders on time
- Keep paper work for one year in separate labeled containers per month
- Make sure deposits are made daily
- Make sure daily paper work and deposit slips are done and filed correctly
- Make sure salon is clean, every stylist will have a area and a retail line to clean
- Make sure monthly collateral is put up by the 3rd of every month
- Call all other issues in to me
- Refer to manager guide for hiring procedures, and all other personnel issues. or call me if you have any questions.

I have read and understand all of these expectations. I have read and understand managers help book concerning hiring, write-ups, and terminations and all other information in it. I under stand that failure to comply with these procedures will result in poor management and may also result demotion

Sign _____



**EXHIBIT**
1

D - 00089  Carpenter v Regis

# All Claims

Period 11/01/2005 - 08/31/2006

## 60885    Opelika,AL-Pepperell Pkwy-HM

**Director:** AMY EDWARDS    **Supervisor:** DELISE BURDETTE

| Service Date | ServiceType: | Complaint Codes | Refund Amt | Gift Cert Amt | Stylist | Resolution |
|---|---|---|---|---|---|---|
| 2/4/2006 | Hair Cut | BC | $14.95 | | Jamie? | Apology |
| | | | | | | Contact Supervisor |
| 8/15/2006 | Other | NSO | | | Amy Carpenter | Apology |
| | | | | | | Contact Manager |
| 8/15/2006 | Hair Cut | NSO | | | Cindy | Contact Manager |
| | | | | | | Goodbye Letter |

*Page 1 of 1*



EXHIBIT
2

*Monday, September 18, 2006*

D - 00179  Carpenter v Regis

## All Claims

Period 11/05/2005 - 08/31/2006

**60895    Auburn,AL-Bruno's Shop Ctr-HM**

*Director:* AMY EDWARDS

*Supervisor:* DELISE BURDETTE

| Service Date | Service Type | Complaint Codes | Refund Amt | Gift Cert Amt | Stylist | Resolution |
|---|---|---|---|---|---|---|
| 12/15/2005 | Shampoo/Set | SIC | | | Jennifer | Salon Incident Report |
| 3/12/2006 | Hair Cut | SIC | | | Amy Carpenter | Salon Incident Report |
| 8/1/2006 | Color | NSC | | | Amy Carpenter | Apology<br>Coupons<br>Redo Service |
| 8/11/2006 | Hair Cut | BC | | | Amy Carpenter | Apology<br>Redo Service<br>Contact Manager |

*Monday, September 18, 2006*

*Page 1 of 1*



D - 00181  Carpenter v Regis



**Customer's Name**   Andy

## Complaint Information

Date of Service   3/12/2006

Service Type   Hair Cut                            Redo? ☐

Products Used                                      Patch Test? ☐

Complaint Codes   SIC

                  Refund at Salon ☐   Permission Signed? ☐

Cost of Service                       Stop Payment ☐

OXL Account ☐    Data Cancelled ☐

## Resolution Information

Claim Closed   7/18/2006

Resolution   Salon Incident Report       Refund Amount

                                          gift Cert Amount

                                          Expires

Charge Card #

Card Type

Refund Includes _____ (for reference on Check Request)

**Notes** Clippers cut C ear. M and S applied direct pressure to try to stop the bleeding. S used antiseptic wipe to clean area
and placed bandage on ear. C didn't complain during service.

Page   1   1   2       Notes

March ▾    2006 ▾

| Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|-----|-----|-----|-----|-----|-----|-----|
| 27 | 28 | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |

PRINT

Customer

Labor

Envelopes

Check Request

Credit Request

D - 00182  Carpenter v Regis



Add Record   Search   ...   Call Info

**Customer Information**

Last Name: Collins
First Name: Heather
Address:
City: Opelika
State/Province: AL
Postal Code: 36801
Country:
Home Phone: (205)...
Work Phone:
Work Extension:

CS Rep: Sara Fox
Call Date: 8/15/2006
Reported By: Customer

Claim Closed: 8/15/2006
Inactive: ☐
Call Terminated By:
Reason Terminated:

Stylist: Amy Carpenter
Manager: APRIL...
Director: AMMED...
Regional: TONY...
Supervisor: DELISE...

**Salon Information**

Salon: 60995
Mall: BRUNOS SHOPPING CENTER
City: AUBURN
State: AL
Division:    Company: 611



Customer's Name  Heather Collins

## Complaint Information

Service Type         Hair Cut
Products Used
Complaint Issues
Cost of Service      BC              Refund at Salon
cXLAccount           Check Cancelled

Date of Service      8/11/2006
Redo
Patch Test
Permission Signed
Stop Payment

## Resolution Information        Claim Closed     8/15/2006

Resolution           Apology
Redo Service
Contact Manager

Charge Card #
Card Type
Refund Includes

Refund Amount
Gift Cert Amount
Expires

August    ▾    2006 ▾

| Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---|---|---|---|---|---|---|
|  |  |  |  | 4 | 5 | 6 |
|  |  |  | 10 |  | 12 | 13 |
|  | 16 |  |  | 19 | 20 | 27 |
|  |  | 23 | 24 | 26 | 26 | 27 |
| 28 |  |  | 31 | 1 | 2 | 3 |
|  |  |  | 7 | 8 | 9 | 10 |

PRINT
Customer Letter
Envelope
Check Request
Credit Request

Notes    C was not happy with her cut.  She stated 1 side of head has layers and the other is longer with no layers.  I apologized and contacted the M of #60866.  She is willing to do a redo.

Page:   1  2      Notes

D - 00184  Carpenter v Regis





D - 00185  Carpenter v Regis



**Customer's Name** Nicole Calloway

**Complaint Information**

Service Type: Other                                    Date of Service: 8/15/2006

Products Used:                                         Redo? ☐

Complaint Codes: NSO                                   Patch Test? ☐

Cost of Service:            Refund at Salon ☐          Permission Signed? ☐
                                                       Stop Payment ☐

CXL Account:            Date Cancelled

**Resolution Information**    Claim Closed: 8/17/2006

Resolution: Apology
            Contact Manager                            Refund Amount:
                                                       Stated Amount:

                                                       Expires:

Charge Card #:

Card Type:

Refund Included:

**Notes** C called and scheduled appt. for a shampoo/curl/blow dry with S. S called her 1 hr before service and stated salon
does not have products for highly textured hair so she wouldn't be able to do her hair. I apologized and contacted the
M. M stated S was aware of the appointments she had that day and knew she used her own special tools on these C
hair. S neglected to bring them and blamed it on salon. M is also in process of ordering more products for ethnic hair.
She feels S is setting up salon for harrassment case. RS and AS are aware.

PRINT
Customer Letter
Envelope
Check Request
Credit Request

August ▾ 2006 ▾

| Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|-----|-----|-----|-----|-----|-----|-----|
| 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |

(no reference on Check Request)

Page

D - 00186  Carpenter v Regis









## Complaint Information

**Customer's Name:** Sylvie Ledbetter

**Date of Service:** 8/1/2006

**Service Type:** Color

**Products Used:**

**Complaint Codes:** NSC

**Cost of Service:**

Refund at Salon

**GMA Account:**

Date Cancelled

## Resolution Information

**Claim Closed** 8/9/2006

Apology
Coupons
Redo Service

**Notes:** C was not happy with the way her daughter's hair color turned out. C stated it did not look good and was very damaged. C ended up going to different Hair Masters to get it fixed. I apologized and sent a coupons.

PRINT

August      2006

| MON | TUE | WED | THU | FRI | SAT | SUN |
| --- | --- | --- | --- | --- | --- | --- |

D - 00092  Carpenter v Regis

On Tuesday August 15, 2006, Shannon & LaToya came over to the salon to visit Amy Carpenter. During their visit, I was talked to Shannon about Neil (who is my current boyfriend), as we were talking, Shannon being messing with her hair and put some whipping wax in her hair, someone asked her what she put in her hair, she said whipping wax, LaToya said whipper what? From there Amy C. made the comment that LaToya need to tattoo Shannon's name on back of her neck, they begin to laugh & Shannon said you know I'm your Boo. Carolyn was right behind them at her station cutting a gentlemen's hair



EXHIBIT
3

D - 00101  Carpenter v Regis

I walked around the corner and begin picking up towels, Carolyn said I already gathered the towels, I told her I was trying to find something to do.

Shannon & LaToya stayed here at the salon until 5:00, when Amy C. got off work then they all left together.

Cindy Carlton

Jimmy Carpenter
ID- 143483

August 15-06

On August 15-06, Amy Carpenter had two visitor
on her job. They were talking about whyping wax
and tatooing some one name on one of the girls neck
and the comement was made you know, I am your Bob
I was Cutting a Customer hair at that time and
they Preceside to Carre on laugh out Loud
and talking with each other very loud it get
the customer attention.

Carolyn Avery

# WARNING NOTICE

2 stylist
Documentation
Attached

EMPLOYEE NAME: Amy Carpenter    SOCIAL SECURITY #: 143492

CITY: Opelika    MALL: Tiger Town    SALON #: 00885

TODAY'S DATE: 8/16/06

## REASON:

____ ATTENDANCE    ✓ CONDUCT    ____ TECHNICAL SKILL    ✓ OTHER

## TYPE OF WARNING:

✓ VERBAL    ✓ WRITTEN    ____ FINAL

## REMARKS:

I had a client complaint that inappropriate
conversations were being carried on while he
was getting his hair cut. He stated that a stylist (Amy)
and 2 other ladies were having a conversation
that had sexual inuendo. This is a violation of
# 21 of our security regulations.

I had No conversation w/ Shannon or Latoya. Nothing sexual
was Stated. Shannon only told Latoya to put her name in
her Neck. Latoya came to make an appt w/ me and Shannon
**ACTION TO BE TAKEN:** came to eat lunch w/ me. Cindy another
Amy is being placed on 60 day probation. If
this occurs again it could result in termination.

*Signature not required for verbal warning.*

MANAGER SIGNATURE: [signature]    DATE: 8/16/06

EMPLOYEE SIGNATURE: _____    DATE: _____

EXHIBIT
4

# WARNING NOTICE

EMPLOYEE NAME: _Amy Carpenter_    SOCIAL SECURITY #: _143403_

CITY: _Opelika_    MALL: _Tiger Town_    SALON #: _600865_

TODAY'S DATE: _8/16/06_

## REASON:

_____ ATTENDANCE    _____ CONDUCT    _____ TECHNICAL SKILL    _____ OTHER

## TYPE OF WARNING:

_____ VERBAL    _____ WRITTEN    _____ FINAL

## REMARKS:

Stylist was leaning on the counter laughing and involved in the conversation. As well. Carolyn Perry was cutting a Gentlemens hair and stated she heard us laughing and her client looked up at her but she heard nothing sexual. Cindy said she heard something Sexual but couldn't conviently remember. I deny this charge and feel that the disciplinary action is unapropriate. I Refuse to Sign because All parties involved did not recieve the same disciplinary action shannon is also a Regis employee

## ACTION TO BE TAKEN:

And I did not hear her say anything sexual inappropriate I also had a client during a haircut, I asked for A copy of this.

*Signature not required for verbal warning.*

MANAGER SIGNATURE: _____    DATE: _____

EMPLOYEE SIGNATURE: _____    DATE: _____

White Copy: Mail to Salon Director    Yellow Copy: Salon File    Pink Copy: Supervisor

D - 00038 Carpenter v Regis

01-13-2004 17:21    DELISE 2567418652                                    PAGE1



EXHIBIT
5

# WARNING NOTICE

EMPLOYEE NAME: Shannon Martin    SOCIAL SECURITY #: 160 364

CITY: Hoover    MALL: _____    SALON #: 6085

TODAY'S DATE: 8/16/06

**REASON:**

_____ ATTENDANCE    _____ CONDUCT    _____ TECHNICAL SKILL    ✓ OTHER

**TYPE OF WARNING:**

✓ VERBAL    _____ WRITTEN    _____ FINAL

**REMARKS:**

Went to 6085 to speak with
another employee. Customer made
complaint that conversation was not
of professional nature.

**ACTION TO BE TAKEN:**

Verbal; Advised Shannon to not
talk with employees unless they are not
working on clients.

*Signature not required for verbal warning.*

MANAGER SIGNATURE: X _Dolse Pruitt_    DATE: 8/16/06
EMPLOYEE SIGNATURE: _Shannon Mart_    DATE: 8/16/06

White Copy: Mail to Salon Director    Yellow Copy: Salon File    Pink Copy: Supervisor

#449 (06/02) Printed in the U.S.A.

D - 00104  Carpenter v Regis

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

AMY CARPENTER,

      Plaintiff,

v.

REGIS CORP., INC.,

      Defendant.

Civil Action No.:
3:07-CV-00501-WKW-CSC

## DECLARATION OF TONI ALVAREZ

1.     My name is Toni Alvarez. I am over eighteen (18) years of age, and I have personal knowledge regarding the information contained in this Declaration.

2.     I work for Regis Corporation as a Regional Manager. I have held this position since February of 1999. I have responsibility over stores in Alabama, Georgia, South Carolina and Florida.

3.     On or about August 16, 2006, Amy Carpenter contacted Amy Edwards (Vice-President and Director of the Promenade Division) at the corporate office to complain about her demotion and transfer to a different Regis store. She also claimed that Delise Burdette had made derogatory statements to her and prevented her from using products and tools necessary to perform ethnic hair care services for highly textured hair. She also felt that she had unfairly received some customer complaints.

4.     In response to Ms. Carpenter's complaint, I conducted an investigation at the salon where Ms. Carpenter worked on August 17 and 18, 2006. Attached to this Declaration as Exhibit 1 is a true and correct type-written copy of my notes that I made during my investigation regarding Ms. Carpenter's complaint. I tried to make my notes as detailed as possible but there

1

were some things that I discussed with persons during the investigation that were not included in my notes.

5.    I began my investigation by speaking to Ms. Carpenter. At no point during our conversation did Ms. Carpenter contend that she was being treated differently because of her race or that she was being discriminated against. She made various complaints that she felt Delise Burdette was treating her unfairly. She claimed that she had not been able to perform a service for a customer because she did not have the necessary relaxer product or her necessary tools. She claimed that Ms. Burdette had said that she could not do ethnic hair or have ethnic products in the store because there was no room.

6.    Ms. Carpenter claimed that Ms. Burdette had told two of her co-workers, Christy Boatwright and Shannon Martin, that Ms. Carpenter was "low class and not management material." She also contended that Ms. Burdette had said to Shannon and Christy that Ms. Carpenter was demoted because she kept "fucking up peoples color."

7.    Ms. Carpenter also said that she felt that there had been unfair customer complaints made against her. Ms. Carpenter mentioned a situation in which she was issued a written reprimand by Ms. Burdette after a customer complained that she was involved in a conversation on the service floor with Shannon Martin and a non-employee named Latoya. During my investigation, I learned from Ms. Carpenter's co-workers that Latoya was spending a large amount of time in the salon, behind the desk and on the service floor, which is a violation of company policy. She said one of her co-workers had reported that they were having a conversation of a sexual nature. She said the only thing said referenced Latoya getting a tattoo on her neck that said "Child Boo." Ms. Carpenter said that her co-worker, Cindy Carlton, lied

about this incident, and she said that she did not believe that the customer had actually complained.

8.    Ms. Carpenter said that all she wanted to do was to return to the Bruno's store. I told Ms. Carpenter that I had recommended that she be moved to the Tiger Town location after her demotion because that is normal practice within the company to help everyone get a fresh start. I told her that I would be willing to consider allowing her to return to the Bruno's store as a stylist once I completed my investigation. I told her that I would get back with her at the completion of my investigation.

9.    It is my understanding that Ms. Carpenter complains in this lawsuit that Tina Cottel was allowed to remain as a stylist in the Tiger Town store after she stepped down from her position. Ms. Cottel worked as a Group Manager, with responsibility as Salon Manager at the Tiger Town store and also having oversight over the College Street store and the Bruno's store. I allowed Ms. Cottel to remain in the position because she had voluntarily stepped down (instead of being demoted) and she had always worked well with Amy Grace, who was to be the new Tiger Town manager.

10.    I next spoke to Amy Grace, the Salon Manager at the Tiger Town Store. She complained that during the time Ms. Carpenter was a Salon Manager, she would constantly call Ms. Grace with problems at the store on issues that she should have been dealing with Ms. Burdette. Ms. Grace said Ms. Carpenter would constantly state that she did not like instructions that Ms. Burdette had given her and that she did not want to follow them. Ms. Grace said that, during the time she worked as the Salon Manager at the Bruno's store, Ms. Carpenter had been a constant disruption at work and had told lies to and about various employees in the store. Ms.

3

Grace said that she felt that Ms. Burdette was justified in demoting Ms. Carpenter, given what she had observed about her performance as a manager.

11.   Ms. Grace told me about her involvement in the customer complaint on approximately August 15, 2006, regarding an African-American customer's request for services. The customer wanted to have a color and a relaxer at the same time, but this is not possible because of the damage that can be caused to the hair. Ms. Grace had previously ordered the products for use in the service. Ms. Grace regularly performs services for African-American customers and says that all the necessary tools and products needed to perform a relaxer were available in the store that day. As part of the relaxer service, Ms. Carpenter would normally use her own personal Marcel Irons. Ms. Carpenter told Ms. Grace that she did not have her irons and that they were at home in her closet. Ms. Grace told the customer that they could still perform the relaxer. Ms. Grace said that she called Ms. Burdette, who volunteered to bring the Marcel irons from the Bruno's store, which was consistent with what Ms. Burdette claimed, but entirely inconsistent with what Ms. Carpenter told me during the investigation. Ms. Grace said that Ms. Carpenter was lying when she asserted during the investigation that Ms. Burdette refused to bring the irons to the store. Ms. Carpenter also claimed that Christy Boatright and Shannon Martin had told her that Ms. Burdette had told them that she was not letting Ms. Carpenter transfer any ethnic products to the Tiger Town store because she did not want that kind of people at Tiger Town. Both persons denied ever hearing this statement from Ms. Burdette when I spoke to them. Ms. Grace stated that she did not believe this statement and that she knew Ms. Burdette would not say that and certainly would not talk to a stylist or a receptionist about another employee.

4

12.    Ms. Grace said that she had to redo several coloring services that Ms. Carpenter had initially performed incorrectly.  Amy Grace said that a customer, Heather Collins, was sent to the Tiger Town location to have her hair redone because she was not pleased with Ms. Carpenter's performance of a shampoo, cut, and conditioning treatment.  Ms. Collins told Ms. Grace that she paid $48.00 for the service, but the service should have been no more than $34.95 under Regis' prices.  It is a violation of company policy to charge a customer more than the listed price.

13.    I next spoke to Shannon Martin.  Shannon said that Ms. Carpenter had called her while I was meeting with Ms. Grace and tried to get Shannon to say various things when I spoke with her.  Shannon reported that Ms. Carpenter was wanting her to say that she had witnessed Ms. Burdette treating Ms. Carpenter badly in the store.  Shannon said that Ms. Carpenter wanted her to say that Ms. Burdette had said that she was low class, which Shannon said was not true. Shannon was concerned that Ms. Carpenter was asking her to lie.  She said that she had never heard Ms. Burdette refer to Ms. Carpenter as low class.  She said merely that Ms. Burdette said that she was sorry that there had been so much turnover with the past managers and that they were hoping to achieve a higher standard in the store and to hopefully get a good manager for them in the store.   She denied ever hearing Ms. Burdette or any other employee say that Ms. Carpenter was demoted because she kept "fucking up people's color."  She said that Ms. Carpenter was the only person who had said this.  She said that she had never heard Ms. Burdette curse.

14.    I also spoke to Christy Boatright.  She denied ever hearing Delise Burdette say that Ms. Carpenter was "low class" or ever hearing Ms. Burdette say that Ms. Carpenter was demoted because she kept "fucking up people's color."  Christy said that she had never heard

5


Ms. Burdette use profanity. Christy expressed concern that Ms. Carpenter was always creating a negative environment. She also mentioned that Ms. Carpenter did not follow proper scheduling and would leave the store while she was still on the clock. Christy said that she did not want to have any more interaction with Ms. Carpenter. Christy said that she would turn in her notice if Ms. Carpenter returned to work at the Bruno's location. Christy voiced her concern that Ms. Carpenter or her friend Latoya might retaliate against her for speaking to me during my investigation. I told Christy that I was speaking to all persons involved and told her that I would keep what she said confidential. Shannon and Christy also said that Ms. Carpenter had told them that she had also called other customers at home and asked them to call me to complain about Ms. Burdette and the company. Ms. Grace had also reported that Ms. Carpenter had said the same thing.

15.    I spoke to Ms. Burdette as part of my investigation. She denied ever cursing at or about Ms. Carpenter. Ms. Burdette denied ever calling Ms. Carpenter "low class" or saying anything to that effect. She told me her version of the customer complaint regarding the Marcel irons situation, and it was the same as Ms. Grace's version of the story. She denied having treated Ms. Carpenter unfairly in dealing with her.

16.    In support of her allegations, Ms. Carpenter provided a letter to Ms. Edwards that she claimed Amy Grace wrote with regard to her recent job performance. Attached to this Declaration as Exhibit 2 is a true and correct copy of the letter of reference supposedly written by Ms. Grace that Ms. Carpenter had provided to Amy Edwards. Amy Grace told me that she had written the letter in either April or May of 2006 for a school application. She denied that she had written the letter in late June of 2006 as Ms. Carpenter claimed. She says she knew this because the letter was written at a time when Ms. Carpenter was working for Ms. Grace as a



stylist, and Ms. Grace did not know that she would later be transferred to the Tiger Town store. Ms. Grace said that she had not put the telephone number for the Tiger Town store on the original letter, because she had not worked at the Tiger Town store at the time the original letter was sent. The letter that Ms. Carpenter had sent contained the telephone numbers for the Bruno's store and the Tiger Town store. Ms. Grace said she did not include the following sentence: "Amy is someone who is understanding, empathetic to others." Amy Grace said that she hand-signed and dated the letter that she provided to Ms. Grace, but this letter was not hand-signed and was not dated. Ms. Grace said that she provided the letter primarily in hopes that Ms. Carpenter might get another job so that she would not have to deal with all of the problems that she caused by her lying and her poor job performance. Ms. Carpenter had not told Ms. Grace that she was sending this letter to Ms. Edwards.

17.    I also looked into a customer complaint in which a customer named Electra made a complaint to Amy Grace that she had been overcharged by Ms. Carpenter, and that she felt that Ms. Carpenter had acted unprofessionally. The customer claimed that she had been charged $40.00 to have some tracks removed from her hair and for a conditioning treatment. A conditioning treatment has its own entry on the computer and should be no more than $10.00. The woman only had four tracks removed and the charge should only be somewhere between $2.50 and $5.00 per track. After following up on the charges, I concluded that Amy Carpenter had, in fact, overcharged the customer. The computer reflects charges by each stylist and I reviewed Ms. Carpenter's charges for this transaction. No conditioning treatment was charged on the computer. However, a $40.00 miscellaneous charge was. Other employees in the salon also stated that they felt the customer was also overcharged for the service.



7

18.     At the completion of my investigation, I made the decision to discharge Ms. Carpenter.    After speaking with stylists, managers, and at least one customer involved, I concluded that Amy Carpenter had falsely accused Ms. Burdette and another stylist (accusing Cindy Carlton of lying) of misconduct.  She had also misrepresented that her co-workers would corroborate her accusations against Ms. Burdette, but none of them did. I concluded that Ms. Carpenter had lied, attempted to manipulate coworkers and clients to cover up information or to lie for her; and altered and misrepresented a letter of reference that Salon Manager Amy Grace had provided to her months earlier.  In addition, a review of the customer complaints that she asked to be investigated all appeared to have been well-founded complaints based on misconduct by Ms. Carpenter.  Further, my investigation revealed that she had charged customers more than the stated price for services in violation of company policy. Based on these discoveries, I terminated Ms. Carpenter's employment.  On August, 18, 2006, I informed Ms. Carpenter that she was being discharged.   Ms. Grace also attended this meeting.   At no time before, during, or after my investigation did Ms. Carpenter inform me that she had filed a complaint with the EEOC.

19.     Attached to this Declaration as Exhibit 3 is a true and correct copy of the termination form that I completed when I terminated Ms. Carpenter.  I stated on the form that she had violated Regis Security Regulations 1, 12, 15 and 21.  A copy of the Security Regulations is attached hereto as Exhibit 4.   Ms. Carpenter had violated Security Regulation 1 by allowing Latoya to constantly stay in the salon and to loiter on the service floor.  Ms. Carpenter had violated Security Regulation 12 by charging her customers more than the Regis charge.  Ms. Carpenter had violated Security Regulation 15 because she was not using approved back bar products. Ms. Carpenter had violated Security Regulation 21 by all of her actions in lying during



8

the investigation, misrepresenting what her co-workers had allegedly said, altering and misrepresenting the nature of Ms. Grace's reference letter, attempting to pressure her co-workers to lie, and creating an unpleasant working environment for her co-workers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct and that any additions, modifications or deletions have been made and initialed by me.

Executed on this the 3 day of ~~February,~~ March 2008.

TONI ALVAREZ

9

Conversations Pertaining to
Employee Amy Carpenter
8/17/06 11:51AM
Quiznos next to the Hairmasters 60885
The following are my notes from my conversation with Amy Carpenter.
I asked Amy to fill me in on what was going on between her and Delise. The following is
what she told me.
I started a book in July because I didn't know if it was about me. Nine years ago we
worked together, I came in and made more money than her so she quit.
When Amy Grace came over to Tiger Town I wasn't promoted. I asked why I wasn't
given the job, Delise said she didn't have to tell me why and not to question her. She said
by me asking she knew she made the right decision.
Katie was made manager on the 7th. She quit and said she didn't like me. Delise came in
that day and gave me the job. She said I had 90 days to see if the job would work out. I
made arrangements for my kids, she said she would train me. All she did was give me
One Minute Manager tapes and a purple book. I had to call Tina and Amy G. to ask how
to order.
Delise hired Edwina part time. She said to "Watch her because she might steal".
I'm working everyday 10-7, I leave to feed my kids.
Edwina is stealing color and Delise said "deal with it it's your store".
Christie started taking a day off and then Delise said I could hire.
LaToya came in to my store, she works at Brunos Grocery. Delise said " she wasn't the
kind of person we hire, isn't she gay. We need a higher class of people". She said is she
with Shannon? I said you need to ask her and Shannon. She told me Latoya had to stop
coming in the salon to hang out. I told her I wasn't telling her she could. She asked if
Latoya paid for her service and I told her Christie charged her half price it's the mens
price.
I asked for help. She left and came back and said Toni called about a customer complaint
and said I had to be gone by 5:00. I asked if I could think about it and she said I could go
to Tiger Town and that's it.
They called Christie I said I would work her in.(The woman with the complaint) I was
doing Ms Rebecca's color and I asked April if I could take the tracks out and she would
wait. The lady was talking about how bad her hair was before. The lady was talking about
where she lived before she was talking about after school care. The lady said thanks for
fitting me in. The color timer went off and the lady said she would start taking the tracks
down. I told Christie to help and I gave her my prices, she was fine. Delise said the
customer called someone and Toni said that was it. I asked if I could have an
investigation into the complaint and she said if I wanted an investigation I would not
have a job. I asked why do I have to leave this store, can I talk to Toni? She said no the
decision has been made. I called Amy G and talked to Tina. Then Delise called and said
if I call anyone else or corporate or question her authority she would " fire my ass", I
said yes mam  she hung up and I packed my stuff.
Tasha Cole called, I couldn't do her hair. Delise said I couldn't do ethnic hair or have
ethnic products in this store there's no room. Diane Jones said she wasn't coming back
because I couldn't do ethnic hair.



**EXHIBIT**

1

D - 00222  Carpenter v Regis

Delise told Shannon and Christie I was "low class and not management material". Amy G. asked to transfer my things and was told no.

She (Delise) has not trained me. She trained Katie.

She got pissed off when I asked for attention from her. She said she had 24 hours to respond to me.

I have never been trained why take me out. She said the decision had been made.

She told Nancy and Nancy told Shannon and Christie I kept "fucking up peoples color".

She told me to say I was stepping down because the job was to stressful. I said no. Anyone can call and complain. My Ex. Would call everyday if he thought it would get me in trouble because he's 20,000.00 behind in child support.

I said I had a customer complain. The lady said she had an appt. at University. They told her they didn't take appts. I did the womans hair. I didn't call anybody.

Cindy can't cut hair worth a damn, but Delise told Amy G. don't fire her we need her.

A man came into Tiger Town and said "Howdy" to the girls. He said they looked at him like he was crazy. He came into my store and I said "Howdy" right back. He liked that, but I didn't call customer service.

Amy G. said if I was doing good with my paperwork, I would be o.k., but I was under a microscope. I smell a rat. I've prayed about it. When Katie came it was me and Christie then Shannon transferred over. Delise hired Edwina the one that steals. She finally told me I could hire Nora.

I have not given anyone sat off. Shannon went to a reunion and requested the 25th and 26th off.

I would let people leave early if we weren't busy. Christy is married so I'd let her go. She really didn't care, she don't give a damn that I never got a day off except Sunday.

I was told I could stay at the Bruno's shop. No one cared what I was told. Everyday I would work 10-7. I leave to go home and feed my kids and get them to bed then I come back to the shop.

I needed to be trained but I didn't get any help.

I was written up when Latoya came in to make an appt. She was asking me questions about what to do with her hair but customers kept coming in so she sat down to wait. I heard nothing sexual about the conversation with Latoya and Shannon. Cindy said she did but she can't remember what it was. Carolyn said she didn't hear anything. The only thing said was about getting a tattoo on Latoyas neck that said "Child Boo". That's just slang, I really don't know what it means. Cindy lied about this, nothing was said. I don't know how Delise found out. I don't think Carolyn's customer really complained. I think it was Cindy.

I felt like I was under a microscope. I wouldn't do anything wrong. I think everyone should be written up not just me. I think Shannon is only being written up because I said something.

All I want is to go back to Bruno's with my old job.

I (Toni) explain to Amy C. That I was the who recommended she be moved to the Tiger Town location after she was demoted, and that was a normal practice to help everyone involved get a fresh start. I told her I was sorry she felt like her title was stripped away from her but Delise had already hired a new manager. I did tell her she could go back as a stylist and upon compleating my investigation, I would forward all information to Amy Edwards. End time 1:00



D - 00223   Carpenter v Regis

Conversation with employee Amy Grace
Quizno's next to HairMasters 69885 1:30 pm
Everyday Amy C. calls me with an emergence. It's always something that she could
leave on Delise's voicemail, but she will call and take me away from customers for
nothing. She even calls me at home on my day off. She would say things about Delise
telling her to do something and she wouldn't want to do it. I told her policies and things
change and she should do what Delise says.
She has told lies on me, Tina, and two other stylist. We have all caught her.
Her and Delise have been at wits end over scheduling. She worked open to close over at
Bruno's but here she said she couldn't close. She called the other day over and over while
I was with a client. When I took her call she wanted to know if Delise made me close at
least 2 nights and work Saturday. I told her yes.
I told her when she came over here I didn't know what happened over there and I didn't
want to. I wanted everything to stay positive here. She said she was just trying this store
out



Friday she kept calling, then told Tina she needed to tell me her schedule. She called back at least a ½ dozen times. Delise called and I told her to tell Amy C. she would call back when she could. Amy C. told Delise she had not called. Amy C. said she was booked for 2 weeks. Delise said give me the name and numbers and we will schedule them at Tiger Town. Amy C. told Amy that she was just told to leave.
Lady calls for color and relaxer. Tina said you can't do both services in one day. The products were ordered for Amy before she came over.
Lady comes in at 12:00 asking me what is the problem. You don't have stuff to do my hair? We have the relaxer.
Amy C. used her personal iron at Bruno's and told Amy G. she didn't bring them because they were in her closet. (She had told the other customer)
Told the lady she could do her relaxer but we don't have the iron you need. Are you telling me that you only do certain peoples hair?
Amy C. said no she has ordered the stuff it will be about 2 weeks.
Lady said I need it done today who is your supervisor? Delise Burdett. Amy C. and lady exchanged glances and she said no I want her supervisor. Her supervisor is Toni.
My supervisor is at Bruno's let me call her. Delise said use the plug in iron and I said she needs the iron. Delise said I can bring you an iron. I said Amy C. didn't bring her irons. Amy C. wanted me to go buy a plastic bin to put her irons on. I asked her why she didn't use the travel bag like Theresa. She said her irons would get stolen like that.

Latoya- Threatens to sue us because we didn't give her a job.

She called me before she got management to complain against Delise and Katie Tuesday I left at 4:00.
Carolyn was doing a cut on a man. Shannon and Latoya just as I was leaving went to lunch at 3:00 with Shannon. Cindy was talking to Shannon about her boyfriend. Shannon was at Amy C. station putting whip wax on her hair then started talking about whip cream, tattoos. Cindy walked away and started folding towels. Carolyn's customer started looking towards Amy C. station then Carolyn started listening to the conversation. Both Carolyn and Cindy had said at different times the same thing about the conversation.
Carolyn's customer called and said he was uncomfortable about the conversation at the station about putting names on each other and using products that were offensive.
Every time I do a write up, I put a 60 day probation.
I wrote her up about the conversation.


Green Chrysler
Red Chevy Malibu

She was mad and everyone should be written up. I said why when they were not in the conversation. She said she wasn't in the conversation it was Shannon and Latoya. I said it was her company visiting at the salon who shouldn't have been there anyway. She said Shannon should be written up and I said she would be dealt with at her salon.



D - 00225   Carpenter v Regis

She pulled me and Tina aside and said she was documenting all the stuff and called corporate and made a complaint.
Everything is being investigated and I'm going back as a manager because they stripped me of my title.
She and Shannon have both tried to get me and Timika fighting.
I finally told Delise to tell Timika if she is saying all this stuff about me to tell her to stop after Amy C. saw I was I wasn't getting mad at Timika she stopped talking about her. Amy C. said Christi and Shannon told her Delise told them she wasn't letting Amy Transfer any product out because she didn't want that kind of people at Tiger Town. I know Delise would not talk to a stylist or receptionist about a manger much less say that. She listened in on the phone when I was talking to Delise. Amy C. said I should turn the volume down on the phone because she heard everything. I didn't have the phone on speaker and the door was closed. I think it was Cindy who said Amy C. was listening on the phone in the back.. Delise had said it sounds to me like she is trying to to keep things stirred up and if she is we need to nip it in the bud. Amy C. came back and opened the door and said I want to show you this list of clients I did when you wrote me up. You might want to turn the volume down on your phone I heard everything you said.

I've had to fix several colors from Amy C.
Heather Collins came to me at Tiger Town. Sara at home office sent her to me. I had done her hair at Bruno's the week before and she wasn't happy. She didn't have a good cut and I could see why. She wasn't happy. It was a mullet! She asked when we went up on our prices and I told her we didn't. She said she paid $48.00 for a cond. Even with a blow dry this wouldn't have been more then 34.95.
Last week a woman called and wanted her tracks removed. I asked her if they were glued or sewn. I told her I hadn't done that but Amy C. at Bruno's can. I called and Christi answered I asked if Amy C. was busy. She said she was doing a blow dry but didn't have anything after so I sent the lady over I was telling Christi what the lady wanted and then Christi said ugh oh. The lady in her chair doesn't like her color. Stop the lady, I can't she already left. What am I suppose to do. Explain the situation and schedule for later. The lady came back over here and said she sat in the lobby and took out all but 4 tracks and the receptionist shampooed her and she left with a wet head and was charged $40.00. She wanted the number to corp.
Amy said she was making 3600 a pay period and she wasn't making enough money to support her kids. She was to work Saturday the 12th and she came in and said she was scheduled at Bruno's 9-11 so she could move. She said she was off for Monday also to move. Delise said she was scheduled 9-6 on Saturday.
She told me on Tuesday she needs off 24, 25, 26 of August. (Thurs, Fri, Sat) and she wants Monday's off
Wednesday she asked if I made the schedule out yet and I said if things keep going like this I might be moving.
Amy F. got your fax yesterday I didn't fax anything I still have the transfer in my car.

Last month Cindy got mad when Delise called and asked if someone could go help Amy at Bruno's (resulted in documentation) Just wrote her up for #21 because Delise always wants a number by the violation. 3:45

D - 00226  Carpenter v Regis

Shannon 706-662-3576

Amy C. told Amy G I said she was going back to Bruno's as the Manager.

Amy C told staff in backroom that I was going to get her job back.

Amy C called Bruno's 4 times while I was talking to Amy G and told her what to say to me when I got there. Christy told Delise she didn't want to lie for Amy C.

Amy C called while I was on the phone with Amy E. She said Shannon left her a message on her cell today saying Delise was calling here low life, poor manager and that Amy C was a back stabber.

I called Amy C., Christi and Shannon and told them not to talk to each other until I talked to them tomorrow.

Electra was a customer who went to Amy C at Bruno's. She went to TT list and Amy G told her she had never taken down seven tracks but Amy C at Bruno's could. Amy G called Bruno's and Christy answered Amy G asked if Amy C was available. Christi said called Bruno's and Christy answered. Amy G asked if Amy C was available. Christi said she was just about through with a blow dry and didn't have anyone waiting. Amy G. told the customer to go on over and then began to explain to Christy what the customer wanted. Christy said the customer in the chair was getting upset about her color and to tell the customer to wait. Amy G said she had already left. Amy G to tell her she didn't like the amount she was charged and would Electra called Amy G to tell her she didn't like the amount she was charged and would like to come see her. Amy said fine. I was standing outside talking to a customer/friend of Amy C when Electra drove up. Amy G met her at the door and thanked her for coming in. I went in and asked her about her service and she said she waited in the lobby and started taking out some of the tracks. Amy C finally came up and took out about six and then the receptionist took out the rest and shampooed her hair. She left without even sitting under the dryer. She was charged $40.00 dollars. I asked her if she was happy with the service at the time and she said no. I asked if she talked to Amy C about the kids going to the day care she worked at like Amy C had told me earlier. She said no, that Amy C only talked to her for a minute about the bad job on her hair and that she talked mostly to Amy C's other customer about where she worked. We gave the woman some product and set up an appt. with Amy G.

8-18-06

Cristie

(1) Did you go from not having a day off to getting one? Yes, when Katie left Amy C started giving me a day off.

(2) Did Latoya ever come in for service with you? Yes, I put in a few foils for her and was told by Amy C I could charge her $5.00 per foil.



D - 00227   Carpenter v Regis

(3) Did Amy G call you about a customer coming in for Amy C to take out trucks? Yes. Is Amy C busy, she's got 2 customers here but she's almost through. Amy G said she was sending a woman over as I was talking to her. Amy C's customer said she wanted her darker. Amy G said the woman had gone. I told Amy G I would talk to her when she came in. When she came in I told her we had her signed in but Amy C had to redo the other customer's color. Electra was very nice when I talked to her. Amy C kept talking about how bad her tracks were and I didn't think it was appropriate. Amy took the tracks down then I finished taking them down and conditioned her. She was charged $40.00 and I thought that was high. Did you hear Electra tell Amy C to get her kids to come to her daycare? No. Were you with Electra the whole time she was in the salon? When she sat out front, I was at the desk, then when Amy took her back she told me to watch her take them out then she told me to take her back to the shampoo bowl and take the rest of the tracks down. I then shampooed, conditioned, put mouse in her hair and she left.

(4) Did Delise tell you & Shannon that Amy C was low class and not management material? No, never once. The only thing she ever told me were things weren't being run correctly and she needed to make a change.

(5) Did Nancy tell you & Shannon that Delise told her she was being demoted because she kept "fucking up people's color". I have not even talked to Nancy about this at all. Have you ever heard Delise cuss in that way? No. I haven't heard her use profanity at all.

(6) Did Amy C. let you leave early because you were married? She only let me leave early once and even when she gave me a day off, I still came in. I'm glad she's not here anymore. I've only been here 2 months and I was worried about my job with all this stuff going on. I work well Nancy and I work OK with Shannon. I just know she goes over and stirs up things. I didn't like Amy C's clientel, like Latoya always coming over here and hanging out even after Delise said she wasn't supposed to be hanging out. She would talk to my clients and say let me do your hair. They were making me feel like I was working in a low class salon.

I don't want Amy C calling over here to talk to me. I wish Delise was here everyday. I like working with her and Nancy and positive people. Amy C was always negative. She would leave and to get her friend Erica. When I asked to go get my step-son, she gave me 1 hour to eat and get him, then when I got back, she left.
I clocked out.
Anything else you want to tell me? I don't want any more communication with Amy C here or at home. My husband is an assistant at Wal Mart and he agrees that I shouldn't have to deal with this drama. Amy C always complained that she didn't get a day off but she never scheduled one. She left early every day at about 2:30, came back around 4:00 after getting her kids. She would schedule her self on the book 8 to 11. We didn't open until 10.
It's been so much more positive here with her gone. It's a lot better now. One more thing the other day, Shannon came in and said Amy G wrote her up because Latoya and her went over there. Shannon said Latoya was on her way over there because Cindy said they



were talking bad on the floor. Shannon said Cindy won't think it's funny when her van is sitting on four flats.

Shannon 8/18/06 12:38

Christy wasn't here. Delise was interviewing managers and she said we were going to get a higher standard of people in here. I don't know if she was referring to Amy C. She just said she was sorry for bouncing managers in here but she wanted to get a higher class in here. She said Amy C was still under 90 days.

Nancy didn't tell me anything about Amy getting demoted. Amy C told me she was getting demoted. Amy C told me she was getting demoted because a black lady complained about getting her tracks removed.

I knew about the color situation because Tiger Town kept calling here. A lady came in and wanted highlights. Amy C pulled her through the cap with a blond color. She liked it when she left. About an hour later, the lady called and said she didn't like it. She came back in and said she wanted it foiled. Amy C foiled it and the lady left happy. Tiger Town called later and the lady was there, not happy. Not that I recall, Did Delise say anything to you about "fucking up color". No, only Amy C said something about the color.

Have you ever heard Delise cuss on the floor? No, when she comes in, I'm usually gone because she's not here long.

After I talked to you yesterday, did you talk to Amy C? No, not until she called up here this morning to ask about an appointment.
Are you aware that she has said, this morning that you told her you lied to me yesterday about the message you left her? I haven't talked to her at all except this morning. What did the message say you left her? It was about Delise telling me that she was demoted because she wasn't suited for the job. She said she's a good stylist but not the type of manager that we need and to be careful about what I was saying to people. Anytime Amy C says anything to me, it's always someone else, not her.

Do you feel that Delise has harassed you, or been negative? No, she has always been good to me.
The only thing I didn't understand was the other day, me and Latoya went over for Amy C to do my hair before school. I talked to Cindy about how her and her boyfriend were doing. Amy said she was sorry she was busy and couldn't do my hair. We started talking about 80's bands with Cindy. Amy told Latoya, are you getting Shannon's name tattooed on your neck? I left then. Latoya made an appointment to get her hair braided. We left Amy G said Cindy told her, her client was complaining. I told Amy G there was not anything inappropriate about the conversation.  1:11

Amy C is not happy and feels like the complaints are nothing she knew about. She feels like Delise is out to her. I told her Delise has never said anything to me except the thing



D - 00229  Carpenter v Regis

about getting a higher standard in here and I think it was just the way she worded it. I told Amy C I don't have time for all this talking.  1:15

Amy Carpenter had asked for an investigation about customer complaints filed against her. After speaking with stylists, managers, and customers involved, we feel Amy Carpenter has falsely accused Delise and other stylists of misconduct. One complaint about a customer stated that she felt that she was over charged. After following up on the charges, we discovered Amy Carpenter had, in fact, overcharged a customer stating it was a conditioning treatment. No conditioning treatment was charged on the computer. However, a $40.00 misc. charge was. Other employees in the salon stated that they felt the customer was also overcharged for the service. Amy Carpenter has also called other customers at home and asked them to call me to complain about Delise and the company. Amy Carpenter sent a letter to Amy Edwards stating that it is was from Amy Grace as referenced to her current job. The letter Amy Grace had given her for a school application. The letter had been altered to look as though it applied to her present performance. After following up on her statements to me, I found that she had not only taken things out of context, she had also lied to make her point. All notes from the conversations are being forwarded to the corporate office to the attention of Amy Edwards.

8/18/06  11:30

My name is April. I'm a customer of Amy C.
Why are you calling me? Because I came in and she was moved. It's too far for me to go the Op.
When was the last time that you talked to her? Friday or Saturday. She just got there Tuesday. She called me on Saturday and said she was moved over there. I'll tell Amy C that you called and want her back over here. I can't talk about individual employees but thank you for calling.

The April lady was out of town until today.

Amy C told Amy G that Shannon told her she lied when she talked to me about when she left Amy C a message. Amy C said I have the message saved. I can prove that she left it yesterday.

I told April to call Toni and tell her that she was in the shop the day Electra came in. I told her that she didn't need to call clients  and get them involved.



D - 00230  Carpenter v Regis

**To Whom It May Concern:**

　　**Amy Carpenter has worked at Hairmasters since November 2005. She has been a team player in all aspects. She is a reliable, which is hard to find. Amy is a devoted and hard worker. She is also a devoted mother of three. When not at work, she is with her children. Amy is someone who is understanding, empathetic to others. I feel that Amy would be a great asset to your company because she has been a great asset to us! If you have any questions, please contact me at (334) 466-4877 or (334)745-4400.**

**Sincerely,**
**Amy Grace**

his is a copy of a refrence letter written around June 30, 2006 in my behalf by my then immediate Salon supervisor.



letter written by Amy Carpenter Amy Grace told is she didnt write this.





EXHIBIT
2

Aug 25 06 10:35a        Scott Alvarez                                    321-939-0291

# REGIS

*143483*

REGIS CORPORATION • 7201 METRO BOULEVARD • MINNEAPOLIS, MINNESOTA 55439 • 952-947-7777 • FAX 952-947-7900

## TERMINATION FORM

**IMPORTANT:**   Please call you salon coordinator as soon as an employee quits or is terminated. You must also
complete this form and mail it to the Home Office, Attn: Payroll Department.

Name of Salon   __Hair Masters__
(i.e. Regis        MasterCuts        SmartStyle)

Salon Number   __60885__

Salon Location   __Tiger Town__        __Opelika__        __Al.__
Mall Name                 City                      State

Employee's Name   __Amy Carpenter__

Social Security Number   ~~███~~ - ~~██~~ - ~~████~~        Today's Date   __8/18/2006__

| LAST DAY WORKED:   __8__/__18__/__2006__ |
|---|
| Mo.    Day    Yr. |

Check One: Voluntary Termination _____        Discharged   __✓__

If voluntary termination, reason for leaving: _____

_____

_____

IF DISCHARGED, GIVE SPECIFIC REASON: __Amy is being terminated for__
__violating the following security regulations # 1, 12, 15 & 21.__
__All notes following Amy's request for an investigation__
__are being sent with this Termination ~~notes~~__

Would you recommend for re-hire? (Yes)  No (Circle One)
If no, reason: _____

If moving to another city and/or state, Where? _____

Signature of Manager or Supervisor: __Toni Wright__

4534 Rev. 04/02 Printed in the U.S.A.

EXHIBIT
3

# Company Security Regulations

The following conduct is against the best interests of the company, its employees and its customers. Any employee who engages in any of the conducts listed below will be subject to discipline up to and including dismissal. This list is not necessarily complete and may be amended from time to time.

1. Allowing persons other than Company employees behind the reception desk or in the salon dispensary.

2. Leaving the cash drawer open between transactions.

3. Moving merchandise or products into or out of the salon without proper documentation and authorization.

4. Leaving the salon unattended during work hours.

5. Leaving the salon keys unsecured.

6. Failure to make at least one bank deposit daily as assigned by salon manager.

7. Failure to comply with company policy regarding acceptance of personal checks as payment for salon services and/or products.

8. Cashing personal checks in the cash drawer for oneself, another employee, or non-employee.

9. Theft, intentional destruction or the unauthorized use of any property belonging to the Company, a customer or a co-worker, including but not limited to merchandise, money or supplies.

10. Failure to charge for products, supplies or services rendered for ANY reason without prior approval of either the manager or a supervisor.

11. Failure to accurately record payments on the P.O.S. or to place monies received from customers into the cash drawer or register immediately following the completion of the service or product sale.

12. Charging customers for salon services at prices other than those posted on the salon's price list or as ticketed, unless such price is authorized by an appropriate Company supervisor.

13. Rendering free or discounted services to anyone other than a Company employee without the prior approval of a supervisor or manager.

14. Discarding or voiding a sales ticket without authorization.

15. Use of product other than approved "back-bar" items when performing services.

16. Intentional falsification of Company records, including but not limited to time sheets, payroll records, appointments books, tickets, or any P.O.S. entry.

17. Failure to accurately report all hours worked, including attendance at company meetings and training sessions.

18. Failure to follow salon closing procedures, including bank deposit procedure.

19. Sale, use or possession of illegal drugs or alcohol on salon premise or reporting to work under the influence of illegal drugs or alcohol.

20. Possession or use of a weapon on salon premises or at any company-sponsored function.

21. Any other misconduct which adversely affects the Company.



EXHIBIT

4

